UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION (Successor To The Connecticut National Bank), Not in its Individual Capacity but Solely As Owner Trustee Under Certain Trust Agreements, | : | **ECF CASE** |
| | : | |
| | : | Case No. 07 CIV 11131 (DLC) |
| | : | |
| Plaintiff, | : | |
| | : | **DECLARATION OF MARC E.** |
| | : | **ISSERLES, ESQ. IN SUPPORT** |
| - against - | : | **OF MOTION TO DISMISS THE** |
| | : | **COMPLAINT** |
| | : | |
| SOUTHWEST AIRLINES CO., | : | |
| | : | |
| Defendant. | | |

------------------------------------------------------------------ X

MARC E. ISSERLES, an attorney duly admitted to practice before this Court and before the courts of the State of New York, hereby declares the following to be true under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  Annexed hereto as Exhibit A is a true and correct copy of the Lease Agreement [Trust B], dated June 1, 1987, between The Connecticut National Bank, predecessor-in-interest to Plaintiff U.S. Bank National Association, and Defendant Southwest Airlines Co. ("Southwest").

2.  Annexed hereto as Exhibit B is a true and correct copy of the October 19, 2007 e-mail from Michael Kortschak of Southwest to DaimlerChrysler (the owner of the underlying trust assets), and attached Specification Sheets describing the engines that Southwest offered to return with the aircraft.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       January 25, 2008

Marc E. Isserles (MI 6446)
misserles@cohengresser.com

Exhibit A

**LEASE AGREEMENT**

[TRUST B]

Dated as of

June 1, 1987

between

THE CONNECTICUT NATIONAL BANK,

not in its individual capacity, except as expressly
provided herein, but solely as Owner Trustee,
Lessor

and

SOUTHWEST AIRLINES CO.,

Lessee

One Boeing 737-3H4 Aircraft

To the extent, if any, that this Lease constitutes chattel paper
(as such term is defined in the Uniform Commercial Code as in
effect in any applicable jurisdiction) no security interest in
this Lease may be created through the transfer or possession of
any counterpart other than the original executed counterpart,
which shall be identified as the counterpart containing the
receipt therefor executed by the Mortgagee (as defined herein) on
the signature page thereof.

# TABLE OF CONTENTS TO LEASE AGREEMENT

Page

SECTION 1.    Definitions...................................    1
SECTION 2.    Lease........................................   12
SECTION 3.    Term and Rent................................   12
              (a)   Interim Term and Basic Term............   12
              (b)   Interim Rent............................   12
              (c)   Basic Rent..............................   12
              (d)   Adjustments to Basic Rent
                    and Supplemental Rent...................   12
              (e)   Supplemental Rent.......................   15
              (f)   Payments in General.....................   15

SECTION 4.    Lessor's Representations and Warranties.......   16
SECTION 5.    Return of the Aircraft.......................   17
              (a)   Condition Upon Return...................   17
              (b)   Return of the Engines...................   20
              (c)   Fuel; Manuals..........................   21
              (d)   Storage Upon Return.....................   21
              (e)   Aid in Disposition.....................   21
SECTION 6.    Liens........................................   22
SECTION 7.    Registration, Maintenance and
                    Operation; Possession and Subleases;
                    Insignia...............................   22
              (a)   Registration, Maintenance and
                    Operation..............................   22
              (b)   Possession and Subleases...............   23
              (c)   Insignia...............................   27
SECTION 8.    Replacement of Parts; Alterations,
                    Modifications and Additions............   28
              (a)   Replacement of Parts...................   28
              (b)   Pooling of Parts.......................   29
              (c)   Alterations, Modifications and
                    Additions..............................   29
SECTION 9.    Voluntary Termination: Obsolete
                    or Surplus Aircraft....................   31
              (a)   Termination Event......................   31
              (b)   Sale of the Aircraft...................   32
              (c)   Termination as to Engines..............   34
SECTION 10.   Loss, Destruction, Requisition, etc..........   34
              (a)   Event of Loss with Respect to
                    the Aircraft...........................   34
              (b)   Event of Loss with Respect to
                    an Engine..............................   37
              (c)   Application of Payments from
                    Governmental Authorities for
                    Requisition of Title, etc..............   38

|   |   |   |
|---|---|---|
| (d) | Requisition for Use of the Aircraft by the United States Government.......... | 39 |
| (e) | Requisition for Use of an Engine by the United States Government............ | 39 |
| (f) | Application of Payments During Existence of Event of Default............ | 39 |
| SECTION 11. | Insurance................................... | 40 |
| (a) | Public Liability and Property Damage Insurance......................... | 40 |
| (b) | Insurance Against Loss or Damage to the Aircraft.................... | 41 |
| (c) | Reports, etc............................. | 44 |
| (d) | Self-Insurance........................... | 45 |
| (e) | Additional Insurance by Lessor and Lessee............................. | 45 |
| (f) | Indemnification by Government in Lieu of Insurance....................... | 45 |
| (g) | Application of Payments During Existence of an Event of Default........ | 46 |
| SECTION 12. | Inspection.................................. | 46 |
| SECTION 13. | Assignment.................................. | 46 |
| SECTION 14. | Events of Default........................... | 47 |
| SECTION 15. | Remedies.................................... | 49 |
| SECTION 16. | Lessee's Cooperation Concerning Certain Matters.......................... | 53 |
| SECTION 17. | Notices..................................... | 54 |
| SECTION 18. | No Set-Off, Counterclaim, etc............... | 55 |
| SECTION 19. | Renewal Option; Purchase Options; Valuation... | 56 |
| (a) | Renewal Option........................... | 56 |
| (b) | Purchase Options......................... | 57 |
| (c) | Valuation................................ | 57 |
| SECTION 20. | Security for Lessor's Obligation to Holders of Loan Certificates...................... | 58 |
| SECTION 21. | Lessor's Right to Perform for Lessee.......... | 59 |
| SECTION 22. | Investment of Security Funds; Liability of Lessor Limited.............. | 59 |
| (a) | Investment of Security Funds............. | 59 |
| (b) | Liability of Lessor Limited.............. | 60 |
| SECTION 23. | Submission to Jurisdiction.................... | 60 |
| SECTION 24. | Miscellaneous............................... | 60 |
| SECTION 25. | Successor Trustee........................... | 61 |
| TESTIMONIUM.................................... | | 62 |
| SIGNATURES..................................... | | 62 |
| EXHIBIT A -................................Form of Lease Supplement | | |
| EXHIBIT B -...............................Basic Rent Schedule | | |
| EXHIBIT C -....................Stipulated Loss Value Schedule | | |
| EXHIBIT D -......................Termination Value Schedule | | |
| EXHIBIT E -.................Schedule of Permitted Sublessees | | |

## LEASE AGREEMENT

### [TRUST B]

This LEASE AGREEMENT [TRUST B], dated as of June 1, 1987, between THE CONNECTICUT NATIONAL BANK, not in its individual capacity, except as expressly provided herein, but solely as Owner Trustee under the Trust Agreement (as defined in Section 1 hereof) (in such capacity, "Lessor"), and SOUTHWEST AIRLINES CO., a corporation organized and existing pursuant to the laws of the State of Texas ("Lessee").

### WITNESSETH:

SECTION 1.  Definitions.

Unless the context otherwise requires, the following terms shall have the following meanings for all purposes of this Lease Agreement and shall be equally applicable to both the singular and the plural forms of the terms herein defined:

"Affiliate" means, with respect to any person, any other person directly or indirectly controlling, controlled by or under common control with such person.

"Aircraft" means, as the context may require, the Airframe delivered and leased hereunder (or any airframe from time to time substituted for such Airframe pursuant to Section 10(a) hereof) together with the Engines initially installed thereon and leased hereunder (or any engine substituted for any of such Engines pursuant to the terms hereof), whether or not any of such initial or substituted Engines may from time to time be installed on such initial or any substituted Airframe or may be installed on any other airframe or on any other aircraft.

"Airframe" means: (i), as the context may require, the Boeing 737-3H4 aircraft (except Engines or engines from time to time installed thereon) specified in the initial Lease Supplement, manufactured by the Manufacturer and transferred by the Manufacturer to Lessee and by Lessee to Lessor pursuant to the bills of sale referred to in subparagraphs (8), (9), (10) and (11), respectively, of paragraph 4(a)(i) of the Participation Agreement, which aircraft shall be leased by Lessor to Lessee hereunder and under such Lease Supplement, and any aircraft (except Engines or engines from time to time installed thereon) which may from time to time be substituted for such aircraft (except Engines

or engines from time to time installed thereon) pursuant to Section 10(a) hereof; (ii) all Buyer-Furnished Equipment; and (iii) any and all other Parts (A) so long as the same shall be incorporated or installed in or attached to such aircraft (except Engines or engines from time to time installed thereon), or (B) so long as title thereto shall remain vested in Lessor in accordance with the terms of Section 8 after removal from such aircraft (except Engines or engines from time to time installed thereon); provided, however, that at such time as an aircraft (except Engines or engines from time to time installed thereon) shall be deemed part of the property leased hereunder in substitution for the Airframe pursuant to the applicable provisions hereof, the replaced Airframe shall cease to be the Airframe hereunder.

"Applicable Rate" means as of any date the weighted average interest rate borne by the Loan Certificates then outstanding; provided, however, when the Loan Certificates are no longer outstanding, "Applicable Rate" shall mean the Base Rate.

"Base Rate" means the rate of interest announced from time to time by The Chase Manhattan Bank, N.A. at its principal office in New York, New York as its "reference rate".

"Basic Rent" means, for the Basic Term, the rent payable for the Aircraft pursuant to Section 3(c) as adjusted as provided in Section 3(d) and, for any Renewal Term, Basic Rent determined pursuant to Section 19.

"Basic Term" means, with respect to the Aircraft, the term commencing on the Commencement Date for which the Aircraft is initially leased hereunder pursuant to Section 3(a) hereof.

"Buyer-Furnished Equipment" means the equipment furnished by Lessee and incorporated in the Airframe prior to, on or promptly after the date of delivery from the Manufacturer, but only to the extent such equipment does not qualify as "transition property" under Code Section 49(e).

"Business Day" means any day other than a Saturday or Sunday or a day on which commercial banks are required or authorized to close in the City of New York, New York; Dallas, Texas; or Hartford, Connecticut.

-2-

"Certificate Holder" means Certificate Holder as defined in the Trust Indenture.

"Code" means the Internal Revenue Code of 1986, as amended through the Delivery Date.

"Commencement Date" means November 1, 1987.

"Commitment" means the Commitment of each of the Owner Participant and the Loan Participants as defined in Section 1(c) of the Participation Agreement.

"Delivery Date" means the date of the initial Lease Supplement, which date shall be the date the Aircraft is leased by Lessor to Lessee and accepted by Lessee hereunder.

"Dollars" and "$" mean the lawful currency of the United States of America.

"Engine" means (i) each of the two CFM International Model CFM 56-3-B1 engines listed by manufacturer's serial number in the initial Lease Supplement in connection with the Airframe, whether or not from time to time installed on such Airframe or installed on any other airframe or on any other aircraft; and (ii) any engine which may from time to time be substituted, pursuant to the terms hereof, for any of such engines, together in each case with any and all Parts incorporated or installed in or attached thereto or any and all Parts removed therefrom so long as title thereto shall remain vested in Lessor in accordance with the terms of Section 8 after removal from such engine; provided, however, that at such time as an engine shall be deemed part of the property leased hereunder in substitution for an Engine pursuant to the applicable provisions hereof, the replaced Engine shall cease to be an Engine hereunder. The term "Engines" means, as of any date of determination, all Engines then leased hereunder.

"Event of Default" has the meaning specified in Section 14.

"Event of Loss" with respect to the Aircraft or Airframe or any Engine means any of the following events with respect to such property: (i) the loss of such property or the use thereof due to the destruction of or damage to such property which renders repair uneconomic

-3-

or which renders such property permanently unfit for
normal use by Lessee for any reason whatsoever; (ii) any
damage to such property which results in an insurance
settlement with respect to such property, on the basis
of a total loss, or a constructive or compromised total
loss; (iii) the disappearance or the theft of such
property for a period in excess of 120 days; (iv) the
confiscation, condemnation, or seizure of, or
requisition of title to, or use of, such property (A) by
the United States Government (or any of its agencies or
instrumentalities) for a period in excess of one year
with respect to use or two months with respect to title,
or (B) by any foreign government for a period in excess
of 180 days with respect to use or two months with
respect to title, which shall have resulted in the loss
of possession or use of such property by Lessee for the
period so specified; (v) as a result of any law, rule,
regulation, order or other action by the Federal
Aviation Administration, the Department of
Transportation or other governmental body (including,
without limitation, any court) having jurisdiction, the
use of such property in the normal course of the
business of air transportation of persons or cargo shall
have been prohibited for a period of 180 consecutive
days, unless Lessee, prior to the expiration of such
180-day period, shall have undertaken and shall be
diligently carrying forward all steps which are
necessary or desirable to permit the normal use of such
property by Lessee or, in any event, if such use shall
have been prohibited as of the last day of the Term; and
(vi) any divestiture of title to an Engine treated as an
Event of Loss pursuant to Section 7(b) hereof.  An Event
of Loss with respect to the Aircraft shall be deemed to
have occurred if an Event of Loss occurs with respect to
the Airframe.

     "Federal Aviation Act" means the Federal Aviation
Act of 1958, as amended.

     "Federal Aviation Administration" and "FAA" mean
the United States Federal Aviation Administration and
any successor agency or agencies thereto.

     "Interim Term" means the period commencing on the
Delivery Date and ending on and including the day
immediately preceding the Commencement Date unless
earlier terminated in accordance with the provisions
hereof.

-4-

"Investment Grade" means a rating of any nationally recognized bond rating service equivalent to or better than a Moody's Investors Services, Inc. rating of "Baa 3."

"Lease Agreement", "this Lease Agreement", "this Lease", "this Agreement", "herein", "hereof", "hereunder", "hereby" or other like words mean this Lease Agreement [Trust B] as originally executed or as modified, amended or supplemented pursuant to the applicable provisions hereof and in accordance with the Trust Agreement and the Trust Indenture, including, without limitation, supplementation hereof by one or more Lease Supplements entered into pursuant to the applicable provisions hereof.

"Lease Period" means, with respect to the Aircraft, each of the consecutive semi-annual periods throughout the Basic Term and any Renewal Term, the first such period commencing on and including the Commencement Date and each of the remaining periods commencing on and including the next following Lease Period Date (other than the last such date).

"Lease Period Date" means November 1, 1987 and each succeeding May 1 and November 1 to and including the last day of the Term.

"Lease Supplement" means a Lease Supplement, substantially in the form of Exhibit A hereto, to be entered into between Lessor and Lessee on the Delivery Date for the purpose of leasing the Aircraft under and pursuant to the terms of this Lease Agreement, and any subsequent Lease Supplement entered into in accordance with the terms hereof.

"Lease Year" means the period November 1, 1987 through October 31, 1988 and each consecutive 12-month period thereafter throughout the Term.

"Lessor Liens" means any Lien or disposition of title arising as a result of (i) claims against Lessor, The Connecticut National Bank, in its individual capacity, or the Owner Participant or any Affiliate of any of the foregoing not related to the transactions contemplated by the Operative Documents, (ii) any act or omission of the Owner Participant, Lessor, or The Connecticut National Bank, in its individual capacity, or any Affiliate of any of the foregoing which is not related to the transactions contemplated by the

-5-

Operative Documents or is in violation of any of the terms of the Operative Documents, (iii) claims against the Owner Participant, Lessor, or The Connecticut National Bank, in its individual capacity, or any Affiliate of any of the foregoing with respect to Taxes or Expenses (as those terms are defined in Sections 7(b) and (c) of the Participation Agreement) against which Lessee is not required to indemnify the Owner Participant, Lessor or The Connecticut National Bank, in its individual capacity, or any Affiliate of any of the foregoing pursuant to Section 7 of the Participation Agreement or (iv) claims against Lessor or the Owner Participant or any Affiliate of any of the foregoing arising out of any transfer by Lessor or the Owner Participant of all or any portion of the respective interests of Lessor or the Owner Participant or any Affiliate of any of the foregoing in the Aircraft, the Trust Estate or the Operative Documents other than the transfer of possession of such Aircraft by Lessor pursuant to this Agreement, the transfer pursuant to the Trust Indenture or a transfer of the Aircraft pursuant to Section 9, 10 or 19 hereof or pursuant to the exercise of the remedies set forth in Section 15 hereof.

"Lessor's Cost" for the Aircraft means the amount therefor set forth in the initial Lease Supplement.

"Lien" means any mortgage, pledge, lien, charge, claim, encumbrance, lease, sublease, sub-sublease or security interest.

"Loan Certificates" shall have the meaning assigned to that term in the Trust Indenture.

"Loan Participants" means the institutions listed on Schedule I to the Participation Agreement and their respective successors and assigns.

"Manufacturer" means The Boeing Company, a Delaware corporation.

"Mortgagee" means the Mortgagee under the Trust Indenture, and any entity appointed as successor mortgagee under the Trust Indenture.

"Net Economic Return" means the Owner Participant's after-tax book yield and aggregate after-tax cash flow (both as to timing and as to amount) utilizing the multiple investment sinking fund method of analysis, computed on the basis of the same methodology and

-6-

assumptions as were utilized by the Owner Participant in determining Basic Rent, Stipulated Loss Values and Termination Values as of the date hereof; provided, however, that in the event of a refinancing pursuant to Section 9 of the Participation Agreement, "Net Economic Return" shall thereafter mean such yield and cash flow computed on the basis of the same methodology and assumptions as were utilized by the Owner Participant in determining Basic Rent, Stipulated Loss Values and Termination Values set forth in the Refinancing Certificate referred to in Section 9 of the Participation Agreement as of the date Lessee accepts such Refinancing Certificate.

"Net Present Value of Rents" means the net present value, as of the Delivery Date, of Basic Rent discounted at the Applicable Rate.

"Operative Documents" and "Operative Document" have the meanings specified in Section 4(a)(i) of the Participation Agreement.

"Owner Participant" means Chrysler Capital Corporation, a Delaware corporation, and any person to which it transfers all its right, title and interest in and to the Trust Agreement, the Trust Estate and the Participation Agreement, to the extent permitted by Section 8.01 of the Trust Agreement and Section 8(m) of the Participation Agreement.

"Participants" means the Owner Participant and the Loan Participants.

"Participation Agreement" means that certain Participation Agreement [Trust B], dated as of the date hereof, among Lessee, the Loan Participants, the Mortgagee, the Owner Participant and Lessor, as such Participation Agreement may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

"Parts" means all appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than (a) complete Engines or engines and (b) any items leased by Lessee from a third party (other than Lessor)) which may from time to time be incorporated or installed in or attached to the Airframe or any Engine or so long as title thereto shall remain vested in Lessor in accordance with Section 8 after removal therefrom.

-7-

"Past Due Rate" means (i) with respect to the portion of any payment of Rent that may be required to be paid to the Mortgagee or to the holders of any outstanding Loan Certificates, a rate per annum equal to 2% over the rate of interest borne by such Loan Certificates and (ii) with respect to the remaining portion of any payment of Rent (and the entire amount of any payment of Rent after the satisfaction and discharge of the Trust Indenture), a rate per annum equal to 2% over the Base Rate but in no event to exceed the maximum rate permitted by applicable law.

"Permitted Lien" means any Lien referred to in clauses (i) through (vii) of Section 6 hereof.

"Permitted Sublessee" means any "foreign air carrier" (as defined in the Federal Aviation Act) listed in Exhibit E hereto; provided, however, that (i) Lessor or Mortgagee may, in the exercise of its reasonable business judgment, by written notice to Lessee, remove any foreign air carrier from Exhibit E and (ii) Lessee may, by written notice to Lessor, request that any foreign air carrier be added to Exhibit E, subject to Lessor's and Mortgagee's prior written consent, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, no deletion of an airline from the list of Permitted Sublessees pursuant hereto shall affect any existing Sublease or other agreement providing for transfer of possession of the Aircraft, Airframe, any Engine or Part which was permitted hereunder at the time entered into, or preclude any subsequent renewal or extension of such Sublease or other agreement to which the Permitted Sublessee under a Sublease is entitled by the terms thereof as originally in effect.

"Purchase Agreement" means Purchase Agreement No. 1099, dated as of May 29, 1981, between the Manufacturer and Lessee providing, among other things, for the manufacture and sale by the Manufacturer to Lessee of certain Boeing Model 737-300 series aircraft (including the Aircraft), as the same has been or may hereafter (to the extent permitted by the terms of the Operative Documents) be amended, modified or supplemented and including, without limitation, as part thereof, the detail specifications referred to therein and any and all change orders from time to time entered into with respect thereto (to the extent permitted by the terms of the Operative Documents), as such Purchase Agreement

-8-

relates to the Aircraft.

"Purchase Agreement Assignment" means the Purchase Agreement Assignment [Trust B], dated as of the date hereof, between Lessor and Lessee, as the same may be amended, supplemented or modified from time to time, with a form of Consent and Agreement to be executed by the Manufacturer attached thereto.

"Renewal Term" means any of the successive periods (each of a whole number of Lease Periods) of not less than two years each nor more than five years in the aggregate which follow the end of the Basic Term with respect to which Lessee shall have exercised its option pursuant to Section 19(a) hereof.

"Rent" means Basic Rent and Supplemental Rent, collectively.

"Stipulated Loss Value" with respect to the Aircraft as of any date through and including November 1, 2007, means the sum of (x) the amount determined by multiplying the Lessor's Cost of the Aircraft by the percentage set forth in Exhibit C hereto opposite the Stipulated Loss Value Date next preceding the date on which Stipulated Loss Value is being paid (or, if such payment date is a Stipulated Loss Value Date, by the percentage set forth opposite such Stipulated Loss Value Date), and (y) daily interest on the amount described in clause (x) above calculated at the Applicable Rate from and including such Stipulated Loss Value Date to but excluding the date of such payment, and (z) such additional amount, whether positive or negative (determined in accordance with the procedures set forth in Section 3(d)), as is necessary to maintain Lessor's Net Economic Return by providing for any tax consequences of the Event of Loss that are not fully provided for in accordance with the preceding clauses (x) and (y), but only to the extent that such tax consequences relate solely to depreciation or tax basis of the Aircraft and would have been properly provided for if the Stipulated Loss Value for purposes of Section 10(a) had been determined as of the date of occurrence of the Event of Loss.

Anything contained in this Lease to the contrary notwithstanding, Stipulated Loss Value with respect to the Aircraft as of any date shall equal under any circumstances and in any event, an amount at least sufficient to pay in full any payments then required to

-9-

be made on account of the principal of and interest on the Loan Certificates issued in connection with such Aircraft; <u>provided</u> that no Stipulated Loss Value payment shall be increased by reason of (i) any attachment or diversion of Rent on account of Lessor Liens or any other Lien on or against the Trust Estate, any part thereof or the Operative Documents arising as a result of claims against the Mortgagee or a Certificate Holder (or any Affiliate of the Mortgagee or any Certificate Holder) not related to the transactions contemplated by the Operative Documents, (ii) any modification of the payment terms of the Loan Certificates without the prior written consent of Lessee, or (iii) the acceleration of any Loan Certificate or Loan Certificates due to the occurrence of an "Event of Default" (as defined in the Trust Indenture) which does not constitute an Event of Default hereunder.

Stipulated Loss Value with respect to the Aircraft as of any date after November 1, 2007 shall be the amount determined for such Aircraft as provided in Section 19(a) hereof.

"Stipulated Loss Value Date" means each date listed on Exhibit C hereto.

"Sublease" means any sublease permitted by the terms of Section 7(b)(viii) hereof.

"Sublessee" means any person for so long, but only so long, as such person is in possession of the Airframe and/or any Engine pursuant to the terms of a Sublease which is then in effect pursuant to Section 7(b)(viii) hereof.

"Supplemental Rent" means all amounts, liabilities and obligations (other than Basic Rent) which Lessee assumes or agrees to pay to Lessor or others hereunder, under the Participation Agreement, under the Tax Indemnity Agreement or under any of the other Operative Documents.

"Tax Indemnity Agreement" means that certain Tax Indemnity Agreement [Trust B], dated as of the date hereof, between the Owner Participant and Lessee, as originally executed or as modified, amended or supplemented pursuant to the applicable provisions thereof.

-10-

"Term" means, with respect to the Aircraft, the Interim Term, Basic Term and, if actually entered into, any Renewal Term for such Aircraft.

"Termination Value" with respect to the Aircraft as of any date through the Basic Term means the amount determined by multiplying Lessor's Cost for the Aircraft by the percentage specified in Exhibit D hereto opposite the Lease Period Date with respect to which the amount is determined.

Anything contained in this Lease to the contrary notwithstanding, Termination Value with respect to the Aircraft as of any Lease Period Date shall equal under any circumstances and in any event, an amount at least sufficient to pay in full any payments then required to be made on account of the principal of and interest on the Loan Certificates issued in connection with such Aircraft; provided that no Termination Value payment shall be increased by reason of (i) any attachment or diversion of Rent on account of (A) Lessor Liens or any other Lien on or against the Trust Estate or any part thereof or the Operative Documents arising as a result of claims against the Mortgagee or a Certificate Holder (or any Affiliate of the Mortgagee or any Certificate Holder) not related to the transactions contemplated by the Operative Documents, (ii) any modification of the payment terms of the Loan Certificates without the prior written consent of Lessee, or (iii) the acceleration of any Loan Certificate or Loan Certificates due to the occurrence of an "Event of Default" (as defined in the Trust Indenture) which does not constitute an Event of Default hereunder.

"Trust Agreement" means that certain Trust Agreement [Trust B], dated as of the date hereof, between the Owner Participant and The Connecticut National Bank, in its individual capacity, as originally executed or as modified, amended or supplemented pursuant to the applicable provisions thereof, including, without limitation, supplementation thereof by one or more Trust Supplements entered into pursuant to the applicable provisions thereof.

"Trust Estate" means the Trust Estate as that term is defined in the Trust Agreement.

"Trust Indenture" means that certain Trust Indenture and Security Agreement [Trust B], dated as of the date hereof, between Lessor and the Mortgagee, as

-11-

originally executed or as modified, amended or supplemented in accordance with the provisions thereof.

"Trust Supplement" means a supplement to the Trust Agreement and the Trust Indenture, substantially in the form of Exhibit A to the Trust Indenture.

"U.S. Air Carrier" means any United States air carrier as to which there is in force a certificate issued pursuant to Section 401 of the Federal Aviation Act, as to which there is in force an air carrier operating certificate issued pursuant to Part 121 of the regulations under such Act and a certificate of public convenience and necessity or which may operate as an air carrier by certification or otherwise under any successor or substitute provisions therefor and which is not then in bankruptcy or reorganization proceedings.

SECTION 2.  Lease.

Lessor hereby agrees to lease to Lessee hereunder, and Lessee hereby agrees to lease from Lessor hereunder, the Aircraft as evidenced by the execution by Lessor and Lessee of a Lease Supplement leasing such Aircraft hereunder.

SECTION 3.  Term and Rent.

(a)  Interim Term and Basic Term.  The Interim Term for the Aircraft shall commence on the Delivery Date and end on and include the day immediately preceding the Commencement Date unless earlier terminated with respect to such Aircraft pursuant to the provisions hereof.  The Basic Term for the Aircraft shall commence on the Commencement Date and end on the date twenty (20) years after the Commencement Date, or such earlier date as this Lease may be terminated with respect to such Aircraft in accordance with the provisions hereof.

(b)  Interim Rent.  No Basic Rent shall be payable with respect to the Interim Term.

(c)  Basic Rent.  On each Lease Period Date during the Basic Term, Lessee shall pay Basic Rent for the Aircraft in the respective amounts indicated in Exhibit B hereto.  Each installment of Basic Rent shall relate to the respective Lease Period specified in Exhibit B.  For federal income tax purposes the aggregate amount of Basic Rent that relates to the two Lease Periods includable in each Lease Year shall accrue ratably over the respective Lease Year.

(d)  Adjustments to Basic Rent and Supplemental Rent.

-12-

(i)  In the event that (A) the Delivery Date
occurs other than on June 2, 1987 or (B)
Transaction Expenses (as defined in Section 16(a)
of the Participation Agreement) are other than
1.575945% of Lessor's Cost, or (C) the Applicable
Rate is not 10.18166% per annum or (D) a
refinancing of the Loan Certificates pursuant to
Section 9 of the Participation Agreement occurs, or
(E) Lessee notifies Lessor that any portion of
Lessor's Cost is attributable to Buyer-Furnished
Equipment, then in each case, the Basic Rent
percentages set forth in Exhibit B and Stipulated
Loss Value percentages set forth in Exhibit C and
the Termination Value percentages set forth in
Exhibit D shall be recalculated by the Owner
Participant, on or prior to the Lease Period Date
next following the event in order to:  (A) maintain
the Owner Participant's Net Economic Return and (B)
minimize the Net Present Value of Rents to Lessee
to the extent possible consistent with clause (A).

(ii)  Any recalculation of Basic Rent,
Stipulated Loss Value and Termination Value
percentages pursuant to this Section 3(d) shall be
determined by the Owner Participant and shall be
subject to the verification of Babcock & Brown
Financial Corporation ("Babcock & Brown").  Such
recalculated Basic Rent, Stipulated Loss Value and
Termination Value percentages shall be set forth in
a Lease Supplement and, in the case of Basic Rent,
shall become effective as of the next succeeding
Lease Period Date and, in the case of Stipulated
Loss Value and Termination Value, shall be
retroactive to the inception of this Lease.  Such
recalculated Basic Rent shall be determined so as
to conform to the requirements of Section 467 of
the Code and Sections 4.(1)(B), 4.(6) and 5. of
Revenue Procedure 75-21, 75-1 Cum. Bull. 715.
Anything contained in the Participation Agreement
or this Lease to the contrary notwithstanding, each
installment of Basic Rent payable hereunder,
whether or not adjusted in accordance with this
Section 3(d), shall be under any circumstances and
in any event, in an amount at least sufficient to
pay in full, on the Lease Period Date on which such
installment of Basic Rent is due, any payments then
required to be made on account of the principal of
and interest (including, without limitation, any
interest on overdue principal and, to the extent

-13-

permitted by applicable law, interest) on the Loan Certificates; _provided_ that no installment of Basic Rent shall be adjusted by reason of (i) any attachment or diversion of Rent on account of Lessor Liens or any other Lien on or against the Trust Estate, any part thereof or the Operative Documents arising as a result of claims against the Mortgagee or a Certificate Holder (or any Affiliate of Mortgagee or any Certificate Holder) not related to the transactions contemplated by the Operative Documents, (ii) any modification of the payment terms of the Loan Certificates made without the prior written consent of Lessee or (iii) the acceleration of any Loan Certificate or Loan Certificates due to the occurrence of an "Event of Default" (as defined in the Trust Indenture) which does not constitute an Event of Default hereunder.

If, upon verification of the percentages determined by the Owner Participant pursuant to this Section 3(d), Babcock & Brown does not agree with the determination of the Owner Participant, then, unless Lessor and Lessee shall agree with the computations of Babcock & Brown, an independent accounting or lease brokerage firm, to be selected jointly by the Owner Participant and Lessee, or if they cannot agree, by the American Arbitration Association (or any successor organization thereto) in New York, New York, shall determine the appropriate computations.  Such firm shall be requested to make its determination within 30 days.  The Owner Participant and Babcock & Brown shall provide to such firm such information as it may reasonably require, including a description of the methodology of the calculation used in computing such adjustment and such other information as is necessary to determine whether the computation is mathematically accurate.  The accounting or lease brokerage firm shall hold in strict confidence such methodology and information.  The computations of the Owner Participant, Babcock & Brown or the firm selected as provided above, whichever is applicable, shall be final, binding and conclusive upon Lessee and Lessor, and Lessee shall have no right to inspect the books, records, tax returns or other documents of or relating to the Owner Participant to verify such computations or for any other purpose in connection with such adjustment.  All fees and expenses payable under this paragraph shall be

-14-

borne by Lessee except that those fees and expenses shall be payable by the Owner Participant if the computations provided by the firm are different from those provided by the Owner Participant and the difference in the Basic Rent, computed on a present value basis, is greater than 10 percent.

(e)  Supplemental Rent.  Lessee shall pay (or cause to be paid) promptly to Lessor, or to whomsoever shall be entitled thereto, any and all Supplemental Rent with respect to Stipulated Loss Value or Termination Value as the same shall become due and owing and all other amounts of Supplemental Rent within five days after demand or such other relevant period as may be provided in any Operative Document, and in the event of any failure on the part of Lessee to pay any Supplemental Rent, Lessor shall have all rights, powers and remedies provided for herein or in any other Operative Document or by law or equity or otherwise in the case of nonpayment of Basic Rent.  Lessee also will pay to Lessor, or to whomsoever shall be entitled thereto, on demand, as Supplemental Rent, to the extent permitted by applicable law, interest at the Past Due Rate on any part of any installment of Basic Rent not paid when due for any period for which the same shall be overdue and on any payment of Supplemental Rent (other than interest comprised in Supplemental Rent) not paid when due for the period until the same shall be paid.  Whenever any interest is payable pursuant to this Section 3(e), such interest shall be computed on the basis of a year or 365 or 366 days, as the case may be, and actual days elapsed.  Lessee also will pay to or on behalf of Lessor, as Supplemental Rent, an amount equal to the premium, if any, payable under the Indenture and the Loan Certificates.

(f)  Payments in General.  All payments of Rent shall be made directly by Lessee (whether or not any Sublease shall be in effect) in Dollars by wire transfer of immediately available funds prior to 11:00 A.M., New York City time, on the date of payment, to Lessor at its office at 777 Main Street, Hartford, Connecticut 06115, Attention: Bond and Trustee Administration (or such other office of Lessor in the continental United States or such other account as Lessor shall direct in a notice to Lessee at least ten Business Days prior to the date such payment of Rent is due); provided that so long as the Trust Indenture shall not have been fully discharged, Lessor hereby directs and Lessee agrees, that, unless the Mortgagee shall otherwise direct, all Rent payable to Lessor and assigned to the Mortgagee pursuant to the Trust Indenture shall be paid prior to 11:00 A.M., New York City time, on the due date thereof directly to the Mortgagee at the office of the Mortgagee, One Constitution Plaza, Hartford, Connecticut 06115, Attention:  Corporate Trust Department.  All payments of Supplemental Rent owing to the Mortgagee or any

-15-

Certificate Holder pursuant to the Participation Agreement shall
be made in Dollars in immediately available funds prior to 11:00
A.M., New York City time, on the due date thereof at the office
of the Mortgagee or at such other office of such other financial
institution located in the continental United States as the party
entitled thereto may so direct at least ten Business Days prior
to the due date thereof.   All payments of Supplemental Rent
payable to the Owner Participant, to the extent that such amounts
constitute Excluded Payments (as defined in the Trust Indenture),
shall be made in Dollars in immediately available funds prior to
11:00 A.M., New York City time, on the due date thereof, to the
account of the Owner Participant specified in Schedule I to the
Participation Agreement.

         Notwithstanding anything to the contrary contained
herein, if any date on which a payment of Rent becomes due and
payable is not a Business Day, then such payment shall not be
made on such scheduled date but shall be made on the next
succeeding Business Day with the same force and effect as if made
on such scheduled date and (provided such payment is made on such
next succeeding Business Day) no interest shall accrue on the
amount of such payment from and after such scheduled date.

         SECTION 4.   Lessor's Representations and Warranties.

         THE AIRCRAFT IS BEING DELIVERED BY LESSOR TO LESSEE "AS
IS".   NEITHER LESSOR, THE MORTGAGEE NOR ANY PARTICIPANT MAKES,
HAS MADE OR SHALL BE DEEMED TO HAVE MADE, AND EACH HEREBY
EXPRESSLY DISCLAIMS, ANY REPRESENTATION OR WARRANTY, EXPRESS OR
IMPLIED, AS TO THE TITLE, AIRWORTHINESS, CONDITION, DESIGN,
OPERATION, MERCHANTABILITY OR FITNESS FOR USE OF THE AIRCRAFT OR
ANY PART THEREOF, AS TO THE ABSENCE OF LATENT OR OTHER DEFECTS,
WHETHER OR NOT DISCOVERABLE, AS TO THE ABSENCE OF ANY
INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, AS TO THE
ABSENCE OF OBLIGATIONS BASED ON STRICT LIABILITY IN TORT, OR ANY
OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED,
WITH RESPECT TO THE AIRCRAFT OR ANY PART THEREOF, except that The
Connecticut National Bank, in its individual capacity, (i)
represents and warrants that on the Delivery Date, Lessor shall
have received whatever title to the Aircraft was conveyed to it
by Lessee, (ii) represents and warrants that on the Delivery Date
the Aircraft shall be free of Lessor Liens attributable to it in
its individual capacity, (iii) covenants that it will not,
through its own actions or inactions, interfere in Lessee's or
any Sublessee's quiet enjoyment of the Aircraft during the Term
so long as this Lease shall not have been declared in default
pursuant to Section 15 hereof, (iv) agrees that it will not
directly or indirectly create, incur, assume or suffer to exist
any Lessor Lien attributable to it in its individual capacity on
or with respect to the Airframe or Engine or any portion of the

-16-

Trust Estate and (v) represents and warrants that it is a "citizen of the United States" as defined in Section 101(16) of the Federal Aviation Act and agrees that if at any time it shall cease to be a "citizen of the United States" within the meaning of Section 101(16) of the Federal Aviation Act, it will promptly resign as Owner Trustee (if and so long as such citizenship is necessary under the Federal Aviation Act as in effect at such time or, if it is not necessary, if and so long as the Owner Trustee's citizenship would have any material adverse effect on Lessee), effective upon the appointment of a successor Owner Trustee in accordance with Section 9.01 of the Trust Agreement. Lessor covenants that during the Term (so long as this Lease shall not have been declared in default pursuant to Section 15 hereof) it will not, through its own actions or inactions, interfere in the quiet enjoyment of the Aircraft by Lessee or any Sublessee and agrees that it will not directly or indirectly create, incur, assume or suffer to exist any Lessor Lien attributable to it on or with respect to the Airframe or any Engine.

### SECTION 5.  Return of the Aircraft.

(a)  Condition Upon Return.  Unless purchased by Lessee pursuant to Section 19 hereof, upon the termination of this Lease at the end of the Basic Term or any Renewal Term or pursuant to Section 9 or 15, Lessee, at its own expense, will return the Aircraft to Lessor at Lessee's principal maintenance facility in the 48 contiguous States of the United States (subject to Section 5(d) hereof).  At the time of such return, the Airframe will be fully equipped with two Engines (or other engines of the same make and model or two other engines of the same or another manufacturer of equivalent utility and value, and suitable for installation and use on the Airframe without impairing the value or utility of the Aircraft) duly installed thereon.  Also, at the time of such return, such Airframe and Engines or engines (i) shall be certificated as an airworthy aircraft by the Federal Aviation Administration (it being understood that the failure of such condition as of the end of the Term under circumstances described in clause (v) of the definition of "Event of Loss" contained herein shall constitute an Event of Loss), (ii) shall be free and clear of all Liens (other than Lessor Liens) and rights of third parties under pooling, interchange, overhaul, repair or other similar agreements or arrangements, (iii) shall be in passenger configuration and in as good operating condition as when delivered to Lessee hereunder, ordinary wear and tear excepted, or, in the case of any such engines owned by Lessee, shall have a value and utility at least equal to, and shall be in as good operating condition as required by the terms hereof with respect to Engines constituting part of the Aircraft but not then installed on the Airframe, (iv) in the event that Lessee (or any

-17-

Sublessee then in possession of such Aircraft) shall not then be using a continuous or "progressive" maintenance program with respect to such Airframe, Lessee agrees that (A) during the period of operation of such Aircraft immediately prior to such return Lessee or such Sublessee, as the case may be, shall have been using a block overhaul program with respect to the Airframe which shall have been approved by all necessary governmental approvals and (B) the Airframe shall have remaining until the next scheduled "C" check (which term, as used in this paragraph, shall include a "C" check and any other check equivalent thereto) at least 50% of the allowable hours between "C" checks permitted under the maintenance program then used by Lessee or such Sublessee, (v) in the event that Lessee (or any Sublessee then in possession of such Aircraft) during the period of operation of such Aircraft immediately prior to such return shall not have been using an on-condition maintenance program with respect to the Engines or engines installed thereon upon return, Lessee agrees that the average number of hours or cycles of operation (whichever shall be applicable under the maintenance program then in use with respect to such Engines or engines) on such Engines. or engines remaining until the next scheduled engine refurbishment shall be at least 25% of the hours or cycles (whichever shall be applicable) between engine refurbishment allowed under the maintenance program then in use with respect to such Engines or engines, and (vi) have all Lessee's and any Sublessee's exterior markings removed or painted over and the areas where such markings were removed or painted over refurbished as necessary to blend with adjacent areas. If clause (iv) of this paragraph shall be applicable to the Airframe but the Airframe does not meet the conditions specified in such clause (iv), Lessee shall perform (or cause to be performed) all maintenance work necessary to meet such conditions or, if Lessor shall so elect, Lessee shall pay or cause to be paid to Lessor a Dollar amount computed by multiplying (i) the current market cost of an airframe block overhaul of the type referred to in such clause iv by (ii) a fraction of which (x) the numerator shall be the excess of 50% of hours of operation allowable between such "C" checks over the actual number of hours of operation remaining on the Airframe to the next such "C" check, and (y) the denominator shall be the number of hours of operation allowable between such "C" checks in accordance with such maintenance program. If clause (v) of this paragraph shall be applicable to any Engine or engine but such Engine or engine does not meet the conditions specified in such clause (v), Lessee shall perform (or cause to be performed) all maintenance work necessary to meet such conditions or, if Lessor shall so elect, Lessee shall pay or cause to be paid to Lessor a Dollar amount computed by multiplying (i) the current market cost of performing for an engine of the same model as such Engine or engine the scheduled engine refurbishment under the maintenance program then used by

-18-

Lessee or any Sublessee for engines of the same model as such Engine or engine by (ii) a fraction of which (x) the numerator shall be the excess of 25% of the hours or cycles of operation (whichever is applicable) allowable between scheduled engine refurbishments over the actual average number of hours or cycles of operation on such Engine or engine remaining until the next such scheduled engine refurbishment, and (y) the denominator shall be the number of hours or cycles allowable between such scheduled engine refurbishments. In the event that Lessee (or any Sublessee then in possession of the Aircraft) shall, immediately prior to the return of the Aircraft at the expiration or termination of this Lease, be using a continuous or "progressive" maintenance program with respect to the Airframe, Lessee agrees that the Airframe shall have an average of at least 1,750 allowable hours between "C" checks permitted under the maintenance program then used by Lessee or such Sublessee remaining prior to the next such "C" check, failing which Lessor may elect either for Lessee to perform (or cause to be performed) any maintenance check required (in which event Lessor shall reimburse Lessee pro rata for the cost of such maintenance check to the extent such check places the Airframe in a condition, based on hours remaining to the next "C" check, better than the condition in which the Airframe is required to be returned pursuant to this Section 5) or for Lessee to make a pro rata financial adjustment at the rate then charged by Lessee to third parties for performing such work, or if Lessee does not perform such work, at the rate then charged by a reputable independent FAA approved maintenance facility mutually agreed upon by Lessee and the Owner Participant. In the event that Lessee (or any Sublessee then in possession of the Aircraft) shall then be using an on-condition maintenance program with respect to the Engines or engines installed on the Airframe upon return, Lessee agrees that each such Engine or engine will have at least 1,750 hours or cycles remaining before the next scheduled engine removal, failing which Lessor may elect either for Lessee to perform (or cause to be performed) any maintenance check required (in which event Lessor shall reimburse Lessee pro rata for the cost of such maintenance check to the extent such check places such Engine or engine in a condition, based on hours remaining to the next scheduled engine removal, better than the condition in which such Engine or engine is required to be returned pursuant to this Section 5) or for Lessee to make a financial adjustment at the rate then charged by Lessee to third parties for performing such work, or if Lessee does not perform such work, at the rate then charged by a reputable independent FAA approved maintenance facility mutually agreed upon by Lessee and the Owner Participant.

Upon return of the Aircraft at the expiration or termination of this Lease, Lessee shall have caused all FAA

-19-

airworthiness directives applicable to the Aircraft and all mandatory service bulletins from the Manufacturer, the Engine manufacturer or other manufacturer of an engine then installed on the Airframe (in compliance with Section 5(b)) applicable to the Aircraft requiring compliance on or before the return date to have been complied with.

If Lessee shall not have exercised its option to purchase the Aircraft in accordance with Section 19 hereof, then within 60 days prior to the expiration of this Lease at the end of the Basic Term or any Renewal Term, or upon termination of this Lease pursuant to Section 9, Lessor may appoint an independent qualified aircraft surveyor of recognized standing (who may be a Federal Aviation Administration inspector) approved by Lessee, which approval shall not be unreasonably withheld. Such surveyor shall inspect the Airframe and the Engines or engines within 30 days prior to such expiration or termination to determine whether the Airframe and the Engines or engines are in the condition required by this Section 5. The survey shall include an examination of the logs and a general examination of the Airframe and Engines or engines without dismantling any parts (except for those parts which the surveyor determines should be dismantled in accordance with customary practice in the sale of used aircraft to determine the condition of the Airframe and Engines or engines). The cost of such survey shall be paid by Lessor unless the cost of bringing the Airframe and the Engines or engines up to the condition required by this Section 5 shall be material, in which event the cost of such survey shall be paid by Lessee. The surveyor shall issue a certificate stating that the Airframe and the Engines or engines are in the return condition required by this Section 5 or shall issue a report specifying the action required to bring the Airframe or Engines or engines into compliance with the terms of this Section 5. The determination of the surveyor properly made in accordance with this paragraph (a) shall be binding on Lessor and Lessee. Should a report be issued citing the need for repairs, Lessee shall make arrangements reasonably acceptable to Lessor for such repairs to be made or shall make such repairs. If a surveyor shall be appointed pursuant to this paragraph (a), the return of the Aircraft pursuant to this Section 5 shall be deemed to have occurred at the end of the Term of this Lease, or upon termination of this Lease pursuant to Section 9, upon the earlier of (x) issuance by the surveyor of such certificate as set forth above or the written acceptance by Lessor of the arrangements referred to above or the completion of the repairs cited in the report of the surveyor, whichever is applicable and (y) acceptance of possession of the Aircraft by Lessor.

(b)  Return of the Engines. In the event that any engine not owned by Lessor shall be delivered with the returned

-20-

Airframe as set forth in paragraph (a) of this Section 5, Lessee, concurrently with such delivery, will, at no cost to Lessor, furnish, or cause to be furnished, to Lessor a full warranty (as to title) bill of sale with respect to each such engine, in form and substance satisfactory to Lessor (together with an opinion of counsel to the effect that such full warranty bill of sale has been duly authorized and delivered and is enforceable in accordance with its terms and that each such engine is free and clear of Liens other than Lessor Liens), against receipt from Lessor of a bill of sale evidencing the transfer, without recourse or warranty (except as to the absence of Lessor Liens), by Lessor to Lessee or its designee of all of Lessor's right, title and interest in and to any Engine not installed on the Airframe at the time of the return of the Airframe.

(c)  Fuel; Manuals.  Upon the return of the Airframe upon any termination of this Lease referred to in paragraph (a) of this Section 5, Lessee shall deliver or cause to be delivered to Lessor all logs, manuals and data and inspection, modification and overhaul records required to be maintained with respect thereto under FAA rules and regulations.

(d)  Storage Upon Return.  If, at least ten days prior to termination of this Lease at the end of the Basic Term or any Renewal Term or pursuant to Section 9(b) with respect to the Aircraft, Lessee receives from Lessor a written request for storage of such Aircraft upon its return hereunder, Lessee will provide Lessor, or cause Lessor to be provided, with free parking facilities for such Aircraft (maintenance costs and other out-of-pocket costs other than parking fees to be for the account of Lessor) for a period not exceeding 30 days commencing on the date of such termination, at Lessee's principal maintenance facility in the contiguous 48 States of the United States or, subject to the prior consent of Lessor, at such other major airport facility located in the continental United States selected by Lessee used as a location for the parking or storage of aircraft.  Lessor will maintain insurance for such Aircraft during such period of storage.  If Lessor does not elect to store such Aircraft upon termination of this Lease, Lessee shall, at the direction of Lessor upon at least ten days' prior notice, return such Aircraft to any location on Lessee's domestic scheduled route system designated by Lessor.

(e)  Aid in Disposition.  Lessee agrees that, unless Lessee shall have elected to purchase the Aircraft pursuant to Section 19(b) or to renew this Lease in accordance with its terms, during the last six months of the Term (and during any storage period, if Section 5(d) shall apply) it will cooperate, and will cause any Sublessee to cooperate, in all reasonable respects with any efforts of Lessor to lease or sell the

-21-

Aircraft, including without limitation (subject to the provisions of Section 12) permitting potential lessees or purchasers to inspect the Aircraft and the records relating thereto.

SECTION 6.  Liens.

Lessee will not directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to the Aircraft, title thereto or any interest therein or in this Lease, except (i) the respective rights of Lessor as owner of the Aircraft and Lessee as herein provided, the Lien of the Trust Indenture, and any other rights existing pursuant to the Operative Documents, (ii) the rights of others under agreements or arrangements to the extent permitted by the terms of Sections 7(b) and 8(b) hereof, (iii) Lessor Liens, (iv) Liens for taxes of Lessee (or any Sublessee) either not yet due or being contested in good faith by appropriate proceedings so long as such proceedings do not involve any material danger of the sale, forfeiture or loss of the Airframe or any Engine or any interest therein, (v) materialmen's, mechanics', workmen's, repairmen's or other like Liens arising in the ordinary course of Lessee's (or, if a Sublease is then in effect, the Sublessee's) business (including those arising under maintenance agreements entered into in the ordinary course of business) securing obligations that are not overdue for a period of more than 60 days or are being contested in good faith by appropriate proceedings so long as such proceedings do not involve any material danger of the sale, forfeiture or loss of the Airframe or any Engine or any interest therein, (vi) Liens arising out of any judgment or award against Lessee, unless the judgment secured shall not, within 30 days after the entry thereof, have been discharged, vacated, reversed or execution thereof stayed pending appeal or shall not have been discharged, vacated or reversed within 30 days after the expiration of such stay, and (vii) any other Lien with respect to which Lessee (or any Sublessee) shall have provided a bond adequate in the reasonable opinion of Lessor.  Lessee will promptly, at its own expense, take (or cause to be taken) such actions as may be necessary duly to discharge any such Lien not excepted above if the same shall arise at any time.

SECTION 7.  Registration, Maintenance and Operation; Possession and Subleases; Insignia.

(a)  Registration, Maintenance and Operation.  Lessee, at its own cost and expense, shall (or shall cause any Sublessee to): (i) forthwith upon the delivery thereof hereunder, cause the Aircraft to be duly registered in the name of Lessor and to remain duly registered in the name of Lessor under the Federal Aviation Act (provided that Lessor shall execute and deliver all such documents as Lessee (or any Sublessee) may reasonably

-22-

request for the purpose of effecting and continuing such registration) and shall not register such Aircraft or permit such Aircraft to be registered under any other laws at any time and shall cause the Trust Indenture to be duly recorded and maintained of record as a first mortgage on the Aircraft; (ii) maintain, service, repair and overhaul (or cause to be maintained, serviced, repaired and overhauled) the Aircraft (x) so as to keep the Aircraft in good operating condition, ordinary wear and tear excepted, (y) so as to keep the Aircraft maintained in the same manner and with the same care as used by Lessee with similar aircraft owned by Lessee, and (z) so as to keep such Aircraft in such condition as may be necessary to enable the applicable airworthiness certification for such Aircraft to be maintained in good standing at all times under the Federal Aviation Act, except when all comparable Boeing Model 737-300 series aircraft registered in the United States have been grounded by the Federal Aviation Administration other than as a result of actions taken or omitted to be taken by Lessee (or, if a Sublease is then in effect, any Sublessee); (iii) maintain or cause to be maintained all records, logs and other materials required to be maintained in respect of the Aircraft by the Federal Aviation Administration; and (iv) promptly furnish or cause to be furnished to Lessor such information as may be required to enable Lessor to file any reports required to be filed by Lessor with any governmental authority because of Lessor's ownership of such Aircraft.  Lessee will not maintain, use, service, repair, overhaul or operate the Aircraft (or permit any Sublessee to maintain, use, service, repair, overhaul or operate the Aircraft) in violation of any law or any rule, regulation, order or certificate of any government or governmental authority (domestic or foreign) having jurisdiction, or in violation of any airworthiness certificate, license or registration relating to the Aircraft issued by any such authority, except to the extent Lessee (or, if a Sublease is then in effect, any Sublessee) is contesting in good faith the validity or application of any such law, rule, regulation or order in any reasonable manner which does not materially adversely affect Lessor.  Lessee will not operate the Aircraft, or permit any Sublessee to operate the Aircraft, in any area excluded from coverage by any insurance required by the terms of Section 11 (or indemnification in lieu of insurance permitted by Section 11(f)).

     (b)  Possession and Subleases.  So long as no Event of Default shall have occurred and be continuing at the time of such sublease, delivery, transfer or relinquishment of possession or installation, and so long as Lessee (or any Sublessee) shall comply with the provisions of Section 11 hereof, Lessee may, without the prior written consent of Lessor:

-23-

(i) subject the Airframe and the Engines or engines then installed thereon to normal interchange agreements or any Engine to normal pooling or similar arrangements, in each case customary in the airline industry and entered into by Lessee (or, except in the case of any interchange agreement, any Sublessee) in the ordinary course of its business; provided that (A) no such agreement or arrangement contemplates or requires the transfer of title to the Airframe, (B) if Lessor's title to any Engine shall be divested under any such agreement or arrangement, such divestiture shall be deemed to be an Event of Loss with respect to such Engine and Lessee shall (or shall cause Sublessee to) comply with Section 10(b) hereof in respect thereof, and (C) any interchange agreement to which the Airframe may be subject shall be with a U.S. Air Carrier;

(ii) deliver possession of the Airframe or any Engine to the manufacturer thereof or to any organization for testing, service, repair, maintenance or overhaul work on such Airframe or Engine or any part of any thereof or for alterations or modifications in or additions to such Airframe or Engine to the extent required or permitted by the terms of Section 8(c) hereof;

(iii) install an Engine on an airframe owned by Lessee (or any Sublessee) free and clear of all Liens, except: (A) Permitted Liens and those which apply only to the engines (other than Engines), appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment (other than Parts) installed on such airframe (but not to the airframe as an entirety), (B) the rights of third parties under normal interchange agreements, provided that Lessor's title to such Engine shall not be divested as a result thereof and (C) mortgage liens or other security interests, provided that (as regards this clause (C)) such mortgage liens or other security interests effectively provide that such Engine shall not become subject to the lien of such mortgage or security interest, notwithstanding the installation thereof on such airframe, unless and until Lessee shall become the owner of such Engine;

(iv) install an Engine on an airframe leased to Lessee (or any Sublessee) or purchased by Lessee

-24-

(or any Sublessee) subject to a conditional sale or
other security agreement, <u>provided</u> that (x) such
airframe is free and clear of all Liens, except:
(A) the rights of the parties to the lease or
conditional sale or other security agreement
covering such airframe, or their assignees, and (B)
Liens of the type permitted by subparagraph (iii)
of this paragraph (b) and (y) such lease,
conditional sale or other security agreement
effectively provides that such Engine shall not
become subject to the lien of such lease,
conditional sale or other security agreement at any
time while such Engine is subject to this Lease,
notwithstanding the installation thereof on such
airframe;

(v)  install an Engine on an airframe owned by
Lessee (or any Sublessee), leased to Lessee (or any
Sublessee) or purchased by Lessee (or any
Sublessee) subject to a conditional sale or other
security agreement under circumstances where
neither subparagraph (iii) nor subparagraph (iv) of
this paragraph (b) is applicable, <u>provided</u> that
such installation shall be deemed an Event of Loss
with respect to such Engine and Lessee shall comply
with Section 10(b) hereof in respect thereof,
Lessor not intending hereby to waive any right or
interest it may have to or in such Engine under
applicable law until compliance by Lessee with such
Section 10(b);

(vi)  to the extent permitted by Section 8(b)
hereof, subject any Parts owned by Lessor and
removed from the Airframe or any Engine to any
pooling arrangement referred to in Section 8(b)
hereof;

(vii)  transfer possession of the Airframe or
any Engine to the United States of America or any
instrumentality or agency thereof pursuant to the
Civil Reserve Air Fleet Program (as established
pursuant to the Executive Order 10219, dated
February 28, 1951), provided such transfer does not
exceed the Term; or

(viii)  so long as the term of any sublease does
not extend beyond the Term, Lessee may, at any
time, enter into any sublease of the Airframe or
any Engine with (x) a U.S. Air Carrier, (y) any
person approved in writing by Lessor and the

-25-

Mortgagee, which approval shall not be unreasonably
withheld or (z) with any Permitted Sublessee,
provided that in the case of a sublease to a
Permitted Sublessee, (A) Lessee shall provide to
Lessor, prior to entering into such sublease,
insurance certificates evidencing that the
insurance required to be maintained in accordance
with Section 11 will be in full force and effect
during the term of the sublease, (B) such sublease
shall expressly provide that the Aircraft will not
be operated into a country with which the United
States does not maintain normal diplomatic
relations, (C) such sublease shall expressly
provide that the maintenance performed on the
Aircraft during the term of such sublease shall
meet all applicable FAA standards and, if the term
of such sublease shall exceed 18 months, (D) Lessee
shall provide an opinion to the effect that the
ownership rights of Lessor and the Lien of the
Trust Indenture are recognized and enforceable
under the laws of the country in which such
Permitted Sublessee has its principal executive
offices and to the effect that the sublease is
subject and subordinate in all respects to the
terms of this Lease.  No transfer of the
registration of the Airframe or any Engine or
engines then installed on the Airframe shall be
effected in connection with any sublease permitted
hereunder.

In the case of any Sublessee or other transferee who
receives possession by reason of a transfer permitted by this
paragraph (b) (other than the transfer of an Engine which is
deemed an Event of Loss), (M) the rights of such' Sublessee or
other transferee shall be effectively subject and subordinate to,
and any Sublease permitted by this paragraph (b) shall be
effectively and expressly subject and subordinate to, all the
terms of this Lease and to the Lien of the Trust Indenture,
including, without limitation, the covenants contained in Section
7(a) hereof and Lessor's rights to repossession pursuant to
Section 15 hereof and to avoid such Sublease upon such
repossession, (N) Lessee shall remain primarily liable hereunder
for the performance of all of the terms of this Lease to the same
extent as if such Sublease or transfer had not occurred, (O) the
terms of any such Sublease shall not permit any Sublessee to take
any action not permitted to be taken by Lessee in this Lease with
respect to the Aircraft and (P) all terms and conditions of this
Lease and the other Operative Documents shall remain in effect.
No pooling agreement, sublease or other relinquishment of
possession of the Airframe or any Engine shall in any way

-26-

discharge or diminish any of Lessee's obligations to Lessor hereunder or constitute a waiver of Lessor's rights or remedies hereunder.  Lessor agrees, for the benefit of Lessee (and any Sublessee) and for the benefit of any mortgagee or other holder of a security interest in any engine (other than an Engine) owned by Lessee (or any Sublessee), any lessor of any engine (other than an Engine) leased to Lessee (or any Sublessee) and any conditional vendor of any engine (other than an Engine) purchased by Lessee (or any Sublessee) subject to a conditional sale agreement or any other security agreement, that no interest shall be created hereunder in any engine so owned, leased or purchased and that neither Lessor nor its successors or assigns will acquire or claim, as against Lessee (or any Sublessee) or any such mortgagee, lessor or conditional vendor or other holder of a security interest or any successor or assignee of any thereof, any right, title or interest in such engine as the result of such engine being installed on the Airframe; provided, however, that such agreement of Lessor shall not be for the benefit of any lessor or secured party of any airframe (other than the Airframe) leased to Lessee (or any Sublessee) or purchased by Lessee (or any Sublessee) subject to a conditional sale or other security agreement or for the benefit of any mortgagee of or any other holder of a security interest in an airframe owned by Lessee (or any Sublessee), unless such lessor, conditional vendor, other secured party or mortgagee has expressly agreed (which agreement may be contained in such lease, conditional sale or other security agreement or mortgage) that neither it nor its successors or assigns will acquire, as against Lessor, any right, title or interest in an Engine as a result of such Engine being installed on such airframe.

After the Lessee has entered into a sublease pursuant to this Section 7(b), Lessee shall within 30 days of the date of execution thereof send written notice to Lessor of such sublease; provided, however, that if the sublease shall be for a term in excess of one year or shall be to a Permitted Sublessee, notice of such sublease shall be given at least five days prior to the execution thereof by Lessee and any Sublessee.

A consolidation, merger, conveyance, transfer, or lease permitted by Section 8(u) of the Participation Agreement shall not be deemed to be a transaction to which this paragraph (b) shall apply.

(c)  Insignia.  Within 15 days of the Delivery Date, Lessee agrees to affix and maintain (or cause to be affixed and maintained) in the cockpit of the Airframe adjacent to the airworthiness certificate therein and on each Engine a nameplate bearing the inscription:

-27-

Leased From

The Connecticut National Bank, as Owner Trustee,
Owner and Lessor

and, for so long as such Airframe and Engine shall be subject to
the Lien of the Trust Indenture, bearing the following additional
inscription:

Mortgaged to

The Connecticut Bank and Trust Company,
National Association, Mortgagee

(such nameplate to be replaced, if necessary, with a nameplate
reflecting the name of any successor Lessor or successor
Mortgagee in each case as permitted under the Operative
Documents).  Except as above provided, Lessee will not allow the
name of any person, association or corporation to be placed on
the Airframe or on any Engine as a designation that might be
interpreted as a claim of ownership; provided that nothing herein
contained shall prohibit Lessee (or any Sublessee) from placing
its customary colors and insignia on such Airframe or any Engine
or displaying information concerning the registration or
manufacturer of the Aircraft, the Airframe, any Engine or Part.

SECTION 8.  Replacement of Parts; Alterations, Modifications
and Additions.

(a)  Replacement of Parts.  Lessee, at its own cost and
expense, will promptly replace or cause to be replaced all Parts
which may from time to time be incorporated or installed in or
attached to the Airframe or any Engine and which may from time to
time become worn out, lost, stolen, destroyed, seized,
confiscated, damaged beyond repair or permanently rendered unfit
for use for any reason whatsoever, except as otherwise provided
in paragraph (c) of this Section 8.  In addition, Lessee may, at
its own cost and expense, remove in the ordinary course of
maintenance, service, repair, overhaul or testing, any Parts,
whether or not worn out, lost, stolen, destroyed, seized,
confiscated, damaged beyond repair or permanently rendered unfit
for use, provided that Lessee, except as otherwise provided in
paragraph (c) of this Section 8, will, at its own cost and
expense, replace such Parts as promptly as practicable.  All
replacement Parts shall be free and clear of all Liens (except
for Permitted Liens and except in the case of replacement
property temporarily installed on an emergency basis) and shall
be in as good operating condition as, and shall have a value and
utility at least equal to, the Parts replaced assuming such
replaced Parts were in the condition and repair required to be

-28-

maintained by the terms hereof. All Parts at any time removed
from the Airframe or any Engine shall remain the property of
Lessor, no matter where located, until such time as such Parts
shall be replaced by Parts which have been incorporated or
installed in or attached to such Airframe or Engine and which
meet the requirements for replacement Parts specified above.
Immediately upon any replacement Part becoming incorporated or
installed in or attached to the Airframe or any Engine as above
provided, without further act (subject only to Permitted Liens
and except in the case of replacement property temporarily
installed on an emergency basis), (i) title to such replacement
Part shall thereupon vest in Lessor, (ii) such replacement Part
shall become subject to this Lease and be deemed part of such
Airframe or such Engine for all purposes hereof to the same
extent as the Parts originally incorporated or installed in or
attached to such Airframe or such Engine, and (iii) title to the
replaced Part shall thereupon vest in Lessee free and clear of
all rights of Lessor, and such replaced Part shall no longer be
deemed a Part hereunder.

(b) Pooling of Parts. Any Part removed from the
Airframe or any Engine as provided in paragraph (a) of this
Section 8 may be subjected by Lessee (or any Sublessee) to a
normal pooling arrangement customary in the airline industry
entered into in the ordinary course of Lessee's (or any
Sublessee's) business; provided that the Part replacing such
removed Part shall be incorporated or installed in or attached to
such Airframe or Engine in accordance with such paragraph (a) as
promptly as practicable after the removal of such removed Part.
In addition, any replacement Part when incorporated or installed
in or attached to the Airframe or any Engine in accordance with
such paragraph (a) may be owned by any third party subject to
such a normal pooling arrangement, provided that Lessee (or any
Sublessee), at its expense, as promptly thereafter as
practicable, either (i) causes title to such replacement Part to
vest in Lessor in accordance with such paragraph (a) by Lessee
(or any Sublessee) acquiring title thereto for the benefit of,
and transferring such title to Lessor free and clear of all Liens
other than Permitted Liens or (ii) replaces such replacement Part
by incorporating or installing in or attaching to the Airframe or
any Engine a further replacement Part owned by Lessee (or any
Sublessee) free and clear of all Liens other than Permitted Liens
and by causing title to such further replacement Part to vest in
Lessor in accordance with such paragraph (a).

(c) Alterations, Modifications and Additions. Lessee,
at its own expense, will make (or cause to be made) such
alterations and modifications in and additions to the Airframe
and Engines as may be required from time to time to meet the
applicable standards of the Federal Aviation Administration;

-29-

provided, however, that Lessee may, in good faith, contest the validity or application of any such law, rule, regulation or order in any reasonable manner which does not adversely affect Lessor; and provided, further, that Lessee's failure to make (or cause to be made) any such alterations or modifications shall not constitute noncompliance with the requirements of this paragraph (c) of this Section 8 or a breach of Lessee's undertaking hereunder for so long a period as may be necessary to remedy such failure, if such failure can be remedied, so long as during such period Lessee is using due diligence and best efforts to remedy such failure. In addition, Lessee, at its own expense, may from time to time add further parts or accessories and make such alterations and modifications in and additions to the Airframe or any Engine as Lessee may deem desirable in the proper conduct of its business, including, without limitation, removal of Parts which Lessee deems obsolete or no longer suitable or appropriate for use on such Airframe or such Engine; provided that no such alteration, modification or addition shall materially diminish the value or utility of such Airframe or such Engine, or materially impair the condition or impair airworthiness thereof below the value, utility, condition or airworthiness thereof immediately prior to such alteration, modification or addition assuming such Airframe or such Engine was then of the value and utility and in the condition and airworthiness required to be maintained by the terms of this Lease Agreement. Title to all Parts incorporated or installed in or attached or added to the Airframe or an Engine as the result of such alteration, modification or addition (except those parts which Lessee has leased from others) shall, without further act, vest in Lessor. Notwithstanding the foregoing sentence, Lessee may, at any time during the Term, so long as no Event of Default shall have occurred and be continuing, remove or suffer to be removed any Part, provided that such Part (i) is in addition to, and not in replacement of or substitution for, any Part originally incorporated or installed in or attached to the Airframe or any Engine at the time of delivery thereof hereunder or any Part in replacement of or substitution for any such Part, (ii) is not required to be incorporated or installed in or attached or added to the Airframe or any Engine pursuant to the terms of Section 7 hereof or the first sentence of this paragraph (c) and (iii) can be removed from such Airframe or such Engine without diminishing or impairing the value, utility, condition or airworthiness which such Airframe or such Engine would have had at such time had such alteration, modification or addition not occurred; provided further, that if Lessee shall not have elected to purchase the Aircraft in accordance with Section 19 hereof, Lessor shall have the option at the end of the Term to purchase all or any part of such severable Parts from Lessee for a purchase price equal to their fair market sales value, as such term is defined in Section 19(c) hereof. Upon the removal by Lessee of any Part as provided

-30-

above, title thereto shall, without further act, vest in Lessee and such Part shall no longer be deemed part of the Airframe or Engine from which it was removed.  Any Part not removed by Lessee as above provided prior to the return of the Airframe or Engine to Lessor hereunder shall remain the property of Lessor.

## SECTION 9.   Voluntary Termination: Obsolete or Surplus Aircraft.

(a)   Termination Event.  So long as no Event of Default shall have occurred and be continuing, Lessee shall have the right to elect to terminate this Lease with respect to the Aircraft on any Lease Period Date occurring after the eighth anniversary of the Delivery Date and during the Basic Term (a "Termination Date"), provided the Airframe thereof and the Engines or engines then installed on such Airframe shall have become obsolete or surplus with respect to Lessee's requirements (as determined by formal resolution of Lessee's Board of Directors); and provided, further, that Lessee shall provide Lessor and the Mortgagee with the notice specified below a certified copy of such resolutions of the Board of Directors and an officer's certificate stating that (1) Lessee has made a good faith determination that the termination of the Lease was based on operational and marketing considerations and not on interest costs or alternative lease costs which might result from a termination of the Lease, (2) such termination is part of a program by Lessee to reduce or phase out its fleet of Boeing Model 737-300 series aircraft (both owned and leased), (3) the procedure for selection of the Aircraft for disposition from its fleet of other Boeing Model 737-300 series aircraft did not discriminate against the Aircraft as compared with other leased aircraft in Lessee's fleet, and (4) Lessee has no Boeing Model 737-300 series aircraft on order, and has no present plans of ordering any additional Boeing Model 737-300 series aircraft. Lessee shall not thereafter, for a period of one year, purchase or otherwise acquire (other than by acquisition of substantially all the assets of another airline or in connection with the replacement for the loss of, or loss of use of, any Boeing Model 737-300 series aircraft owned or leased by Lessee) any more Boeing Model 737-300 series aircraft (and this obligation shall survive termination of this Lease).  Lessee shall give to Lessor 180 days' advance written notice of Lessee's intention so to terminate this Lease (any such notice, a "Termination Notice"). The Termination Notice shall specify the Termination Date and shall be accompanied by a copy, certified by the Secretary or Assistant Secretary of Lessee, of the Board of Directors' resolution referred to above and any such officer's certificate.  Lessee may revoke any Termination Notice by notice to Lessor not less than 90 days prior to the proposed Termination Date, if Lessor shall not have received a bid to purchase the

-31-

Aircraft for at least the Termination Value thereof pursuant to paragraph (b) of this Section 9; provided, that Lessee may so revoke a Termination Notice no more than twice during the Term; and provided further that if Lessee so revokes a Termination Notice, Lessee shall reimburse Lessor and/or the Owner Participant for any out-of-pocket expenses incurred in connection with such Termination Notice.

(b)  Sale of the Aircraft.  During the period from the giving of the notice referred to in Section 9(a) until no more than 30 days' prior to the proposed Termination Date, Lessee, as agent for Lessor and at no expense to Lessor, shall use its best efforts to obtain bids in the worldwide market for the purchase of the Airframe and Engines or engines installed thereon and, in the event it receives any bid, Lessee shall, as soon as practicable after receipt thereof and at least 30 days prior to the proposed Termination Date (but not earlier than 30 days after the giving of the notice referred to in Section 9(a)), certify to Lessor in writing the amount and terms of each such bid, and the name and address of the party or parties (who shall not be Lessee or any Affiliate thereof but who may be the Owner Participant, any Affiliate thereof or any person contacted by the Owner Participant) submitting such bid.  After Lessee shall have certified to Lessor all bids received, the Owner Participant, any Affiliate thereof or any person contacted by the Owner Participant (except Lessee or an Affiliate thereof) may submit a further bid or bids to Lessee not later than 15 days prior to the Termination Date proposed by Lessee.

Subject to the next succeeding sentence, on or before the Termination Date, subject to the release of all mortgage and security interests with respect to the Aircraft under the Trust Indenture:  (1) Lessee shall deliver the Aircraft, or cause the Aircraft to be delivered, to the bidder(s), if any, which shall have submitted the highest bid therefor at least 30 (or, in the case of the Owner Participant, any Affiliate thereof, or person contacted by the Owner Participant, 15) days prior to such Termination Date, in the same manner and in the same condition and otherwise in accordance with all the terms of this Lease as if delivery were made to Lessor pursuant to Section 5, and shall duly transfer to Lessor title to any engines not owned by Lessor, all in accordance with the terms of Section 5, (2) Lessor shall comply with the terms of the Trust Indenture and shall, without recourse or warranty (except as to the absence of Lessor Liens), subject to prior or concurrent payment by Lessee of all amounts due under clause (3) of this sentence, sell the Aircraft for cash in Dollars to such bidder(s), the total selling price realized at such sale to be retained by Lessor, and (3) Lessee shall simultaneously pay or cause to be paid to Lessor in funds of the type specified in Section 3(f) hereof, an amount equal to the sum

-32-

of (u) all unpaid Rent with respect to the Aircraft due prior to
the Termination Date plus (v) the excess, if any, of (A) the
Termination Value for such Aircraft, computed as of the
Termination Date, over (B) the sale price of such Aircraft sold
by Lessor after deducting the reasonable expenses incurred by
Lessor in connection with such sale, and Lessor simultaneously
will transfer to Lessee, without recourse or warranty (except as
to the absence of Lessor Liens), all of Lessor's right, title and
interest in and to any Engines which were not sold with the
Aircraft.  Notwithstanding the preceding sentence, Lessor may
elect to retain title to the Aircraft, in which event Lessee
shall have no obligation to pay any Termination Value.  If Lessor
so elects, Lessor shall give to Lessee written notice of such
election at least 15 days prior to the proposed Termination Date
accompanied by an irrevocable undertaking by the Owner
Participant (subject to the provisions of Section 8(r) of the
Participation Agreement) to make available to the Lessor for
payment to the Mortgagee on the Termination Date the amount
required to pay in full the unpaid principal of the Loan
Certificates outstanding on the Termination Date plus interest
accrued thereon through such date.  Upon receipt of notice of
such an election by Lessor and the accompanying undertaking by
the Owner Participant, Lessee shall cease its efforts to obtain
bids as provided above with respect to the Aircraft and shall
reject all bids theretofore or thereafter received for such
Aircraft.  On the Termination Date, Lessor shall pay in full the
unpaid principal of the Loan Certificates outstanding on the
Termination Date plus interest accrued thereon through such date
plus all other amounts due to the Certificate Holders under the
Operative Documents and, provided that the Loan Certificates are
paid as aforesaid, Lessee shall deliver the Airframe and Engines
or engines to Lessor in accordance with Section 5 and shall pay
all Rent due on or prior to the Termination Date, including any
installment of Basic Rent accrued prior to and due on such
date.  If no sale shall have occurred on the Termination Date and
Lessor has not made the payment contemplated by the preceding
sentence and thereby caused this Lease to terminate, this Lease
shall continue in full force and effect, Lessee shall pay the
reasonable costs and expenses incurred by the Owner Participant
and Lessor, if any, in connection with the preparation for such
sale and Lessee may give one or more additional Termination
Notices.  In the event of any such sale or retention of the
Aircraft by Lessor and upon compliance by Lessee with the
provisions of this paragraph, the obligation of Lessee to pay
Basic Rent or any other amounts hereunder with respect to the
Aircraft shall cease to accrue and this Lease shall terminate.
Lessor shall be under no duty to solicit bids, to inquire into
the efforts of Lessee to obtain bids or otherwise take any action
in connection with any such sale other than to transfer (in
accordance with the foregoing provisions) to the purchaser named,

-33-

in the highest bid certified by Lessee to Lessor all of Lessor's right, title and interest in such Aircraft, against receipt of the payments provided herein.

(c) <u>Termination as to Engines</u>.  So long as no Event of Default shall have occurred and be continuing, Lessee shall have the right, at its option at any time during the Term, on at least 30 days prior written notice, to terminate this Lease with respect to any Engine not then installed or held for use on the Airframe, <u>provided</u> such Engine shall have become obsolete or surplus to Lessee's requirements.  In such event, and prior to the date of such termination, Lessee shall replace such Engine hereunder by complying with the terms of Section 10(b) to the same extent as if an Event of Loss had occurred with respect to such Engine, and Lessor shall transfer title to the replaced Engine as provided in Section 5(b).

SECTION 10.  <u>Loss, Destruction, Requisition, etc.</u>

(a) <u>Event of Loss with Respect to the Aircraft</u>.

Upon the occurrence of an Event of Loss with respect to the Airframe, or the Airframe and the Engines and/or engines then installed thereon, Lessee shall forthwith (and in any event, within 15 days after such occurrence) give Lessor and the Mortgagee written notice of such Event of Loss and, within 60 days after such occurrence, Lessee shall give written notice to Lessor and the Mortgagee of its election to make payment or substitution as provided in clause (i) or (ii) below.  Not later than, with respect to clause (i) below, the earlier of (x) 120 days following the occurrence of such Event of Loss or (y) 15 days following the date of receipt of insurance proceeds in respect of such occurrence or, with respect to clause (ii) below, 180 days following the occurrence of such Event of Loss Lessee shall:

> (i) pay or cause to be paid to Lessor in funds of the type specified in Section 3(f) hereof, the Stipulated Loss Value of the Aircraft; or

> (ii)  provided that no Event of Default (or any event which with notice or lapse of time would constitute an Event of Default) shall have occurred and be continuing, substitute an aircraft or an airframe and one or more engines for the Aircraft or the Airframe and one or more Engines;

-34-

provided, however, that if Lessee shall have failed to provide notice of its election under this Section 10(a) within 60 days after the occurrence of the Event of Loss, Lessee shall be deemed to have elected to comply with clause (i) and provided, further, that if Lessee shall have elected to substitute an airframe and/or engines pursuant to clause (ii) and such substitution has not occurred within 180 days after the Event of Loss, Lessee shall not be entitled to make such substitution but shall promptly make the payments required by clause (i) above.

At such time as Lessor shall have received the Stipulated Loss Value specified in subparagraph (i) above, together with all other amounts that then may be due hereunder, under the Participation Agreement and under the Tax Indemnity Agreement, (1) the obligation of Lessee to pay Basic Rent hereunder for any period commencing after the Stipulated Loss Value Date with reference to which such Stipulated Loss Value is computed shall terminate (but Lessee shall remain liable for all payments of Supplemental Rent due through and including the date of such payment of Stipulated Loss Value), (2) this Lease shall terminate, (3) Lessor will comply with the terms of the Trust Indenture and transfer to or at the direction of Lessee, without recourse or warranty (except as to the absence of Lessor Liens), all Lessor's right, title and interest in and to the Airframe and Engines subject to such Event of Loss, as well as all of Lessor's right, title and interest in and to a number of Engines equal to the number of engines (which are not Engines) installed on such Airframe, and (4) Lessee will be subrogated to all claims of Lessor, if any, against third parties, for damage to or loss of such Airframe and any Engines which were subject to such Event of Loss to the extent of the then insured value of such Aircraft. Upon such transfer of title Lessor shall request the Mortgagee to execute and deliver to Lessee, at Lessee's expense, an appropriate instrument releasing the Airframe and Engines from the Lien of the Trust Indenture.

In the event Lessee shall elect to substitute an aircraft (or an airframe or an airframe and one or more engines, as the case may be) Lessee shall, not later than 180 days following the occurrence of such Event of Loss, (A) convey or cause to be conveyed to Lessor, to be leased by Lessee hereunder, an aircraft (or an airframe or an airframe and one or more engines which, together with the Engines not installed thereon at the time of such Event of Loss, constitute the Aircraft) free and clear of all Liens (other than Permitted Liens) and having a value and utility at least equal to, and being in as good operating condition as, the Aircraft subject to such Event of Loss assuming such aircraft was of the value and utility and in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss, provided that any

-35-

aircraft, airframe or engine so substituted hereunder shall be of the same or improved model or series as those initially leased hereunder, and (B) prior to or at the time of any such substitution, Lessee (or any Sublessee), at its own expense, will (1) furnish Lessor with a full warranty bill of sale and a Federal Aviation Administration bill of sale, in form and substance reasonably satisfactory to Lessor, evidencing such transfer of title, (2) cause a Lease Supplement and a Trust Supplement to be duly executed by Lessee and filed for recording pursuant to the Federal Aviation Act, (3) furnish Lessor with such evidence of compliance with the insurance provisions of Section 11 with respect to such substituted property as Lessor may reasonably request, (4) provide an appraisal of independent aircraft appraisers as required by Section 5.06 of the Trust Indenture and an opinion of tax counsel, selected by the Owner Participant, reasonably satisfactory to the Owner Participant as to such matters with respect to the substitute Aircraft, Airframe and/or Engines as shall have been requested by the Owner Participant, (5) provide the documentation required to be provided by it pursuant to Section 5.06 of the Trust Indenture and Lessor simultaneously will comply with the terms of the Trust Indenture and transfer to or at the direction of Lessee, without recourse or warranty (except as to the absence of Lessor Liens), all of Lessor's right, title and interest, if any, in and to the Aircraft or the Airframe and one or more Engines, as the case may be, with respect to which such Event of Loss occurred and furnish to or at the direction of Lessee a bill of sale in form and substance reasonably satisfactory to Lessee, evidencing such transfer, and (6) Lessee will be subrogated to all claims of Lessor, if any, against third parties for damage to or loss of such Airframe and any Engine which were subject to such event of Loss to the extent of the then insured value of such Aircraft. For all purposes hereof, the property so substituted shall after such transfer be deemed part of the property leased hereunder and shall be deemed the "Aircraft", the "Airframe" and an "Engine", as the case may be, as defined herein. No Event of Loss with respect to the Airframe and the Engines or engines then installed thereon for which substitution has been elected pursuant to Section 10(a)(ii) hereof shall result in any reduction in Basic Rent. If Section 10(a)(ii) above is elected by Lessee and Lessee has not fully performed the same within 120 days of the occurrence of such Event of Loss, in the event that any amounts that are being held by the Mortgagee (or Lessor, if the Trust Indenture shall have been discharged) in respect of such Event of Loss are less than the amount of Stipulated Loss Value that would be payable pursuant to Section 10(a)(i), Lessee will, not later than the second Business Day following such 120th day, deposit with the Mortgagee (or Lessor, if the Trust Indenture shall have been discharged) an amount equal to the excess of such Stipulated Loss Value over any such amount then being held by the Mortgagee

-36-

(or Lessor, if the Trust Indenture shall have been discharged) as security for Lessee's compliance with the provisions of this Section 10(a).

Notwithstanding the foregoing, with respect to an Event of Loss described in clause (v) of the definition thereof, it is expressly confirmed that Lessor shall have the option to waive Lessee's obligations under this Section 10(a), retain title to the Aircraft and release Lessee from all its obligations under this Lease (other than as respects prior periods).

(b) Event of Loss with Respect to an Engine.  Upon the occurrence of an Event of Loss with respect to an Engine under circumstances in which there has not occurred an Event of Loss with respect to the Airframe, Lessee shall forthwith (and in any event, within 15 days after such occurrence) give Lessor written notice thereof and shall, within 60 days after the occurrence of such Event of Loss, convey or cause to be conveyed to Lessor, as replacement for the Engine with respect to which such Event of Loss occurred, title to another CFM 56-3-B1 engine (or engine of the same or another manufacturer of the same, an equivalent or an improved model and suitable for installation and use on the Airframe) free and clear of all Liens (other than Permitted Liens), and having a value and utility at least equal to, and being in as good operating condition as, the Engine with respect to which such Event of Loss occurred, assuming such Engine was of the value or utility and in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss.  Prior to or at the time of any such conveyance, Lessee, at its own expense, will (i) furnish Lessor with a warranty (as to title) bill of sale in form and substance reasonably satisfactory to Lessor, with respect to such replacement engine, (ii) cause a Lease Supplement and Trust Supplement to be duly executed by Lessee and to be filed for recording pursuant to the Federal Aviation Act, (iii) furnish Lessor with such evidence of compliance with the insurance provisions of Section 11 hereof with respect to such replacement engine as Lessor may reasonably request, and (iv) provide the documentation required by Section 5.06 of the Trust Indenture. Upon full compliance by Lessee with the terms of this paragraph (b),  Lessor will comply with the terms of the Trust Indenture and transfer to or at the direction of Lessee without recourse or warranty (except as to absence of Lessor Liens) all of Lessor's right, title and interest, if any, in and to (A) the Engine with respect to which such Event of Loss occurred and furnish to or at the direction of Lessee a bill of sale in form and substance reasonably satisfactory to Lessee evidencing such transfer and (B) all claims, if any, against third parties, for damage to or loss of the Engine subject to such Event of Loss, and such Engine shall thereupon cease to be an Engine leased hereunder.  For all

-37-

purposes hereof, each such replacement engine shall, after such conveyance, be deemed part of the property leased hereunder, and shall be deemed an "Engine". No Event of Loss with respect to an Engine under the circumstances contemplated by the terms of this paragraph (b) shall result in any reduction in Basic Rent.

(c) Application of Payments from Governmental Authorities for Requisition of Title, etc. Any payments (other than insurance proceeds the application of which is provided for in Section 11) received at any time by Lessor or by Lessee from any governmental authority or other person with respect to an Event of Loss resulting from the theft, disappearance, condemnation, confiscation or seizure of, or requisition of title to or use of, any Airframe or Engine, other than a requisition for use by the United States Government or any instrumentality or agency thereof not constituting an Event of Loss, will be applied as follows:

(i) if payments are received with respect to the Airframe (or the Airframe and Engines or engines then installed thereon), (A) unless the same are replaced pursuant to the third paragraph of Section 10(a) after reimbursement of Lessor (as provided in Section 7.01 of the Trust Agreement) for reasonable costs and expenses, so much of such payments remaining as shall not exceed the Stipulated Loss Value required to be paid by Lessee pursuant to Section 10(a) and any other Rent then due, shall be applied in reduction of Lessee's obligation to pay such Stipulated Loss Value and any other Rent then due, if not already paid by Lessee, or, if already paid by Lessee, shall be applied to reimburse Lessee for its payment of such Stipulated Loss Value and any other Rent then due, and the balance, if any, of such payments remaining thereafter will be allocated and distributed between Lessor and Lessee in proportion to their relative interests in the Aircraft as measured by compensation for loss of ownership (in the case of Lessor) and for loss of use (in the case of Lessee); or (B) if such property is replaced pursuant to the third paragraph of Section 10(a), such payments shall be paid over to, or retained by, Lessee; provided that Lessee shall have fully performed or, concurrently therewith, will fully perform the terms of the third paragraph of Section 10(a) with respect to the Event of Loss for which such payments are made; and

(ii) if such payments are received with

-38-

respect to an Engine under circumstances
- contemplated by Section 10(b) hereof, so much of
such payments remaining after reimbursement of
Lessor (as provided for in Section 7.01 of the
Trust Agreement) for reasonable costs and expenses
shall be paid over to, or retained by, Lessee,
provided that Lessee shall have fully performed, or
concurrently therewith will perform, the terms of
Section 10(b) with respect to the Event of Loss for
which such payments are made.

(d) Requisition for Use of the Aircraft by the United
States Government. In the event of the requisition for use of
the Airframe and the Engines or engines installed on such
Airframe during the Term by the United States Government or any
instrumentality or agency thereof, Lessee shall notify Lessor of
such requisition, and all of Lessee's obligations under this
Lease Agreement with respect to the Aircraft shall continue to
the same extent as if such requisition had not occurred, provided
that if such Airframe and Engines or engines installed thereon
are not returned by such government prior to the end of the Term,
Lessee shall be obligated to return such Airframe and such
Engines or engines to Lessor pursuant to, and in all other
respects in compliance with the provisions of, Section 5 promptly
on the date of such return by such government. If Lessee shall
fail to return the Aircraft on or before the thirtieth day beyond
the end of the Term, such failure shall constitute an Event of
Loss. All payments received by Lessor or Lessee from such
government for the use of such Airframe and Engines or engines
during the Term shall be paid over to, or retained by, Lessee
(or, if directed by Lessee, any Sublessee); and all payments
received by Lessor or Lessee from such government for the use of
such Airframe and Engines or engines after the end of the Term
shall be paid over to, or retained by, Lessor unless Lessee shall
have exercised its purchase option hereunder, in which case such
payments shall be made to Lessee.

(e) Requisition for Use of an Engine by the United
States Government. In the event of the requisition for use of an
Engine by the United States Government or any agency or
instrumentality thereof (other than in the circumstances
contemplated by subsection (d)), Lessee shall replace such Engine
hereunder by complying with the terms of Section 10(b) to the
same extent as if an Event of Loss had occurred with respect
thereto, and, upon compliance with Section 10(b) hereof, any
payments received by Lessor or Lessee from such government with
respect to such requisition shall be paid over to, or retained
by, Lessee.

(f) Application of Payments During Existence of Event

-39-

of Default.  Any amount referred to in this Section 10 which is
payable to or retainable by Lessee shall not be paid to or
retained by Lessee if at the time of such payment or retention an
Event of Default or an event or condition which, with notice or
lapse of time or both, would constitute an Event of Default shall
have occurred and be continuing, but shall be held by or paid
over to Lessor as security for the obligations of Lessee under
this Lease and, if Lessor declares this Lease to be in default,
pursuant to Section 15 hereof, applied against Lessee's
obligations hereunder as and when due.  At such time as there
shall not be continuing any such Event of Default or an event or
condition which, with notice or lapse of time or both would
constitute an Event of Default, such amount shall be paid to
Lessee to the extent not previously applied in accordance with
the preceding sentence.

           SECTION 11.  Insurance.

           (a)  Public Liability and Property Damage Insurance.
Lessee will carry or cause to be carried at its or any
Sublessee's expense (i) aircraft public liability (including,
without limitation, passenger legal liability) insurance and
property damage insurance (exclusive of manufacturer's product
liability insurance) with respect to the Aircraft, in an amount
not less than the greater of (x) the amounts of public liability
and property damage insurance from time to time applicable to
passenger aircraft owned or operated by Lessee of the same type
as the Aircraft which comprise Lessee's fleet and (y)
$250,000,000 per occurrence and (ii) cargo liability insurance,
in the case of both clause (i) and clause (ii), (A) of the type
usually carried by corporations engaged in the same or a similar
business, similarly situated with Lessee and owning and operating
similar aircraft and engines, and covering risks of the kind
customarily insured against by such corporations and (B) which is
maintained in effect with insurers of recognized
responsibility.  Any policies of insurance carried in accordance
with this paragraph (a) and any policies taken out in
substitution or replacement for any of such policies (A) shall be
amended to name Lessor, in its individual capacity and as owner
of the Aircraft, the Mortgagee and the Owner Participant (but
without imposing on any such parties liability to pay the
premiums for such insurance) (and, if any Sublease shall be in
effect, Lessee in its capacity as sublessor under the Sublease)
as additional insureds as their respective interests may appear,
(B) shall provide that in respect of the respective interests of
Lessor, the Mortgagee and the Owner Participant (and, if any
Sublease shall be in effect, Lessee in its capacity as sublessor
under the Sublease) in such policies the insurance shall not be
invalidated by any action or inaction of Lessee (or, if any
Sublease is then in effect, any Sublessee or any sub-sublessee)

                            -40-

and shall insure Lessor, the Mortgagee and the Owner Participant (and, if any Sublease shall be in effect, Lessee, in its capacity as sublessor under the Sublease) regardless of any breach or violation of any warranty, declaration or condition contained in such policies by Lessee (or, if any Sublease is then in effect, any Sublessee or any sub-sublessee), and (C) shall provide that if the insurers cancel such insurance for any reason whatever or if any material change is made in such insurance which adversely affects the interest of Lessor, the Mortgagee or the Owner Participant (or, if any Sublease shall be in effect, Lessee in its capacity  as sublessor under the Sublease), such cancellation or change shall not be effective as to Lessor, the Mortgagee or the Owner Participant (or, if any Sublease shall be in effect, Lessee in its capacity as sublessor under the Sublease) for 30 days (or such lesser period as may be applicable in the case of war risk and allied perils coverage) after receipt by Lessor, the Mortgagee and the Owner Participant, respectively, of written notice by such insurers of such cancellation or change; <u>provided, however</u>, that if any notice period specified above is not generally obtainable, such policies shall provide for as long a period of prior notice as shall then be generally obtainable. Each liability policy (1) shall be primary without right of contribution from any other insurance which is carried by Lessor, the Mortgagee or the Owner Participant (or, if any Sublease shall be in effect, Lessee in its capacity as sublessor under the Sublease) and (2) shall expressly provide that all of the provisions thereof, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured.

(b)  <u>Insurance Against Loss or Damage to the Aircraft</u>. Lessee shall maintain, or cause to be maintained in effect, at its or any Sublessee's expense, with insurers of recognized responsibility, all-risk ground, flight and taxiing aircraft hull insurance covering the Aircraft and all-risk coverage of Engines and Parts while temporarily removed from the Aircraft and not replaced by similar components (including, without limitation, war risk and governmental confiscation and expropriation (other than by the United States of America) and political and non-political hijacking insurance, if and to the extent the same is maintained by Lessee (or, if a Sublease is then in effect, any Sublessee) with respect to other aircraft owned or operated by Lessee (or such Sublessee) on the same routes, except that Lessee (or such Sublessee) shall maintain war risk and governmental confiscation and expropriation (other than by the United States of America) and hijacking insurance if the Aircraft is operated on routes where the custom is for air carriers flying comparable routes to carry such insurance) which is of the type as from time to time applicable to passenger aircraft owned or operated by Lessee of the same type which comprise Lessee's fleet; <u>provided</u>

-41-

that such insurance shall at all times while the Aircraft is subject to this Lease be for an amount (subject to self-insurance to the extent permitted by Section 11(d)) not less than the amount described in clause (x) of the definition of Stipulated Loss Value (less the component thereof representing accrued but unpaid Basic Rent) for the Aircraft. Any policies carried in accordance with this paragraph (b) covering the Aircraft and any policies taken out in substitution or replacement for any such policies (i) shall name Lessor, as owner of such Aircraft, the Mortgagee and the Owner Participant (and, if any Sublease shall be in effect, Lessee in its capacity as sublessor under the Sublease) as additional insureds and loss payees, as their respective interests may appear (but without imposing on any such party liability to pay premiums with respect to such insurance), (ii) may provide for self-insurance to the extent permitted in Section 11(d), (iii) shall provide that (A) in the event of a loss involving proceeds in excess of $1,500,000, the proceeds in respect of such loss shall be payable to Lessor (or, so long as the Trust Indenture shall not have been discharged, the Mortgagee) (except in the case of a loss with respect to an Engine installed on an airframe other than the Airframe, in which case Lessee shall arrange for any payment of insurance proceeds in respect of such loss to be held for the account of Lessor (or, so long as the Trust Indenture shall not have been discharged, the Mortgagee), whether such payment is made to Lessee or any Sublessee or any third party), it being understood and agreed that in the case of any payment to Lessor (or the Mortgagee) otherwise than in respect of an Event of Loss, Lessor (or the Mortgagee) shall, upon receipt of evidence satisfactory to it that the damage giving rise to such payment shall have been repaired or that such payment shall then be required to pay for repairs then being made, pay the amount of such payment to Lessee or its order, and (B) the entire amount of any loss involving proceeds of $1,500,000 or less shall be paid to Lessee or its order unless an Event of Default shall have occurred and be continuing and the insurers have been notified thereof by Lessor or the Mortgagee, (iv) shall provide that if the insurers cancel such insurance for any reason whatever, or if any material change is made in the insurance which adversely affects the interest of Lessor, the Mortgagee or the Owner Participant, such cancellation or change shall not be effective as to Lessor, the Mortgagee or the Owner Participant (or, if any Sublease shall be in effect, Lessee in its capacity as sublessor under the Sublease) for 30 days (or such lesser period as may be applicable in the case of hull war risk and allied perils coverage) after receipt by Lessor, the Mortgagee or the Owner Participant (or, if any Sublease shall be in effect, Lessee in its capacity as sublessor under the Sublease), respectively, of written notice by such insurers of such cancellation or change, provided, however, that if any notice period specified above is not generally obtainable,

-42-

such policies shall provide for as long a period of prior notice
as shall then be generally obtainable, (v) shall provide that in
respect of the respective interests of Lessor, the Mortgagee and
the Owner Participant (and, if any Sublease shall be in effect,
Lessee in its capacity as sublessor under the Sublease) in such
policies the insurance shall not be invalidated by any action or
inaction of Lessee (or, if a Sublease is then in effect, any
Sublessee) and shall insure the respective interests of Lessor,
the Mortgagee and the Owner Participant (and, if any Sublease
shall be in effect, Lessee in its capacity as sublessor under the
Sublease), as they appear, regardless of any breach or violation
of any warranty, declaration or condition contained in such
policies by Lessee (or, if a Sublease is then in effect, any
Sublessee), (vi) shall be primary without any right of
contribution from any other insurance which is carried by Lessor,
the Owner Participant or the Mortgagee (or, if any Sublease shall
be in effect, Lessee, in its capacity as sublessor under the
Sublease), (vii) shall waive any right of subrogation of the
insurers against Lessor, the Owner Participant and the Mortgagee
(and, if any Sublease shall be in effect, Lessee, in its capacity
as sublessor under the Sublease), and (viii) shall waive any
right of the insurers to set-off or counterclaim or any other
deduction, whether by attachment or otherwise, in respect of any
liability of Lessor, the Mortgagee or the Owner Participant (or,
if any Sublease shall be in effect, Lessee in its capacity as
sublessor under the Sublease) to the extent of any moneys due to
Lessor, the Mortgagee or the Owner Participant. In the case of a
loss with respect to an engine (other than an Engine) installed
on the Airframe, Lessor shall hold any payment to it of any
insurance proceeds in respect of such loss for the account of
Lessee or any other third party that is entitled to receive such
proceeds.

As between Lessor and Lessee, it is agreed that all
insurance payments received as the result of the occurrence of an
Event of Loss will be applied as follows:

> (x)  if such payments are received with
> respect to the Airframe (or the Airframe and the
> Engines installed thereon), (i) unless such
> property is replaced pursuant to the third
> paragraph of Section 10(a), so much of such
> payments remaining, after reimbursement of Lessor
> (as provided in Section 7.01 of the Trust
> Agreement) for reasonable costs and expenses, as
> shall not exceed the Stipulated Loss Value required
> to be paid by Lessee pursuant to Section 10(a)
> hereof shall be applied in reduction of Lessee's
> obligation to pay such Stipulated Loss Value and
> any past due Rent, if not already paid by Lessee,

or, if already paid by Lessee, shall be applied to reimburse Lessee for its payment of such Stipulated Loss Value, and the balance, if any, of such payments remaining thereafter will be paid over to, or retained by, Lessee; or (ii) if such property is replaced pursuant to the third paragraph of Section 10(a), such payments shall be paid over to, or retained by, Lessee, provided that Lessee shall have fully performed or, concurrently therewith, will fully perform the terms of the third paragraph of Section 10(a) with respect to the Event of Loss for which such payments are made; and

(y)  if such payments are received with respect to an Engine under the circumstances contemplated by Section 10(b) hereof, so much of such payments remaining after reimbursement of Lessor (as provided in Section 7.01 of the Trust Agreement) for reasonable costs and expenses, shall be paid over to, or retained by, Lessee, provided that Lessee shall have fully performed or, concurrently therewith, will fully perform, the terms of Section 10(b) with respect to the Event of Loss for which such payments are made.

As between Lessor and Lessee, the insurance payments for any property damage loss to the Airframe or any Engine not constituting an Event of Loss with respect thereto will be applied in payment for repairs or for replacement property in accordance with the terms of Sections 7 and 8, if not already paid for by Lessee, and any balance (or if already paid for by Lessee, all such insurance proceeds) remaining after compliance with such Sections with respect to such loss shall be paid to Lessee.

(c)  Reports, etc.  Lessee will furnish, or cause to be furnished, to Lessor, the Mortgagee and the Owner Participant, on or before the Delivery Date and on or before June 1 in each year thereafter during the Term commencing in 1988, a report, signed by Frank B. Hall & Co., or any other independent firm of insurance brokers reasonably acceptable to Lessor (the "Insurance Brokers"), describing in reasonable detail the insurance and reinsurance then carried and maintained with respect to the Aircraft and stating the opinion of such firm that the insurance then carried and maintained with respect to the Aircraft complies with the terms hereof.  Lessee will cause such Insurance Brokers to agree to advise Lessor, the Mortgagee and the Owner Participant in writing of any default in the payment of any premium and of any other act or omission on the part of Lessee of which it has knowledge and which might invalidate or render

-44-

unenforceable, in whole or in part, any insurance on the
Aircraft. To the extent such agreement is reasonably obtainable,
Lessee will also cause such Insurance Brokers to agree to advise
Lessor, the Mortgagee and the Owner Participant in writing at
least 30 days (seven days in the case of war risk and allied
perils coverage) prior to the expiration or termination date of
the insurance carried and maintained on the Aircraft pursuant to
this Section 11.  In the event that Lessee or any Sublessee shall
fail to maintain or cause to be maintained insurance as herein
provided, Lessor or the Mortgagee may at its sole option provide
such insurance and, in such event, Lessee shall, upon demand,
reimburse Lessor or the Mortgagee, as Supplemental Rent, for the
cost thereof to Lessor or the Mortgagee, as the case may be,
without waiver of any other rights Lessor may have.

(d)  Self-Insurance.  Lessee may from time to time self-
insure by way of deductible or premium adjustment provisions or
otherwise in the insurance policies covering the risks required
to be insured against pursuant to this Section 11, in such
reasonable amounts as are then applicable to passenger aircraft
of the same type as the Aircraft owned or operated by Lessee, but
in no case shall the aggregate amounts of such self-insurance
exceed 3% of the consolidated tangible net worth of Lessee (as
determined in accordance with generally accepted accounting
principles); provided that if at any time Lessee's unsecured
senior long-term debt is not rated Investment Grade, such self-
insurance shall in no case be in amounts greater than that
carried by other air carriers similarly situated with Lessee and
operating aircraft similar to the Aircraft and on similar routes
(such standard to be determined by a nationally recognized firm
of aviation insurance brokers chosen by Lessor and reasonably
acceptable to Lessee).

(e)  Additional Insurance by Lessor and Lessee.  Lessee
(or any Sublessee) may at its own expense carry insurance with
respect to its interest in the Aircraft in amounts in excess of
that required to be maintained by this Section 11; the Owner
Participant, either directly or through Lessor, may carry for its
own account at its sole cost and expense insurance with respect
to its interest in the Aircraft, provided that such insurance
does not prevent Lessee (or any Sublessee) from carrying the
insurance required or permitted by this Section 11 or adversely
affect such insurance or the cost thereof.

(f)  Indemnification by Government in Lieu of
Insurance.  Notwithstanding any provisions of this Section 11
requiring insurance, Lessor agrees to accept, in lieu of
insurance against any risk with respect to the Aircraft,
indemnification from, or insurance provided by, the United States
Government or any agency or instrumentality thereof against such

-45-

risk in an amount which, when added to the amount of insurance against such risk maintained by Lessee (or any Sublessee) with respect to such Aircraft (including permitted self-insurance) shall be at least equal to the amount of insurance against such risk otherwise required by this Section 11.

(g)  Application of Payments during Existence of an Event of Default.  Any amount referred to in this Section 11 which is payable to or retainable by Lessee shall not be paid to or retained by Lessee if at the time of such payment or retention an Event of Default or an event or condition which, with notice or lapse of time or both, would constitute an Event of Default, shall have occurred and be continuing, but shall be held by or paid over to Lessor (or, so long as the Trust Indenture shall remain in effect, to the Mortgagee) as security for the obligations of Lessee under this Lease and, if an Event of Default or an event or condition which, with notice or lapse of time or both, would constitute an Event of Default, shall have occurred and be continuing, applied against Lessee's obligations hereunder as and when due.  At such time as there shall not be continuing any such Event of Default or an event or condition which, with notice or lapse of time or both would constitute an Event of Default, such amount shall be paid to Lessee to the extent not previously applied in accordance with the preceding sentence.

SECTION 12.  Inspection.

At all reasonable times, Lessor or the Mortgagee or their respective authorized representatives may inspect the Aircraft and inspect and make copies (at Lessor's or the Mortgagee's expense, as the case may be) of the books and records of Lessee relating to the maintenance of the Aircraft; any such inspection of the Aircraft shall be a visual, walk-around inspection which may include going on board the Aircraft but shall not include opening any panels, bays or the like without the express consent of Lessee; provided that no exercise of such inspection right shall interfere with the normal operation and maintenance of the Aircraft by Lessee (or any Sublessee).  Lessee will give the Owner Participant 15 days' prior notice of the last heavy maintenance visit scheduled to take place prior to return of the Aircraft under Section 5 hereof.  Neither Lessor nor the Mortgagee shall have any duty to make any such inspection nor shall either of them incur any liability or obligation by reason of not making any such inspection.

SECTION 13.  Assignment.

Except as otherwise provided herein or in Section 8(u) of the Participation Agreement, Lessee will not, without prior

-46-

written consent of Lessor, assign any of its rights hereunder.
Lessor agrees that it will not assign or convey its right, title
and interest in and to this Lease or the Aircraft except as
provided herein, in the Trust Agreement or in the Participation
Agreement.  Subject to the foregoing, the terms and provisions of
this Lease shall be binding upon and inure to the benefit of
Lessor and Lessee and their respective successors and permitted
assigns.

        In the event Lessor shall have fully discharged its
payment obligations under the Loan Certificates, Lessor may, at
no cost or expense to Lessee, assign all or any part of its
interest in this Lease or the Aircraft to any lender(s) or an
indenture trustee pursuant to any financing documents including a
"quiet enjoyment" clause for the benefit of Lessee substantially
the same as Section 4 hereof; provided that no such assignment
shall impair the rights and benefits, or increase the burdens or
obligations, of Lessee hereunder; and provided, further, that no
such assignment shall be made to any lender(s), or an indenture
trustee acting on behalf of any lender(s), objectionable to
Lessee (it being understood and agreed, however, that this
proviso shall not operate (i) in the absence of objection made by
Lessee in writing within five days of its receipt of notice from
Lessor identifying its proposed lender(s) and (ii) in any event
to prevent subsequent transfers of debt instruments by any such
lender(s) who initially purchased the same in good faith for
their own account in a transaction not prohibited hereby).
Lessee hereby agrees, in connection with any assignment or
contemplated assignment described in this paragraph, at the
expense of Lessor, to execute and deliver a consent and agreement
relating thereto containing customary covenants, representations
and warranties and all such other documents and instruments
(including, without limitation, opinions of counsel and officers'
certificates regarding this Lease and the Aircraft), and to
cooperate generally and in such other ways, as Lessor may
reasonably request.

        SECTION 14.  Events of Default.

        Each of the following events shall constitute an Event
of Default (whether any such event shall be voluntary or
involuntary or come about or be effected by operation of law or
pursuant to or in compliance with any judgment, decree or order
of any court or any order, rule or regulation of any
administrative or governmental body) and each such Event of
Default shall continue so long as, but only as long as, it shall
not have been remedied:

        (a)  Lessee shall have failed to make a payment of Basic
Rent or Supplemental Rent after the same shall have become due

-47-

and such failure shall continue for 10 Business Days after Lessee's receipt of written notice thereof or demand therefor by the party entitled thereto; or

(b) Lessee shall fail to carry and maintain on or with respect to the Aircraft (or cause to be carried and maintained) insurance required to be maintained in accordance with the provisions of Section 11 hereof; provided that any such failure that continues unremedied for a period of not more than 15 days shall not constitute an Event of Default so long as (i) neither the Aircraft nor any Engine is operated without the full insurance coverage required under Section 11 hereof, and (ii) the Aircraft and each Engine are covered by such insurance as is required hereunder while they are on the ground; or

(c) Lessee shall have failed to perform or observe (or caused to be performed and observed) any other covenant or agreement to be performed or observed by it under any Operative Document, and such failure shall continue unremedied for a period of 30 days after written notice thereof by Lessor or the Mortgagee unless Lessee shall be diligently proceeding to correct such failure and such failure shall be corrected within a reasonable time; or

(d) any representation or warranty made by Lessee herein or in the Participation Agreement or any document or certificate furnished by Lessee in connection herewith or therewith or pursuant hereto or thereto (except the representations and warranties set forth in the Tax Indemnity Agreement and such documents or certificates as are furnished to the Owner Participant solely in connection with matters dealt with in the Tax Indemnity Agreement and for no other purpose) shall prove to have been incorrect in any material respect at the time made; provided that if the representation or warranty was originally given by Lessee in good faith, an Event of Default shall not be deemed to exist unless the incorrect representation or warranty in the reasonable opinion of Lessor remains material to Lessor at the time such incorrectness is discovered and, if capable of being cured, remains uncured for a period of 30 days after receipt by Lessee of a written notice from Lessor advising Lessee of such incorrectness; or

(e) Lessee shall consent to the appointment of or taking possession by a receiver, assignee, custodian, sequestrator, trustee or liquidator (or other similar official) of itself or of a substantial part of its property, or Lessee shall admit in writing its inability to pay its debts generally as they become due, or shall make a general assignment for the benefit of its creditors, or Lessee shall voluntarily commence any proceeding seeking liquidation, reorganization or other

-48-

relief with respect to itself or its debts under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or state bankruptcy, insolvency or other similar law or shall consent to the entry of an order for relief in an involuntary case under any such law or Lessee shall file in bankruptcy an answer admitting the material allegations of a petition filed against Lessee in any such proceeding, or otherwise seek relief under the provisions of any now existing or future Federal or state bankruptcy, insolvency or other similar law providing for the reorganization or winding-up of corporations, or providing for an agreement, composition, extension or adjustment with its creditors; or

(f)   an order, judgment or decree shall be entered against Lessee by any court of competent jurisdiction appointing, without the consent of Lessee, a receiver, assignee, custodian, sequestrator, trustee, or liquidator (or other similar official) of Lessee or of any substantial part of its property, or granting any other relief in respect to Lessee or its debts under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or state bankruptcy, insolvency or other similar law, as now or hereafter constituted, and any such order, judgment or decree shall remain in force undismissed, unstayed or unvacated for a period of 90 days after the date of entry thereof; or

(g)   a decree or order for relief in respect of the Lessee shall be entered by a court of competent jurisdiction in an involuntary case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or state bankruptcy, insolvency or other similar law, as now or hereafter constituted, and such decree or order shall remain unstayed in effect for a period of 90 days, or if, under the provisions of any law providing for reoganization or winding-up of corporations which may apply to Lessee, any court of competent jurisdiction shall assume jurisdiction, custody or control of Lessee or of any substantial part of its property and such jurisdiction, custody or control shall remain in force unrelinquished, unstayed or unterminated for a period of 90 days.

SECTION 15.   Remedies.

Upon the occurrence of any Event of Default and at any time thereafter so long as the same shall be continuing, Lessor may, at its option, declare by written notice to Lessee this Lease Agreement to be in default; and at any time thereafter, so long as any such outstanding Events of Default shall not have been waived or remedied, Lessor may do one or more of the following with respect to all or any part of the Airframe and any or all of the Engines as Lessor in its sole discretion shall

-49-

elect, to the extent permitted by, and subject to compliance with any mandatory requirements of, applicable law then in effect:

(a)   upon the written demand of Lessor and at Lessee's expense, cause Lessee to return promptly, and Lessee shall return promptly, the Airframe or any Engine as Lessor may so demand to Lessor or its order in the manner and condition required by, and otherwise in accordance with all the provisions of, Section 5 as if such Airframe or Engine were being returned at the end of the Term, or Lessor, at its option, may enter upon the premises where all or any part of the Airframe or any Engine is located and take immediate possession of and remove the same by summary proceedings or otherwise (and/or, at Lessor's option, store the same at Lessee's premises until disposal thereof by Lessor), all without liability accruing to Lessor for or by reason of such entry or taking of possession or removing whether for the restoration of damage to property caused by such action or otherwise;

(b)   sell the Aircraft at public or private sale, as Lessor may determine, or otherwise dispose of, hold, use, operate, lease to others or keep idle the Aircraft as Lessor, in its sole discretion, may determine, all free and clear of any rights of Lessee, except as hereinafter set forth in this Section 15;

(c)   whether or not Lessor shall have exercised, or shall thereafter at any time exercise, any of its rights under paragraph (a) or paragraph (b) above with respect to the Aircraft, Lessor, by written notice to Lessee specifying a payment date which shall be the Lease Period Date not earlier than ten days from the date of such notice, may demand that the Lessee pay to Lessor, and Lessee shall pay Lessor, on the payment date so specified, as liquidated damages for loss of a bargain and not as a penalty (in lieu of Basic Rent for such Aircraft due for Lease Periods commencing on or after the Lease Period Date specified as the payment date in such notice), any unpaid Basic Rent due on Lease Period Dates prior to the payment date so specified (including without limitation any adjustments to Basic Rent payable pursuant to Section 3(d)) plus whichever of the following amounts Lessor, in its sole discretion, shall specify in such notice (together with interest, if any, on such amount at the Past Due Rate from such specified payment date until the date of actual payment of such amount):   (i) an amount equal to the excess, if any, of the Stipulated Loss Value for such Aircraft, computed as of the Lease Period Date specified as the payment date in such notice, over the aggregate fair market rental value (computed as hereafter in this Section 15 provided) of such Aircraft for the remainder of the Term, after discounting such aggregate fair market rental value to present value as of the

-50-

Lease Period Date specified as the payment date in such notice at an annual rate equal to the then Base Rate plus 2%; or (ii) an amount equal to the excess, if any, of the Stipulated Loss Value for such Aircraft on the Lease Period Date specified as the payment date in such notice over the fair market sales value of such Aircraft (computed as hereafter in this Section provided) as of the Lease Period Date specified as the payment date in such notice;

(d)  in the event Lessor, pursuant to paragraph (b) above, shall have sold the Aircraft, Lessor, in lieu of exercising its rights under paragraph (c) above with respect to such Aircraft, may, if it shall so elect, demand that Lessee pay Lessor, and Lessee shall pay to Lessor, on the date of such sale, as liquidated damages for loss of a bargain and not as a penalty, any unpaid Basic Rent with respect to such Aircraft due prior to such date plus the amount of any deficiency between the net proceeds of such sale (after deduction of all reasonable costs of sale) or (if such sale is a private sale and is made to Lessor, the Mortgagee, a Participant or any Affiliate thereof) between the fair market sales value of the Aircraft (calculated as hereinafter in this Section 15 provided as of the date of such sale) and the Stipulated Loss Value of such Aircraft, computed as of the date of such sale together with interest, if any, on the amount of such deficiency, at the Past Due Rate, from the date of such sale to the date of actual payment of such amount; and/or

(e)  Lessor may terminate this Lease Agreement as to the Aircraft, and/or may exercise any other right or remedy which may be available to it under applicable law or proceed by appropriate court action to enforce the terms hereof or to recover damages for breach hereof.

For the purposes of paragraph (c) above, the "fair market rental value" or the "fair market sales value" of the Aircraft shall be the rental value or sales value, as the case may be, which would be obtained in an arm's-length transaction between an informed and willing lessee or purchaser, as the case may be, under no compulsion to lease or purchase, as the case may be, and an informed and willing lessor or seller in possession, as the case may be, in each case based upon the actual condition and location of the Aircraft and taking into account any inability of Lessor to recover possession of the Aircraft, which value shall be determined by mutual agreement or, in the absence of mutual written agreement, pursuant to an appraisal prepared and delivered by a nationally recognized firm of independent aircraft appraisers nominated by Lessor, and Lessor shall immediately notify Lessee of such nomination.  Unless Lessee shall have objected in writing within ten days after its receipt of Lessor's notice, Lessor's nomination shall be conclusive and

-51-

binding. If Lessee shall object, however, Lessor and Lessee shall endeavor, within ten days after such objection is made, to select a mutually acceptable appraiser; provided that if Lessee shall not so endeavor to make such selection, Lessor's nomination referred to in the preceding sentence hereof shall be conclusive and binding. If Lessor and Lessee fail to reach agreement (except for the reason referred to in the proviso in the preceding sentence), or if any appraiser selected fails to act for any reason, then the question shall be determined by an appraisal (applying the definitions of "fair market rental value" and "fair market sales value" as set forth above based upon the actual condition of the Aircraft) mutually agreed to by two recognized independent aircraft appraisers, one of which appraisers shall be chosen by Lessor and one by Lessee within five Business Days after Lessor or Lessee shall have received written notice from the other party of a demand that such an appraisal be made, which notice shall specify the appraiser chosen by the party giving the notice or, if such appraisers cannot agree on the amount of such appraisal within 20 Business Days after the end of such five-day period, each shall render its own appraisal and shall by mutual consent choose another appraiser within five Business Days after the end of such 20-day period. If, within such five-day period, such two appraisers fail to appoint a third appraiser, then either Lessor or Lessee, on behalf of both, may request such appointment by the then President of the Association of the Bar of the City of New York (or any successor organization thereto) or, in his absence, failure, refusal or inability to act, then either Lessor or Lessee may apply to the American Arbitration Association (or any successor organization thereto) in New York, New York for the appointment of such third appraiser. The decision of the third appraiser so appointed shall be given within 20 Business Days after the appointment of such third appraiser. As soon as the third appraiser has delivered his appraisal, that appraisal shall be compared with the appraisals given by the other two appraisers. If the determination of one appraiser is more disparate from the average of all three determinations than each of the other two determinations, then the determination of such appraiser shall be excluded, the remaining two determinations shall be averaged and such average shall be final and binding upon the parties hereto. If no determination is more disparate from the average of all three determinations than each of the other determinations, then such average shall be final and binding upon the parties thereto. The cost of such appraisal or appointment shall be borne by Lessee.

    In addition, Lessee shall be liable, except as otherwise provided above without duplication of amounts payable hereunder, for any and all unpaid Rent due hereunder before, after or during the exercise of any of the foregoing remedies and for all

reasonable and actual legal fees and other costs and expenses (including fees of the appraisers hereinabove referred to) incurred by Lessor, the Mortgagee and the Owner Participant in connection with the return of the Airframe or Engine in accordance with the terms of Section 5 or in placing such Airframe or Engine in the condition and airworthiness required by such Section.

At any sale of the Aircraft or any part thereof pursuant to this Section 15, Lessor (or the Mortgagee or the Owner Participant) may bid for and purchase such property. Lessor agrees to give Lessee at least 15 days written notice of the date fixed for any public sale of any Airframe or Engine or of the date on or after which will occur the execution of any contract providing for any private sale, and any such public sale shall be conducted in general so as to afford Lessee a reasonable opportunity to bid. Except as otherwise expressly provided above, no remedy referred to in this Section 15 is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity; and the exercise or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all of such other remedies. No waiver by Lessor of any Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Event of Default.

SECTION 16.  Lessee's Cooperation Concerning Certain Matters.

Forthwith upon the execution and delivery of each Lease Supplement and Trust Supplement from time to time required by the terms hereof, Lessee will cause such Lease Supplement, Trust Supplement (and, in the case of the initial Lease Supplement and Trust Supplement, this Lease, the Trust Agreement and the Trust Indenture as well) to be duly filed and recorded, and maintained of record, in accordance with the Federal Aviation Act.  In addition, Lessee will promptly and duly execute and deliver to Lessor and Mortgagee such further documents and take such further action as Lessor or the Mortgagee may from time to time reasonably request in order more effectively to carry out the intent and purpose of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor and the Mortgagee hereunder, including, without limitation, if requested by Lessor or the Mortgagee, at the expense of Lessee, the execution and delivery of supplements or amendments hereto or to the Trust Indenture, each in recordable form, subjecting to this Lease and the Trust Indenture, any airframe or engine substituted for the Airframe or any Engine pursuant to the terms thereof and the recording or filing of

-53-

counterparts thereof, in accordance with the laws of such
jurisdictions as Lessor or the Mortgagee may from time to time
deem advisable.  Lessee will promptly provide the Participants,
Lessor and the Mortgagee with such financial information as is
provided from time to time to Lessee's public shareholders or,
should Lessee be reorganized as a subsidiary of another
corporation, then of Lessee's parent corporation, or, in any
event, such other financial information as any such person shall
reasonably request from time to time.  Commencing in 1988, on or
before December 1 of each year during the Term, Lessee will
deliver to Lessor and the Mortgagee a certificate of Lessee,
signed by the President, a Vice President or the Treasurer of
Lessee to the effect that the signer is familiar with or has
reviewed the relevant terms of this Lease and the signer does not
have knowledge of the existence, as of the date of such
certificate, of any condition or event which constitutes an Event
of Default.  Lessee agrees that if an officer of Lessee has
knowledge of the existence of an Event of Default, Lessee shall
promptly give notice thereof to Lessor and the Mortgagee.

          SECTION 17.  Notices.

          All notices required under the terms and provisions
hereof shall be by cable or telex (with such cable or telex to be
confirmed in writing), or if such notice is impracticable by
registered, first-class mail, with postage prepaid, or by
personal delivery of written notice, and any such notice shall
become effective when received, any telex to be deemed received
upon receipt by the party transmitting the telex of such other
party's callback code at the end of such telex (receipt of
confirmation in writing not being necessary to the effectiveness
of any telex), addressed:

               (i)   if to Lessee, at 8008 Aviation Place,
          P.O. Box 37611, Love Field, Dallas, Texas 75235-
          1625, Attention: Treasurer, Telex No. 9108614300 SW
          AIRLINE DAL, or to such other address as Lessee
          shall from time to time designate in writing to
          Lessor in accordance with this Section 17,

               (ii)  if to Lessor at 777 Main Street,
          Hartford, Connecticut 06115, Attention: Bond and
          Trustee Administration, Telex No. 99339 CTNB-HFD,
          or to such other address as Lessor shall from time
          to time designate in writing to Lessee in
          accordance with this Section 17, and

               (iii) if to the Mortgagee or the Participants,
          addressed to the Mortgagee or the Participants at
          such address as the Mortgagee or the Participants

shall have furnished by notice to Lessor and to
Lessee, and, until an address is so furnished,
addressed to the Mortgagee or the Participants at
their respective addresses set forth on the
signature pages of the Participation Agreement.

SECTION 18.   No Set-Off, Counterclaim, etc.

All Rent shall be paid by Lessee to Lessor in funds of
the type specified in Section 3(f). Except as otherwise provided
in Section 8(p) of the Participation Agreement, Lessee's
obligation to pay all Rent payable hereunder shall be absolute
and unconditional and shall not be affected by any circumstance,
including, without limitation, (i) any set-off, counterclaim,
recoupment, defense or other right which Lessee may have against
Lessor, in its individual capacity or as Owner Trustee under the
Trust Agreement, the Mortgagee, the Owner Participant, or anyone
else for any reason whatsoever (whether in connection with the
transactions contemplated hereby or any other transactions),
including, without limitation, any breach by Lessor or the Owner
Participant of their respective warranties, agreements or
covenants contained in any of the Operative Documents, (ii) any
defect in the title, registration, airworthiness, condition,
design, operation, or fitness for use of, or any damage to or
loss or destruction of, the Aircraft, or any interruption or
cessation in or prohibition of the use or possession thereof by
Lessee (or any Sublessee) for any reason whatsoever, including,
without limitation, any such interruption, cessation or
prohibition resulting from the act of any government authority,
(iii) any insolvency, bankruptcy, reorganization or similar case
or proceedings by or against Lessee (or any Sublessee) or any
other person, or (iv) any other circumstance, happening, or event
whatsoever, whether or not unforeseen or similar to any of the
foregoing.   If for any reason whatsoever this Lease shall be
terminated in whole or in part by operation of law or otherwise
except as specifically provided herein, Lessee nonetheless agrees
without limitation of the other rights or remedies of Lessor
hereunder to pay to Lessor an amount equal to each Rent payment
at the time such payment would have become due and payable in
accordance with the terms hereof had this Lease not been
terminated in whole or in part. Lessee hereby waives, to the
extent permitted by applicable law, any and all rights which it
may now have or which at any time hereafter may be conferred upon
it, by statute or otherwise, to terminate, cancel, quit or
surrender this Lease except in accordance with the express terms
hereof.   Each Rent payment made pursuant to this Lease by Lessee
shall be final and Lessee will not seek to recover all or any
part of such payment from Lessor or the Mortgagee for any reason
whatsoever.

SECTION 19.    Renewal Option; Purchase Option; Valuation.

(a)    Renewal Option.  Not less than 180 days before the
end of the Basic Term or any Renewal Term, Lessee may deliver to
Lessor a written notice irrevocably electing to renew this Lease
for a Renewal Term specified in such notice of not less than two
years (nor more than five years in the aggregate).  Basic Rent
payable during each of the first two years of the first Renewal
Term shall be in an amount equal to the lesser of (i) the "fair
market rental value" of the Aircraft determined as of the
commencement of such Renewal Term and (ii) 50% of the Basic Rent
for the last year of the Basic Term.  Basic Rent payable during
any subsequent year of a Renewal Term shall be in an amount equal
to the "fair market rental value" of the Aircraft determined as
of the commencement of the respective Renewal Term.  Such "fair
market rental value" shall be determined as set forth in this
Section 19(a) and in Section 19(c) hereof.  The Aircraft shall be
valued under this Section 19 (i) as if in the condition and
otherwise in compliance with the terms of Section 5 upon return
of the Aircraft, (ii) on the basis of the value which would
obtain in an arm's-length transaction between an informed and
willing buyer-user or lessee (other than a lessee or an Affiliate
of a lessee currently in possession or a used equipment scrap
dealer) under no compulsion to buy or lease and an informed and
willing seller or lessor unaffiliated with such buyer-user and
under no compulsion to sell or lease, and (iii) in the case of
such valuation for determining "fair market rental value",
assuming such lessee would have substantially the same
obligations during the Renewal Term as provided hereunder
including without limitation the obligations of Lessee to carry
and maintain the insurance required by Section 11 hereof and to
make certain payments with reference to Stipulated Loss Value
during the applicable Renewal Term.  If no such written notice is
delivered by Lessee to Lessor on or before said 180th day, Lessee
shall be deemed to have waived any right to renew this Lease.  At
the end of the Basic Term or the initial Renewal Term, if Lessee
has elected to renew this Lease as aforesaid, and provided that
there shall not then have occurred and be continuing an Event of
Default and that all necessary governmental authorizations and
approvals shall have been received and that Basic Rent for the
applicable Renewal Term has already been determined as above
provided, this Lease shall continue in full force and effect
during the Renewal Term, except that (x) Lessee shall pay Lessor
Basic Rent in amounts determined as aforesaid, which Basic Rent
shall be payable in semiannual installments in arrears, each such
installment being due and payable on each Lease Period Date
occurring during such Renewal Term, commencing with the Lease
Period Date next following the commencement of such Renewal Term
and (y) the Stipulated Loss Value Schedule applicable during such
Renewal Term shall be determined separately for such Renewal Term

-56-

by the Owner Participant in good faith to reflect the "fair
market sales value" (determined in the manner set forth in this
Section 19) of the Aircraft as of the commencement of such
Renewal Term.

(b) <u>Purchase Options</u>. At the expiration of the Basic
Term or any Renewal Term, Lessee shall have the option, upon at
least 180 days' irrevocable prior notice to Lessor, to purchase
the Aircraft on the last Business Day of the Basic Term or such
Renewal Term for a purchase price equal to (i) in the case of the
purchase option at the expiration of the Basic Term, the lesser
of 50.0% of Lessor's Cost or the then fair market sales value as
defined in Section 19(c) below or (ii) in the case of any other
purchase option the then fair market sales value, such fair
market sales value to be computed as of 30 days prior to such
date in accordance with the provisions of Sections 19(a) and
19(c) hereof. Upon such payment in full and payment of any other
amounts then due hereunder (including costs or expenses of the
Owner Participant in connection with such purchase), Lessor will
transfer to Lessee, without recourse or warranty (except as to
the absence of Lessor Liens), all of Lessor's right, title and
interest in and to the Aircraft.

(c) <u>Valuation</u>. At any time not earlier than 365 days
prior to the date on which Lessee may purchase the Aircraft
pursuant to Section 19(b) hereof or renew this Lease pursuant to
Section 19(a) hereof, Lessee may deliver to Lessor a revocable
notice of its intent to exercise its renewal option or purchase
option. Upon receipt of such notice Lessor and Lessee shall
confer in good faith with a view to reaching agreement on the
"fair market rental value" or "fair market sales value", as the
case may be, of the Aircraft. If the parties have not so agreed
by 290 days prior to the end of the Basic Term or the Renewal
Term in question, then the question shall be determined by an
appraisal (applying the definition of "fair market rental value"
or "fair market sales value", as the case may be, in Section
19(a) hereof) mutually agreed to by two recognized independent
aircraft appraisers, one of which appraisers shall be chosen by
Lessor and one by Lessee within five Business Days after Lessor
or Lessee shall have received written notice from the other party
of a demand that such an appraisal be made, which notice shall
specify the appraiser chosen by the party giving the notice or,
if such appraisers cannot agree on the amount of such appraisal
within 20 Business Days after the end of such five-day period,
each shall render its own appraisal and shall by mutual consent
choose another appraiser within five Business Days after the end
of such 20-day period. If, within such five-day period, such two
appraisers fail to appoint a third appraiser, then either Lessor
or Lessee, on behalf of both, may request such appointment by the
then President of the Association of the Bar of the City of New

York (or any successor organization thereto) or, in his absence, failure, refusal or inability to act, then either Lessor or Lessee may apply to the American Arbitration Association (or any successor organization thereto) in New York, New York for the appointment of such third appraiser. The decision of the third appraiser so appointed shall be given within 20 Business Days after the appointment of such third appraiser. As soon as the third appraiser has delivered his appraisal, that appraisal shall be compared with the appraisals given by the other two appraisers. If the determination of one appraiser is more disparate from the average of all three determinations than each of the other two determinations, then the determination of such appraiser shall be excluded, the remaining two determinations shall be 'averaged and such average shall be final and binding upon the parties hereto. If no determination is more disparate from the average of all three determinations than each of the other determinations, then such average shall be final and binding upon the parties thereto. Lessee and Lessor shall share equally all expenses relating to such appraisal procedure.

SECTION 20. Security for Lessor's Obligation to Holders of Loan Certificates.

In order to secure the indebtedness evidenced by the Loan Certificates, Lessor has agreed in the Trust Indenture, among other things, to assign to the Mortgagee this Lease and each Lease Supplement and to mortgage the Aircraft in favor of the Mortgagee, subject to the reservations and conditions therein set forth. To the extent, if any, that this Lease and any Lease Supplement constitute chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction), no security interest in this Lease and any Lease Supplement may be created through the transfer or possession of any counterpart other than the original counterpart, which shall be identified as the counterpart containing the receipt therefor executed by the Mortgagee as mortgagee under the Trust Indenture on the signature page thereof. Lessee hereby accepts and consents to the assignment of all Lessor's right, title and interest in and to this Lease pursuant to the terms of the Trust Indenture. Lessee agrees to pay directly to the Mortgagee (or, after receipt by Lessee of notice from the Mortgagee of the discharge of the Trust Indenture, to Lessor), all amounts of Rent due or to become due hereunder and assigned to the Mortgagee, and Lessee agrees that the Mortgagee's right to such payments hereunder shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation, the circumstances set forth in clauses (i) through (iv) of Section 18 hereof. Notwithstanding the foregoing assignment of this Lease, the obligations of Lessor to Lessee to perform the terms and conditions of this Lease shall remain in full force and effect.

SECTION 21.  Lessor's Right to Perform for Lessee.

If Lessee fails to make any payment of Rent required to be made by it hereunder or fails to perform or comply with any of its agreements contained herein, then Lessor may itself make such payment òr perform or comply with such agreement but shall not be obligated hereunder to do so, and the amount of such payment and the amount of the reasonable expenses of Lessor incurred in connection with such payment or the performance of or compliance with such agreement, as the case may be, together with interest thereon at the Past Due Rate, shall be deemed Supplemental Rent, payable by Lessee upon demand.  Lessor will promptly notify each holder of a Loan Certificate of each exercise by it of any of its rights to perform for Lessee pursuant to this Section 21.

SECTION 22.  Investment of Security Funds; Liability of Lessor Limited.

(a) Investment of Security Funds.  Any moneys held by Lessor as security hereunder for future payment to Lessee at a time when there is not continuing an Event of Default or an event or condition which, with notice or lapse of time, or both, would constitute an Event of Default shall, until paid to Lessee, be invested by Lessor or, if the Trust Indenture shall not have been discharged, by the Mortgagee, as the case may be, as Lessee may from time to time direct in writing in obligations of, or guaranteed by, the United States Government maturing within 91 days after such investment, open market commercial paper of any corporation incorporated under the laws of the United States of America or any State thereof rated P-1 or its equivalent by Moody's Investors Service, Inc. or A-1 or its equivalent by Standard & Poor's Corporation or certificates of deposit maturing within 90 days after such investment issued by commercial banks organized under the laws of the United States or of any political subdivision thereof having a combined capital and surplus in excess of $100,000,000; provided, however, that the aggregate amount at any one time so invested in certificates of deposit issued by any one bank shall not be in excess of the lesser of $10,000,000 or 5% of such bank's capital and surplus.  There shall be promptly remitted to Lessee or its order any gain (including interest received) realized as a result of any such investment (net of any fees, commissions and other expenses, if any, incurred in connection with such investment) unless an Event of Default or an event or condition which, with notice or lapse of time, or both, would constitute an Event of Default shall have occurred and be continuing.  Lessee shall be responsible for any net loss realized as a result of any such investment and shall reimburse Lessor (or the Mortgagee, as the case may be) therefor on demand.

(b) <u>Liability of Lessor Limited</u>.  It is expressly agreed and understood that all representations, warranties and undertakings of Lessor hereunder shall be binding upon Lessor only in its capacity as trustee under the Trust Agreement, and the institution acting as Lessor shall not be liable in its individual capacity for any breach thereof except for its gross negligence or willful misconduct or for breach of its covenants, representations and warranties contained herein, to the extent covenanted or made in its individual capacity.

SECTION 23.  <u>Submission to Jurisdiction</u>.

Lessor and Lessee each hereby irrevocably submits itself to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and to the non-exclusive jurisdiction of the Supreme Court of the State of New York, New York County, for the purposes of any suit, action or other proceeding arising out of this Lease, the subject matter hereof or any of the transactions contemplated hereby brought by Lessor, Lessee, the Mortgagee or the Owner Participant or their respective successors or assigns.

SECTION 24.  <u>Miscellaneous</u>.

Lessor shall not, without the consent of Lessee, assign any of its rights or interests under the Lease (except as security for the Loan Certificates issued pursuant to the Trust Indenture) otherwise than to a transferee of its entire interest under the Lease.  Any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  No term or provision of this Lease may be changed or waived orally, but only by an instrument in writing signed by Lessor, Lessee and any assignee of Lessor's rights hereunder.  This Lease shall constitute an agreement of lease, and nothing contained herein shall be construed as conveying to Lessee any right, title or interest in the Aircraft except as a lessee only.  The Section and paragraph headings in this Lease and the table of contents are for convenience of reference only and shall not modify, define, expand or limit any of the terms or provisions hereof and all references herein to numbered sections, unless otherwise indicated, are to sections of this Lease.  This Lease has been delivered in the State of New York and shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance.  This Lease may be executed by the

-60-

parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

### SECTION 25.  Successor Trustee.

Lessee agrees that in the case of the appointment of any successor Owner Trustee pursuant to the terms of the Trust Agreement, such successor Owner Trustee shall, upon written notice to Lessee by such successor Owner Trustee, succeed to all the rights, powers and title of Lessor hereunder and shall be deemed to be Lessor and the owner of the Aircraft for all purposes hereof without the necessity of any consent or approval by Lessee (subject to Section 10 of the Participation Agreement) and without in any way altering the terms of this Lease or Lessee's obligations hereunder.  One such appointment and designation of a successor Owner Trustee shall not exhaust the right to appoint and designate further successor Owner Trustees pursuant to the Trust Agreement, but such right may be exercised repeatedly as long as this Lease shall be in effect.

IN WITNESS WHEREOF, Lessor and Lessee have each caused this Lease [Trust B] to be duly executed as of the day and year first above written.

                              THE CONNECTICUT NATIONAL BANK, not
                              in its individual capacity, except
                              as expressly provided herein, but
                              solely as Owner Trustee,
                                  Lessor

                              BY: _____
                                  Title:
                                        Vice President


                              SOUTHWEST AIRLINES CO.,
                                  Lessee


                              BY: _____
                                  Title:   Treasurer

IN WITNESS WHEREOF, Lessor and Lessee have each caused this Lease [Trust B] to be duly executed as of the day and year first above written.

THE CONNECTICUT NATIONAL BANK, not in its individual capacity, except as expressly provided herein, but solely as Owner Trustee,
    Lessor

BY: _____
    Title:

SOUTHWEST AIRLINES CO.,
    Lessee

BY: _____
    Title:  Treasurer

EXHIBIT A

to

Lease Agreement

LEASE SUPPLEMENT NO. _____

[TRUST B]

LEASE SUPPLEMENT NO. ____ ·[TRUST B] dated *6-2-87*          ,
_____ between THE CONNECTICUT NATIONAL BANK, not in its
individual capacity, but solely as Owner Trustee under the Trust
Agreement [Trust B] dated as of June 1, 1987, between Chrysler
Capital Corporation, as Owner Participant, and such Owner Trustee
(such Owner Trustee, in its capacity as such Owner Trustee, being
herein called "Lessor"), and SOUTHWEST AIRLINES CO. ("Lessee").·

Lessor and Lessee have heretofore entered into that
certain Lease Agreement [Trust B], dated as of June 1, 1987,
relating to one Boeing Model 737-3H4 aircraft (herein called the
"Lease," and the defined terms therein being hereinafter used
with the same meanings).  The Lease provides for the execution
and delivery from time to time of Lease Supplements for the
purpose of leasing the Airframe and Engines under the Lease as
and when delivered by Lessor to Lessee in accordance with the
terms thereof.

1/The Lease relates to the Airframe and Engines
described below, and a counterpart of the Lease is attached
hereto, and made a part hereof, and this Lease Supplement [Trust
B], together with such attachment, is being filed for recordation
on the date hereof with the Federal Aviation Administration as
one document.

2/The Lease Agreement relates to the Airframe and
Engines described below, and a counterpart of the Lease
Agreement, attached and made a part of Lease Supplement No. 1
[Trust B] dated June ___, 1987 to the Lease Agreement, has been
recorded by the Federal Aviation Administration on ___, 198_, as
one document and assigned Conveyance No. __ .

_____

1/      This language for Lease Supplement No. 1.

2/      This language for other Lease Supplements.

-1-

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, Lessor and Lessee hereby agree as follows:

1.    Lessor hereby delivers and leases to Lessee under the Lease and Lessee hereby accepts and leases from Lessor under the Lease the following described one Boeing Model 737-300 series aircraft (the "Aircraft"), which Aircraft as of the date hereof consists of the following components:

FAA Registration No. N___SW

Airframe manufacturer's serial No. _____

Two _____ Model _____ engines installed on the Airframe (each of which engines has 750 or more rated take-off horsepower or the equivalent of such horsepower) having manufacturer's serial nos. _____
_____

Lessor's Cost:    _____

2.    The Delivery Date of the Aircraft is the date of this Lease Supplement set forth in the opening paragraph hereof.

3.    Lessee hereby confirms its agreement to pay Lessor Basic Rent for the Aircraft during the Term therefor in accordance with Section 3 of the Lease.

4.    Lessee hereby confirms to Lessor that Lessee has accepted the Aircraft for all purposes hereof and of the Lease as being airworthy, in good working order and repair and without defect or inherent vice in title, condition, design, operation or fitness for use; provided, however, that nothing contained herein or in the Lease shall in any way diminish or otherwise affect any right Lessee or Lessor may have with respect to the Aircraft against The Boeing Company, or any subcontractor or supplier of The Boeing Company, under the Purchase Agreement or otherwise.

-2-

5. All of the terms and provisions of the Lease are hereby incorporated by reference in this Lease Supplement to the same extent as if fully set forth herein.

6. This Lease Supplement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

7. This Lease Supplement is being delivered in the State of New York and shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance.

IN WITNESS WHEREOF, Lessor and Lessee have caused this Lease Supplement to be duly executed on the day and year first above written.

THE CONNECTICUT NATIONAL BANK
    Not in its Individual Capacity,
    but solely as Owner Trustee,

Lessor

By: _____  _____
Title:

SOUTHWEST AIRLINES CO.,

Lessee

By: _____
Title:  Treasurer

-4-

## EXHIBIT B

### Schedule of Basic Rent

| Lease Period Date | Basic Rent (as % of Lessor's Cost)* |
|---|---|
| 11/ 1/1987 | 0.0000000 |
| 5/ 1/1988 | 3.8124510 |
| 11/ 1/1988 | 4.7340776 |
| 5/ 1/1989 | 3.7672450 |
| 11/ 1/1989 | 4.7792830 |
| 5/ 1/1990 | 3.7176044 |
| 11/ 1/1990 | 4.8289234 |
| 5/ 1/1991 | 3.6630942 |
| 11/ 1/1991 | 4.8834342 |
| 5/ 1/1992 | 3.6032365 |
| 11/ 1/1992 | 4.9432915 |
| 5/ 1/1993 | 3.5375070 |
| 11/ 1/1993 | 5.0090210 |
| 5/ 1/1994 | 3.4653290 |
| 11/ 1/1994 | 5.0811990 |
| 5/ 1/1995 | 3.3860710 |
| 11/ 1/1995 | 5.1604576 |
| 5/ 1/1996 | 10.4457350 |
| 11/ 1/1996 | 2.9484915 |
| 5/ 1/1997 | 7.4972440 |
| 11/ 1/1997 | 2.7253751 |
| 5/ 1/1998 | 7.7203601 |
| 11/ 1/1998 | 2.4803711 |
| 5/ 1/1999 | 7.9653640 |
| 11/ 1/1999 | 2.3223940 |
| 5/ 1/2000 | 8.1233410 |
| 11/ 1/2000 | 2.3223940 |
| 5/ 1/2001 | 8.1233410 |
| 11/ 1/2001 | 2.3223940 |
| 5/ 1/2002 | 8.1233410 |
| 11/ 1/2002 | 2.0309820 |
| 5/ 1/2003 | 8.4147530 |
| 11/ 1/2003 | 1.7006220 |
| 5/ 1/2004 | 8.7451139 |
| 11/ 1/2004 | 1.3360693 |
| 5/ 1/2005 | 9.1096660 |
| 11/ 1/2005 | 0.9337860 |
| 5/ 1/2006 | 9.5119497 |
| 11/ 1/2006 | 0.4898660 |
| 5/ 1/2007 | 9.9558698 |

*    Each installment of Basic Rent payable on a Lease Period Date
     occurring on or before November 1, 1995 shall relate to the
     Lease Period ended on the day immediately preceding such

EXHIBIT B

*Superseded by Lease Supp. No. 7*

Schedule of Basic Rent

| Lease Period Date | Basic Rent (as % of Lessor's Cost)* |
|---|---|
| 11/ 1/1987 | 0.0000000 |
| 5/ 1/1988 | 3.8124510 |
| 11/ 1/1988 | 4.7340776 |
| 5/ 1/1989 | 3.7672450 |
| 11/ 1/1989 | 4.7792830 |
| 5/ 1/1990 | 3.7176044 |
| 11/ 1/1990 | 4.8289234 |
| 5/ 1/1991 | 3.6630942 |
| 11/ 1/1991 | 4.8834342 |
| 5/ 1/1992 | 3.6032365 |
| 11/ 1/1992 | 4.9432915 |
| 5/ 1/1993 | 3.5375070 |
| 11/ 1/1993 | 5.0090210 |
| 5/ 1/1994 | 3.4653290 |
| 11/ 1/1994 | 5.0811990 |
| 5/ 1/1995 | 3.3860710 |
| 11/ 1/1995 | 5.1604576 |
| 5/ 1/1996 | 10.4457350 |
| 11/ 1/1996 | 2.9484915 |
| 5/ 1/1997 | 7.4972440 |
| 11/ 1/1997 | 2.7253751 |
| 5/ 1/1998 | 7.7203601 |
| 11/ 1/1998 | 2.4803711 |
| 5/ 1/1999 | 7.9653640 |
| 11/ 1/1999 | 2.3223940 |
| 5/ 1/2000 | 8.1233410 |
| 11/ 1/2000 | 2.3223940 |
| 5/ 1/2001 | 8.1233410 |
| 11/ 1/2001 | 2.3223940 |
| 5/ 1/2002 | 8.1233410 |
| 11/ 1/2002 | 2.0309820 |
| 5/ 1/2003 | 8.4147530 |
| 11/ 1/2003 | 1.7006220 |
| 5/ 1/2004 | 8.7451139 |
| 11/ 1/2004 | 1.3360693 |
| 5/ 1/2005 | 9.1096660 |
| 11/ 1/2005 | 0.9337860 |
| 5/ 1/2006 | 9.5119497 |
| 11/ 1/2006 | 0.4898660 |
| 5/ 1/2007 | 9.9558698 |

---

\*    Each installment of Basic Rent payable on a Lease Period Date
occurring on or before November 1, 1995 shall relate to the
Lease Period ended on the day immediately preceding such

Lease Period Date and each installment of Basic Rent payable on a Lease Period Date occurring on or after May 1, 1996 shall relate to the Lease Period beginning on such Lease Period Date.

## EXHIBIT C

### Stipulated Loss Value

*Superceded by Lease Supp. No. 2*

| Date | Percentage of Lessor's Cost |
|------|------|
| 2 JUN 1987 | 101.57595 |
| 1 JUL 1987 | 102.44571 |
| 1 AUG 1987 | 103.33828 |
| 1 SEP 1987 | 104.23248 |
| 1 OCT 1987 | 105.10524 |
| 1 NOV 1987 | 105.97951 |
| 1 DEC 1987 | 106.88871 |
| 1 JAN 1988 | 105.97601 |
| 1 FEB 1988 | 106.84256 |
| 1 MAR 1988 | 107.71058 |
| 1 APR 1988 | 108.57308 |
| 1 MAY 1988 | 109.42439 |
| 1 JUN 1988 | 106.46190 |
| 1 JUL 1988 | 107.29764 |
| 1 AUG 1988 | 108.13464 |
| 1 SEP 1988 | 108.97293 |
| 1 OCT 1988 | 109.79691 |
| 1 NOV 1988 | 110.62209 |
| 1 DEC 1988 | 106.70687 |
| 1 JAN 1989 | 107.51133 |
| 1 FEB 1989 | 108.31692 |
| 1 MAR 1989 | 109.12364 |
| 1 APR 1989 | 109.92457 |
| 1 MAY 1989 | 110.71179 |
| 1 JUN 1989 | 107.73279 |
| 1 JUL 1989 | 108.50725 |
| 1 AUG 1989 | 109.28265 |
| 1 SEP 1989 | 110.05898 |
| 1 OCT 1989 | 110.82146 |
| 1 NOV 1989 | 111.58480 |
| 1 DEC 1989 | 107.56145 |
| 1 JAN 1990 | 108.30344 |
| 1 FEB 1990 | 109.52060 |
| 1 MAR 1990 | 110.21805 |
| 1 APR 1990 | 110.91203 |
| 1 MAY 1990 | 111.59786 |
| 1 JUN 1990 | 108.56635 |
| 1 JUL 1990 | 109.24425 |
| 1 AUG 1990 | 109.92239 |
| 1 SEP 1990 | 110.60078 |
| 1 OCT 1990 | 111.27094 |
| 1 NOV 1990 | 112.44131 |
| 1 DEC 1990 | 108.27696 |
| 1 JAN 1991 | 109.44844 |
| 1 FEB 1991 | 110.10496 |
| 1 MAR 1991 | 110.76166 |
| 1 APR 1991 | 111.41480 |
| 1 MAY 1991 | 112.05922 |

## EXHIBIT C

### Stipulated Loss Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 JUN 1991 | 109.04068 |
| 1 JUL 1991 | 109.67649 |
| 1 AUG 1991 | 110.31240 |
| 1 SEP 1991 | 110.94842 |
| 1 OCT 1991 | 111.57566 |
| 1 NOV 1991 | 112.20296 |
| 1 DEC 1991 | 107.93693 |
| 1 JAN 1992 | 109.06065 |
| 1 FEB 1992 | 109.66927 |
| 1 MAR 1992 | 110.27792 |
| 1 APR 1992 | 110.88265 |
| 1 MAY 1992 | 111.48845 |
| 1 JUN 1992 | 108.49103 |
| 1 JUL 1992 | 109.09792 |
| 1 AUG 1992 | 109.70484 |
| 1 SEP 1992 | 110.31179 |
| 1 OCT 1992 | 110.91981 |
| 1 NOV 1992 | 111.52787 |
| 1 DEC 1992 | 107.18171 |
| 1 JAN 1993 | 108.29508 |
| 1 FEB 1993 | 108.89333 |
| 1 MAR 1993 | 109.49162 |
| 1 APR 1993 | 110.09041 |
| 1 MAY 1993 | 110.69035 |
| 1 JUN 1993 | 107.75282 |
| 1 JUL 1993 | 108.35396 |
| 1 AUG 1993 | 108.95515 |
| 1 SEP 1993 | 109.55638 |
| 1 OCT 1993 | 110.15878 |
| 1 NOV 1993 | 110.76122 |
| 1 DEC 1993 | 106.34268 |
| 1 JAN 1994 | 107.44947 |
| 1 FEB 1994 | 108.04117 |
| 1 MAR 1994 | 108.63293 |
| 1 APR 1994 | 109.22524 |
| 1 MAY 1994 | 109.81879 |
| 1 JUN 1994 | 106.94708 |
| 1 JUL 1994 | 107.54194 |
| 1 AUG 1994 | 108.13687 |
| 1 SEP 1994 | 108.73188 |
| 1 OCT 1994 | 109.32814 |
| 1 NOV 1994 | 109.92448 |
| 1 DEC 1994 | 105.42649 |
| 1 JAN 1995 | 106.01095 |
| 1 FEB 1995 | 106.59550 |
| 1 MAR 1995 | 107.18013 |
| 1 APR 1995 | 107.76538 |
| 1 MAY 1995 | 108.35097 |

EXHIBIT C

Stipulated Loss Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 JUN 1995 | 105.55058 |
| 1 JUL 1995 | 106.13661 |
| 1 AUG 1995 | 106.72274 |
| 1 SEP 1995 | 107.30896 |
| 1 OCT 1995 | 107.89553 |
| 1 NOV 1995 | 108.48220 |
| 1 DEC 1995 | 103.89400 |
| 1 JAN 1996 | 104.46661 |
| 1 FEB 1996 | 105.03932 |
| 1 MAR 1996 | 105.61212 |
| 1 APR 1996 | 106.18514 |
| 1 MAY 1996 | 106.76162 |
| 1 JUN 1996 | 96.83405 |
| 1 JUL 1996 | 97.35569 |
| 1 AUG 1996 | 97.87746 |
| 1 SEP 1996 | 98.39935 |
| 1 OCT 1996 | 98.92474 |
| 1 NOV 1996 | 99.45026 |
| 1 DEC 1996 | 97.02744 |
| 1 JAN 1997 | 97.55661 |
| 1 FEB 1997 | 98.08595 |
| 1 MAR 1997 | 98.61544 |
| 1 APR 1997 | 99.14658 |
| 1 MAY 1997 | 99.68001 |
| 1 JUN 1997 | 92.67918 |
| 1 JUL 1997 | 93.17789 |
| 1 AUG 1997 | 93.67679 |
| 1 SEP 1997 | 94.17588 |
| 1 OCT 1997 | 94.67726 |
| 1 NOV 1997 | 95.17885 |
| 1 DEC 1997 | 92.95526 |
| 1 JAN 1998 | 93.45936 |
| 1 FEB 1998 | 93.96366 |
| 1 MAR 1998 | 94.46818 |
| 1 APR 1998 | 94.97384 |
| 1 MAY 1998 | 95.48205 |
| 1 JUN 1998 | 88.22930 |
| 1 JUL 1998 | 88.69946 |
| 1 AUG 1998 | 89.16985 |
| 1 SEP 1998 | 89.64048 |
| 1 OCT 1998 | 90.11368 |
| 1 NOV 1998 | 90.58713 |
| 1 DEC 1998 | 88.58046 |
| 1 JAN 1999 | 89.05674 |
| 1 FEB 1999 | 89.53328 |
| 1 MAR 1999 | 90.01008 |
| 1 APR 1999 | 90.48819 |
| 1 MAY 1999 | 90.96911 |

## EXHIBIT C

### Stipulated Loss Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 JUN 1999 | 83.44469 |
| 1 JUL 1999 | 83.88841 |
| 1 AUG 1999 | 84.33237 |
| 1 SEP 1999 | 84.77656 |
| 1 OCT 1999 | 85.22354 |
| 1 NOV 1999 | 85.67078 |
| 1 DEC 1999 | 83.79586 |
| 1 JAN 2000 | 84.24615 |
| 1 FEB 2000 | 84.69669 |
| 1 MAR 2000 | 85.14750 |
| 1 APR 2000 | 85.59971 |
| 1 MAY 2000 | 86.05487 |
| 1 JUN 2000 | 78.35128 |
| 1 JUL 2000 | 78.77386 |
| 1 AUG 2000 | 79.19658 |
| 1 SEP 2000 | 79.61946 |
| 1 OCT 2000 | 80.04516 |
| 1 NOV 2000 | 80.47103 |
| 1 DEC 2000 | 78.57466 |
| 1 JAN 2001 | 79.00353 |
| 1 FEB 2001 | 79.43258 |
| 1 MAR 2001 | 79.86180 |
| 1 APR 2001 | 80.29240 |
| 1 MAY 2001 | 80.72584 |
| 1 JUN 2001 | 73.00047 |
| 1 JUL 2001 | 73.40116 |
| 1 AUG 2001 | 73.80192 |
| 1 SEP 2001 | 74.20274 |
| 1 OCT 2001 | 74.60629 |
| 1 NOV 2001 | 75.00992 |
| 1 DEC 2001 | 73.09124 |
| 1 JAN 2002 | 73.49769 |
| 1 FEB 2002 | 73.90423 |
| 1 MAR 2002 | 74.31086 |
| 1 APR 2002 | 74.71876 |
| 1 MAY 2002 | 75.12948 |
| 1 JUN 2002 | 67.36734 |
| 1 JUL 2002 | 67.73137 |
| 1 AUG 2002 | 68.09551 |
| 1 SEP 2002 | 68.45976 |
| 1 OCT 2002 | 68.82684 |
| 1 NOV 2002 | 69.19405 |
| 1 DEC 2002 | 67.53040 |
| 1 JAN 2003 | 67.90058 |
| 1 FEB 2003 | 68.27089 |
| 1 MAR 2003 | 68.64134 |
| 1 APR 2003 | 69.01314 |
| 1 MAY 2003 | 69.38808 |

## EXHIBIT C

### Stipulated Loss Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 JUN 2003 | 61.29337 |
| 1 JUL 2003 | 61.61656 |
| 1 AUG 2003 | 61.93993 |
| 1 SEP 2003 | 62.26346 |
| 1 OCT 2003 | 62.59017 |
| 1 NOV 2003 | 62.91706 |
| 1 DEC 2003 | 61.54352 |
| 1 JAN 2004 | 61.87378 |
| 1 FEB 2004 | 62.20425 |
| 1 MAR 2004 | 62.53491 |
| 1 APR 2004 | 62.86711 |
| 1 MAY 2004 | 63.20283 |
| 1 JUN 2004 | 54.73290 |
| 1 JUL 2004 | 55.01162 |
| 1 AUG 2004 | 55.29058 |
| 1 SEP 2004 | 55.56978 |
| 1 OCT 2004 | 55.85253 |
| 1 NOV 2004 | 56.13553 |
| 1 DEC 2004 | 55.08272 |
| 1 JAN 2005 | 55.36956 |
| 1 FEB 2005 | 55.65666 |
| 1 MAR 2005 | 55.94403 |
| 1 APR 2005 | 56.23315 |
| 1 MAY 2005 | 56.52621 |
| 1 JUN 2005 | 47.64286 |
| 1 JUL 2005 | 47.87314 |
| 1 AUG 2005 | 48.10372 |
| 1 SEP 2005 | 48.33463 |
| 1 OCT 2005 | 48.56951 |
| 1 NOV 2005 | 48.80473 |
| 1 DEC 2005 | 48.10649 |
| 1 JAN 2006 | 48.34604 |
| 1 FEB 2006 | 48.58594 |
| 1 MAR 2006 | 48.82619 |
| 1 APR 2006 | 49.06843 |
| 1 MAY 2006 | 49.31508 |
| 1 JUN 2006 | 39.97617 |
| 1 JUL 2006 | 40.15364 |
| 1 AUG 2006 | 40.33152 |
| 1 SEP 2006 | 40.50979 |
| 1 OCT 2006 | 40.69252 |
| 1 NOV 2006 | 40.87567 |
| 1 DEC 2006 | 40.56938 |
| 1 JAN 2007 | 40.75743 |
| 1 FEB 2007 | 40.94593 |
| 1 MAR 2007 | 41.13486 |
| 1 APR 2007 | 41.32605 |
| 1 MAY 2007 | 41.52258 |

## EXHIBIT C

### Stipulated Loss Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 JUN 2007 | 32.25876 |
| 1 JUL 2007 | 32.38207 |
| 1 AUG 2007 | 32.50279 |
| 1 SEP 2007 | 32.67402 |
| 1 OCT 2007 | 32.80279 |
| 1 NOV 2007 | 33.00000 |

## EXHIBIT D

*Superceded by Lease Supp. No. 2*

### Termination Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 2 JUN 1987 | 101.57595 |
| 1 JUL 1987 | 102.44571 |
| 1 AUG 1987 | 103.33828 |
| 1 SEP 1987 | 104.23248 |
| 1 OCT 1987 | 105.10524 |
| 1 NOV 1987 | 105.97951 |
| 1 DEC 1987 | 106.88871 |
| 1 JAN 1988 | 105.97601 |
| 1 FEB 1988 | 106.84256 |
| 1 MAR 1988 | 107.71058 |
| 1 APR 1988 | 108.57308 |
| 1 MAY 1988 | 109.42439 |
| 1 JUN 1988 | 106.46190 |
| 1 JUL 1988 | 107.29764 |
| 1 AUG 1988 | 108.13464 |
| 1 SEP 1988 | 108.97293 |
| 1 OCT 1988 | 109.79691 |
| 1 NOV 1988 | 110.62209 |
| 1 DEC 1988 | 106.70687 |
| 1 JAN 1989 | 107.51133 |
| 1 FEB 1989 | 108.31692 |
| 1 MAR 1989 | 109.12364 |
| 1 APR 1989 | 109.92457 |
| 1 MAY 1989 | 110.71179 |
| 1 JUN 1989 | 107.73279 |
| 1 JUL 1989 | 108.50725 |
| 1 AUG 1989 | 109.28265 |
| 1 SEP 1989 | 110.05898 |
| 1 OCT 1989 | 110.82146 |
| 1 NOV 1989 | 111.58480 |
| 1 DEC 1989 | 107.56145 |
| 1 JAN 1990 | 108.30344 |
| 1 FEB 1990 | 109.52060 |
| 1 MAR 1990 | 110.21805 |
| 1 APR 1990 | 110.91203 |
| 1 MAY 1990 | 111.59786 |
| 1 JUN 1990 | 108.56635 |
| 1 JUL 1990 | 109.24425 |
| 1 AUG 1990 | 109.92239 |
| 1 SEP 1990 | 110.60078 |
| 1 OCT 1990 | 111.27094 |
| 1 NOV 1990 | 112.44131 |
| 1 DEC 1990 | 108.27696 |
| 1 JAN 1991 | 109.44844 |
| 1 FEB 1991 | 110.10496 |

## EXHIBIT D

### Termination Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 MAR 1991 | 110.76166 |
| 1 APR 1991 | 111.41480 |
| 1 MAY 1991 | 112.05922 |
| 1 JUN 1991 | 109.04068 |
| 1 JUL 1991 | 109.67649 |
| 1 AUG 1991 | 110.31240 |
| 1 SEP 1991 | 110.94842 |
| 1 OCT 1991 | 111.57566 |
| 1 NOV 1991 | 112.20296 |
| 1 DEC 1991 | 107.93693 |
| 1 JAN 1992 | 109.06065 |
| 1 FEB 1992 | 109.66927 |
| 1 MAR 1992 | 110.27792 |
| 1 APR 1992 | 110.88265 |
| 1 MAY 1992 | 111.48845 |
| 1 JUN 1992 | 108.49103 |
| 1 JUL 1992 | 109.09792 |
| 1 AUG 1992 | 109.70484 |
| 1 SEP 1992 | 110.31179 |
| 1 OCT 1992 | 110.91981 |
| 1 NOV 1992 | 111.52787 |
| 1 DEC 1992 | 107.18171 |
| 1 JAN 1993 | 108.29508 |
| 1 FEB 1993 | 108.89333 |
| 1 MAR 1993 | 109.49162 |
| 1 APR 1993 | 110.09041 |
| 1 MAY 1993 | 110.69035 |
| 1 JUN 1993 | 107.75282 |
| 1 JUL 1993 | 108.35396 |
| 1 AUG 1993 | 108.95515 |
| 1 SEP 1993 | 109.55638 |
| 1 OCT 1993 | 110.15878 |
| 1 NOV 1993 | 110.76122 |
| 1 DEC 1993 | 106.34268 |
| 1 JAN 1994 | 107.44947 |
| 1 FEB 1994 | 108.04117 |
| 1 MAR 1994 | 108.63293 |
| 1 APR 1994 | 109.22524 |
| 1 MAY 1994 | 109.81879 |
| 1 JUN 1994 | 106.94708 |
| 1 JUL 1994 | 107.54194 |
| 1 AUG 1994 | 108.13687 |
| 1 SEP 1994 | 108.73188 |
| 1 OCT 1994 | 109.32814 |
| 1 NOV 1994 | 109.92448 |

## EXHIBIT D

### Termination Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 DEC 1994 | 105.42649 |
| 1 JAN 1995 | 106.01095 |
| 1 FEB 1995 | 106.59550 |
| 1 MAR 1995 | 107.18013 |
| 1 APR 1995 | 107.76538 |
| 1 MAY 1995 | 108.35097 |
| 1 JUN 1995 | 105.55058 |
| 1 JUL 1995 | 106.13661 |
| 1 AUG 1995 | 106.72274 |
| 1 SEP 1995 | 107.30896 |
| 1 OCT 1995 | 107.89553 |
| 1 NOV 1995 | 108.48220 |
| 1 DEC 1995 | 103.89400 |
| 1 JAN 1996 | 104.46661 |
| 1 FEB 1996 | 105.03932 |
| 1 MAR 1996 | 105.61212 |
| 1 APR 1996 | 106.18514 |
| 1 MAY 1996 | 106.76162 |
| 1 JUN 1996 | 96.83405 |
| 1 JUL 1996 | 97.35569 |
| 1 AUG 1996 | 97.87746 |
| 1 SEP 1996 | 98.39935 |
| 1 OCT 1996 | 98.92474 |
| 1 NOV 1996 | 99.45026 |
| 1 DEC 1996 | 97.02744 |
| 1 JAN 1997 | 97.55661 |
| 1 FEB 1997 | 98.08595 |
| 1 MAR 1997 | 98.61544 |
| 1 APR 1997 | 99.14658 |
| 1 MAY 1997 | 99.68001 |
| 1 JUN 1997 | 92.67918 |
| 1 JUL 1997 | 93.17789 |
| 1 AUG 1997 | 93.67679 |
| 1 SEP 1997 | 94.17588 |
| 1 OCT 1997 | 94.67726 |
| 1 NOV 1997 | 95.17885 |
| 1 DEC 1997 | 92.95526 |
| 1 JAN 1998 | 93.45936 |
| 1 FEB 1998 | 93.96366 |
| 1 MAR 1998 | 94.46818 |
| 1 APR 1998 | 94.97384 |
| 1 MAY 1998 | 95.48205 |
| 1 JUN 1998 | 88.22930 |
| 1 JUL 1998 | 88.69946 |
| 1 AUG 1998 | 89.16985 |

## EXHIBIT D

### Termination Value

| Date | Percentage of Lessor's Cost |
|------|------------------------------|
| 1 SEP 1998 | 89.64048 |
| 1 OCT 1998 | 90.11368 |
| 1 NOV 1998 | 90.58713 |
| 1 DEC 1998 | 88.58046 |
| 1 JAN 1999 | 89.05674 |
| 1 FEB 1999 | 89.53328 |
| 1 MAR 1999 | 90.01008 |
| 1 APR 1999 | 90.48819 |
| 1 MAY 1999 | 90.96911 |
| 1 JUN 1999 | 83.44469 |
| 1 JUL 1999 | 83.88841 |
| 1 AUG 1999 | 84.33237 |
| 1 SEP 1999 | 84.77656 |
| 1 OCT 1999 | 85.22354 |
| 1 NOV 1999 | 85.67078 |
| 1 DEC 1999 | 83.79586 |
| 1 JAN 2000 | 84.24615 |
| 1 FEB 2000 | 84.69669 |
| 1 MAR 2000 | 85.14750 |
| 1 APR 2000 | 85.59971 |
| 1 MAY 2000 | 86.05487 |
| 1 JUN 2000 | 78.35128 |
| 1 JUL 2000 | 78.77386 |
| 1 AUG 2000 | 79.19658 |
| 1 SEP 2000 | 79.61946 |
| 1 OCT 2000 | 80.04516 |
| 1 NOV 2000 | 80.47103 |
| 1 DEC 2000 | 78.57466 |
| 1 JAN 2001 | 79.00353 |
| 1 FEB 2001 | 79.43258 |
| 1 MAR 2001 | 79.86180 |
| 1 APR 2001 | 80.29240 |
| 1 MAY 2001 | 80.72584 |
| 1 JUN 2001 | 73.00047 |
| 1 JUL 2001 | 73.40116 |
| 1 AUG 2001 | 73.80192 |
| 1 SEP 2001 | 74.20274 |
| 1 OCT 2001 | 74.60629 |
| 1 NOV 2001 | 75.00992 |
| 1 DEC 2001 | 73.09124 |
| 1 JAN 2002 | 73.49769 |
| 1 FEB 2002 | 73.90423 |
| 1 MAR 2002 | 74.31086 |
| 1 APR 2002 | 74.71876 |
| 1 MAY 2002 | 75.12948 |

## EXHIBIT D

### Termination Value

<u>Date</u>                                   <u>Percentage of Lessor's Cost</u>

| Date | Percentage of Lessor's Cost |
|------|------|
| 1 JUN 2002 | 67.36734 |
| 1 JUL 2002 | 67.73137 |
| 1 AUG 2002 | 68.09551 |
| 1 SEP 2002 | 68.45976 |
| 1 OCT 2002 | 68.82684 |
| 1 NOV 2002 | 69.19405 |
| 1 DEC 2002 | 67.53040 |
| 1 JAN 2003 | 67.90058 |
| 1 FEB 2003 | 68.27089 |
| 1 MAR 2003 | 68.64134 |
| 1 APR 2003 | 69.01314 |
| 1 MAY 2003 | 69.38808 |
| 1 JUN 2003 | 61.29337 |
| 1 JUL 2003 | 61.61656 |
| 1 AUG 2003 | 61.93993 |
| 1 SEP 2003 | 62.26346 |
| 1 OCT 2003 | 62.59017 |
| 1 NOV 2003 | 62.91706 |
| 1 DEC 2003 | 61.54352 |
| 1 JAN 2004 | 61.87378 |
| 1 FEB 2004 | 62.20425 |
| 1 MAR 2004 | 62.53491 |
| 1 APR 2004 | 62.86711 |
| 1 MAY 2004 | 63.20283 |
| 1 JUN 2004 | 54.73290 |
| 1 JUL 2004 | 55.01162 |
| 1 AUG 2004 | 55.29058 |
| 1 SEP 2004 | 55.56978 |
| 1 OCT 2004 | 55.85253 |
| 1 NOV 2004 | 56.13553 |
| 1 DEC 2004 | 55.08272 |
| 1 JAN 2005 | 55.36956 |
| 1 FEB 2005 | 55.65666 |
| 1 MAR 2005 | 55.94403 |
| 1 APR 2005 | 56.23315 |
| 1 MAY 2005 | 56.52621 |
| 1 JUN 2005 | 47.64286 |
| 1 JUL 2005 | 47.87314 |
| 1 AUG 2005 | 48.10372 |
| 1 SEP 2005 | 48.33463 |
| 1 OCT 2005 | 48.56951 |
| 1 NOV 2005 | 48.80473 |
| 1 DEC 2005 | 48.10649 |
| 1 JAN 2006 | 48.34604 |

## EXHIBIT D

### Termination Value

Date | Percentage of Lessor's Cost
--- | ---

| Date | Percentage of Lessor's Cost |
| --- | --- |
| 1 FEB 2006 | 48.58594 |
| 1 MAR 2006 | 48.82619 |
| 1 APR 2006 | 49.06843 |
| 1 MAY 2006 | 49.31508 |
| 1 JUN 2006 | 39.97617 |
| 1 JUL 2006 | 40.15364 |
| 1 AUG 2006 | 40.33152 |
| 1 SEP 2006 | 40.50979 |
| 1 OCT 2006 | 40.69252 |
| 1 NOV 2006 | 40.87567 |
| 1 DEC 2006 | 40.56938 |
| 1 JAN 2007 | 40.75743 |
| 1 FEB 2007 | 40.94593 |
| 1 MAR 2007 | 41.13486 |
| 1 APR 2007 | 41.32605 |
| 1 MAY 2007 | 41.52258 |
| 1 JUN 2007 | 32.25876 |
| 1 JUL 2007 | 32.38207 |
| 1 AUG 2007 | 32.50279 |
| 1 SEP 2007 | 32.67402 |
| 1 OCT 2007 | 32.50279 |
| 1 NOV 2007 | 33.00000 |

## EXHIBIT E

### PERMITTED FOREIGN AIR CARRIERS

AerLingus
Aerolineas Argentinas
Aeromexico
Korean Air
Air Afrique
Air Canada
Air Europe
Air France
Air Inter
Air Jamaica
Air New Zealand
Alitalia
All Nippon Airways
Ansett Airlines of Australia
Austrian Airlines
Bahamasair
Braathens S.A.F.E.
British Airways
British Caledonian Airways
British Midland
Britannia
BWIA
CAAC
Canadian International Airlines
Cathay Pacific Airways
Cayman Airways
China Airlines
Condor Flugdienst
Dan-Air
Finnair
Iberia
Icelandair

Interflug
Japan Air Lines
KLM
Lan Chile
Lufthansa
Luxair
Malaysian Airline System
Martinair
Mexicana
Monarch Airlines
Nordair
Orion
Olympic Airlines
Philippine Airlines
QANTAS Airways
Quebecair
Sabena
SAS
Singapore Airlines
SouthWest Airlines
Swissair
TAP
Thai Airways
TOA Domestic Airlines
Trans Australia Airlines
Transbrasil
TransEuropean
UTA
VARIG
VIASA
Wardair Canada, Ltd.

Exhibit B

| From: | Michael Kortschak |
|---|---|
| Sent: | Friday, October 19, 2007 3:09 PM |
| To: | 'KC269@daimlerchrysler.com'; Toby Page |
| Cc: | cs63@daimlerchrysler.com; jinfante@avcappartners.com |
| Subject: | RE: FW: Spec Sheets |
| Attachments: | 721193.XLS; 721498.xls; 721967.xls; 722407.xls; 857881.xls; 858278.xls |

Ken,

Attached are the engines that we're proposing to return with the aircraft. These engines will meet the return conditions as set out in the Lease.

Regards,

Michael



Michael Kortschak
Manager Fleet Planning & Transactions
Southwest Airlines Co.
2702 Love Field Drive
Mailcode HDQ6TR
Dallas, TX 75235
Phone: (214) 792-2964
Fax:    (214) 932-0033
www.southwest.com

---

**From:** KC269@daimlerchrysler.com [mailto:KC269@daimlerchrysler.com]
**Sent:** Friday, October 19, 2007 2:42 PM
**To:** Toby Page
**Cc:** cs63@daimlerchrysler.com; jinfante@avcappartners.com; Michael Kortschak
**Subject:** Re: FW: Spec Sheets

Thanks Toby,

This is all well and good, assuming the buyer will be getting some mix of these engines. Michael, however, hinted yesterday that SWA may return different engines altogether. In the end, this may not be an issue as Daimler/Buyer is due engines with comparable value and utility as the engines currently owned by Daimler. So inspecting the leased engines may be the best avenue as that will provide the basis of value for whatever engines are returned with the planes.

Ken

Toby.Page@wnco.com

10/19/07 03:25 PM

To  cs63@daimlerchrysler.com, KC269@daimlerchrysler.com,
jinfante@avcappartners.com

CC  Michael.Kortschak@wnco.com

Subject  FW: Spec Sheets


Chris,

Here are spec sheets that have the leased engines and current engines.

Toby Page
MX Contracts
Southwest Airlines
Ph 214-792-5913
Fax 214-792-5989
toby.page@wnco.com

---

**From:** Toby Page
**Sent:** Wednesday, October 17, 2007 3:13 PM
**To:** 'Mickey Burgos'
**Subject:** Spec Sheets

Mickey,

Here are the current spec sheets to get you started for the aircraft.

Note:

-ESN 721642 (N319SW) is in the Dallas Engine Shop for with an oil pressure problem.
-ESN 721451 (N319SW) was made serviceable today.  It had been in the Dallas Engine Shop for overheating.

Toby Page
MX Contracts
Southwest Airlines
Ph 214-792-5913
Fax 214-792-5989
toby.page@wnco.com
 [attachment "N321 Spec Sheet with Leased Engines 101707.pdf" deleted by Kenneth
Casper/DCFS/debis/DCX] [attachment "N319 Spec Sheet with Current Engines 101707.pdf" deleted by
Kenneth Casper/DCFS/debis/DCX] [attachment "N319 Spec Sheet with Leased Engines 101707.pdf"
deleted by Kenneth Casper/DCFS/debis/DCX] [attachment "N320 Spec Sheet with Current Engines
101707.pdf" deleted by Kenneth Casper/DCFS/debis/DCX] [attachment "N320 Spec Sheet with Leased
Engines 101707.pdf" deleted by Kenneth Casper/DCFS/debis/DCX] [attachment "N321 Spec Sheet with
Current Engines 101707.pdf" deleted by Kenneth Casper/DCFS/debis/DCX]

If you are not the addressee, please inform us immediately that you have received this e-mail by mistake, and delete it. We thank you for your support.

SA-M 618
ORIG 11/27/95
REV 05/22/96
RCB 4622

# SOUTHWEST AIRLINES - AIRCRAFT RECORDS
## CFM56-3 ENGINE DISK REFERENCE SHEET

SERIAL NUMBER: 721193

PREPARED BY:

DATE PREPARED:

| | INSTALLED | AS OF | |
|---|---|---|---|
| Aircraft | 633 / 1 | Date | 10/18/2007 |
| Aircraft Total Time | 29598;02 | Aircraft Total Time | 38261;39 |
| Aircraft Total Cycles | 24828 | Aircraft Total Cycles | 31634 |

| | | |
|---|---|---|
| Engine Total Hours | 57054:11 | Engine Total Cycles | 49974 |
| Time Since LEVEL 3 | 57054:11 | Cycles Since LEVEL 3 | 49974 |
| Time Since LEVEL 2 | 8665;37 | Cycles Since LEVEL 2 | 6806 |
| Time Since Installation | 8665;37 | Cycles Since Installation | 6806 |

| Item | Part Name | Part No. | Serial No. | Hour Limit | Total Time | Hours Remaining | Cycle Limit | Total Cycles | Cycles Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Fan Disk | 335-014-811-0 | DB081902 | N/A | N/A | N/A | 30,000 | 21951 | 8,049 |
| 2 | Booster Spool | 335-009-306-0 | BB230497 | N/A | N/A | N/A | 30,000 | 21951 | 8,049 |
| 3 | Fan Shaft | 335-006-414-0 | DB143099 | N/A | N/A | N/A | 30,000 | 21951 | 8,049 |
| | **Compressor Rotor Module S/N:** | | | | | | | | |
| 4 | HPC Front Shaft | 1275M37P02 | GWN09CGH | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| 5 | Stage 1-2 Spool | 1588M66G02 | GWN09EOH | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| 6 | Stage 3 Disk | 1590M59P01 | XAEF2792 | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| 7 | Stage 4-9 Spool | 1588M89G03 | GWN09DE9 | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| 8 | Compressor Rear (CDP) Air Seal | 1319M25P02 | GFF5CF39 | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| | **HPT Rotor Module S/N:** | | | | | | | | |
| 9 | Front Shaft | 1385M90P04 | XAE78134 | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| 10 | Front Air Seal | 1282M72P05 | GWN09CGN | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| 11 | Disk | 1475M29P02 | GWN09A50 | N/A | N/A | N/A | 20,000 | 6806 | 13,194 |
| 12 | Rear Shaft | 9514M71P07 | TMTMS214 | N/A | N/A | N/A | 25,000 | 21951 | 3,049 |
| | **LPT Rotor Module S/N:** | | | | | | | | |
| 13 | Stage 1 Disk | 301-331-126-0 | BB563329 | N/A | N/A | N/A | 25,000 | 16006 | 8,994 |
| 14 | Stage 2 Disk | 301-331-227-0 | BB517643 | N/A | N/A | N/A | 25,000 | 16006 | 8,994 |
| 15 | Stage 3 Disk | 301-331-322-0 | BB505129 | N/A | N/A | N/A | 25,000 | 16006 | 8,994 |
| 16 | Stage 4 Disk | 301-331-429-0 | DB688177 | N/A | N/A | N/A | 25,000 | 16006 | 8,994 |
| 17 | LPT Shaft | 301-330-067-0 | LA069828 | N/A | N/A | N/A | 30,000 | 21951 | 8,049 |
| 18 | LPT Stub Shaft | 301-330-626-0 | BC053786 | N/A | N/A | N/A | 25,000 | 6806 | 18,194 |
| 19 | Conical Support | 305-055-116-0 | BB528884 | N/A | N/A | N/A | 25,000 | 16006 | 8,994 |

Page 1 of 1

SA-M 618
ORIG 11/27/95
REV 05/22/96
RCB 4622

## SOUTHWEST AIRLINES - AIRCRAFT RECORDS
## CFM56-3 ENGINE DISK REFERENCE SHEET

SERIAL NUMBER: 721498

PREPARED BY: Nelda Sharp
DATE PREPARED: 10/16/2007

| INSTALLED | | AS OF | | | |
|---|---|---|---|---|---|
| Aircraft | 336 / 1 | Date | 10/16/2007 | Engine Total Hours | 64674:32 | Engine Total Cycles | 60512 |
| Aircraft Total Time | 54163:55 | Aircraft Total Time | 64389:31 | Time Since LEVEL 3 | 64674:32 | Cycles Since LEVEL 3 | 60512 |
| | | | | Time Since LEVEL 2 | 10225:36 | Cycles Since LEVEL 2 | 7989 |
| Aircraft Total Cycles | 50886 | Aircraft Total Cycles | 58875 | Time Since Installation | 10225:36 | Cycles Since Installation | 7989 |

| Item | Part Name | Part No. | Serial No. | Hour Limit | Total Time | Hours Remaining | Cycle Limit | Total Cycles | Cycles Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Fan Disk | 335-014-511-0 | BA338493 | N/A | N/A | N/A | 30,000 | 27174 | 2,826 |
| 2 | Booster Spool | 335-009-306-0 | DA092038 | N/A | N/A | N/A | 30,000 | 27174 | 2,826 |
| 3 | Fan Shaft | 335-006-414-0 | DA145028 | N/A | N/A | N/A | 30,000 | 27174 | 2,826 |
| **Compressor Rotor Module S/N:** | | | | | | | | | |
| 4 | HPC Front Shaft | 1275M37P02 | GWN02GT5 | N/A | N/A | N/A | 20,000 | 16761 | 3,239 |
| 5 | Stage 1-2 Spool | 1588M86G02 | GWN02K61 | N/A | N/A | N/A | 20,000 | 16761 | 3,239 |
| 6 | Stage 3 Disk | 1590M59P01 | GWN02P62 | N/A | N/A | N/A | 20,000 | 16761 | 3,239 |
| 7 | Stage 4-9 Spool | 1590M29G01 | GWN02NF2 | N/A | N/A | N/A | 20,000 | 16761 | 3,239 |
| 8 | Compressor Rear (CDP) Air Seal | 1319M25P02 | GFF590DKC | N/A | N/A | N/A | 20,000 | 16761 | 3,239 |
| **HPT Rotor Module S/N:** | | | | | | | | | |
| 9 | Front Shaft | 1385M90P04 | XAE35891 | N/A | N/A | N/A | 20,000 | 16247 | 3,753 |
| 10 | Front Air Seal | 1282M72P05 | GWN03506 | N/A | N/A | N/A | 20,000 | 16247 | 3,753 |
| 11 | Disk | 1475M29P02 | GWN017PK | N/A | N/A | N/A | 20,000 | 17355 | 2,645 |
| 12 | Rear Shaft | 9514M71P07 | TMTMS934 | N/A | N/A | N/A | 25,000 | 16247 | 8,753 |
| **LPT Rotor Module S/N:** | | | | | | | | | |
| 13 | Stage 1 Disk | 301-331-126-0 | BB5548980 | N/A | N/A | N/A | 25,000 | 16247 | 8,753 |
| 14 | Stage 2 Disk | 301-331-227-0 | BB517641 | N/A | N/A | N/A | 25,000 | 16247 | 8,753 |
| 15 | Stage 3 Disk | 301-331-322-0 | BB258822 | N/A | N/A | N/A | 25,000 | 16247 | 8,753 |
| 16 | Stage 4 Disk | 301-331-429-0 | BB494652 | N/A | N/A | N/A | 25,000 | 16247 | 8,753 |
| 17 | LPT Shaft | 301-330-067-0 | LA048532 | N/A | N/A | N/A | 30,000 | 23876 | 6,124 |
| 18 | LPT Stub Shaft | 301-330-626-0 | DB693683 | N/A | N/A | N/A | 25,000 | 16247 | 8,753 |
| 19 | Conical Support | 305-056-116-0 | DB687726 | N/A | N/A | N/A | 25,000 | 16247 | 8,753 |

SA-M 618
ORIG 11/27/95
REV 05/22/96
RCB 4622

## SOUTHWEST AIRLINES - AIRCRAFT RECORDS
## CFM56-3 ENGINE DISK REFERENCE SHEET

SERIAL NUMBER 721967

PREPARED BY: Nelda Sharp
DATE PREPARED: 10/16/2007

| | INSTALLED | | AS OF | | |
|---|---|---|---|---|---|
| Aircraft | 631 / 2 | Date | 10/16/2007 | Engine Total Hours | 59174:34 | Engine Total Cycles | 50523 |
| Aircraft Total Time | 29272:30 | Aircraft Total Time | 38945:20 | Time Since LEVEL 3 | 59174:34 | Cycles Since LEVEL 3 | 50523 |
| | | | | Time Since LEVEL 2 | 9672:50 | Cycles Since LEVEL 2 | 7530 |
| Aircraft Total Cycles | 24635 | Aircraft Total Cycles | 32165 | Time Since Installation | 9672:50 | Cycles Since Installation | 7530 |

| Item | Part Name | Part No. | Serial No. | Hour Limit | Total Time | Hours Remaining | Cycle Limit | Total Cycles | Cycles Remaining |
|---|---|---|---|---|---|---|---|---|---|
| | **Compressor Rotor Module S/N:** | | | | | | | | |
| 1 | Fan Disk | 335-014-511-0 | BA456742 | N/A | N/A | N/A | 30,000 | 26942 | 3,058 |
| 2 | Booster Spool | 335-009-306-0 | BA516907 | N/A | N/A | N/A | 30,000 | 26942 | 3,058 |
| 3 | Fan Shaft | 335-006-414-0 | DA144874 | N/A | N/A | N/A | 30,000 | 26942 | 3,058 |
| | **Compressor Rotor Module S/N:** | | | | | | | | |
| 4 | HPC Front Shaft | 1275M37P02 | GWN03CMR | N/A | N/A | N/A | 20,000 | 15773 | 4,227 |
| 5 | Stage 1-2 Spool | 1589M66G02 | GWN08NRG | N/A | N/A | N/A | 20,000 | 7530 | 12,470 |
| 6 | Stage 3 Disk | 1590M59P01 | GWN03CD7 | N/A | N/A | N/A | 20,000 | 15773 | 4,227 |
| 7 | Stage 4-9 Spool | 1277M97G03 | GWN03CGG | N/A | N/A | N/A | 20,000 | 15773 | 4,227 |
| 8 | Compressor Rear (CDP) Air Seal | 1319M25P02 | GFF59H9A | N/A | N/A | N/A | 20,000 | 15773 | 4,227 |
| | **HPT Rotor Module S/N:** | | | | | | | | |
| 9 | Front Shaft | 1385M90P04 | XAE35468 | N/A | N/A | N/A | 20,000 | 17194 | 2,806 |
| 10 | Front Air Seal | 1282M72P05 | GWN03DP7 | N/A | N/A | N/A | 20,000 | 15773 | 4,227 |
| 11 | Disk | 1476M29P02 | GWN03C2F | N/A | N/A | N/A | 20,000 | 15773 | 4,227 |
| 12 | Rear Shaft | 9514M71P07 | TMTKA676 | N/A | N/A | N/A | 25,000 | 21587 | 3,413 |
| | **LPT Rotor Module S/N:** | | | | | | | | |
| 13 | Stage 1 Disk | 301-331-126-0 | DA703393 | N/A | N/A | N/A | 25,000 | 19436 | 5,564 |
| 14 | Stage 2 Disk | 301-331-227-0 | BB150480 | N/A | N/A | N/A | 25,000 | 17032 | 7,968 |
| 15 | Stage 3 Disk | 301-331-322-0 | BA607814 | N/A | N/A | N/A | 25,000 | 22199 | 2,801 |
| 16 | Stage 4 Disk | 301-331-427-0 | DA480929 | N/A | N/A | N/A | 25,000 | 22199 | 2,801 |
| 17 | LPT Shaft | 301-330-067-0 | LA069054 | N/A | N/A | N/A | 30,000 | 19991 | 10,009 |
| 18 | LPT Stub Shaft | 301-330-626-0 | DA727685 | N/A | N/A | N/A | 25,000 | 15524 | 9,476 |
| 19 | Conical Support | 305-056-116-0 | DA703908 | N/A | N/A | N/A | 25,000 | 19221 | 5,779 |

Page 1 of 1

SA-M 618
ORIG 11/27/95
REV 05/22/96
RCB 4622

# SOUTHWEST AIRLINES - AIRCRAFT RECORDS
## CFM56-3 ENGINE DISK REFERENCE SHEET

SERIAL NUMBER: 722407

PREPARED BY: Nelda Sharp
DATE PREPARED: 10/18/2007

|  | INSTALLED | AS OF |
|---|---|---|
| Aircraft | 626 / 1 | Date 10/18/2007 |
| Aircraft Total Time | 29286:11 | Aircraft Total Time 39063:36 |
| Aircraft Total Cycles | 25153 | Aircraft Total Cycles 32828 |

| | | | |
|---|---|---|---|
| Engine Total Hours | 57443:05 | Engine Total Cycles | 51762 |
| Time Since LEVEL 3 | 57443:05 | Cycles Since LEVEL 3 | 51762 |
| Time Since LEVEL 2 | 9777:25 | Cycles Since LEVEL 2 | 7675 |
| Time Since Installation | 9777:25 | Cycles Since Installation | 7675 |

| Item | Part Name | Part No. | Serial No. | Hour Limit | Total Time | Hours Remaining | Cycle Limit | Total Cycles | Cycles Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Fan Disk | 335-014-511-0 | DA739054 | N/A | N/A | N/A | 30,000 | 21837 | 8,163 |
| 2 | Booster Spool | 335-009-306-0 | DA739084 | N/A | N/A | N/A | 30,000 | 21837 | 8,163 |
| 3 | Fan Shaft | 335-006-414-0 | DA703832 | N/A | N/A | N/A | 30,000 | 21837 | 8,163 |
| **Compressor Rotor Module S/N:** | | | | | | | | | |
| 4 | HPC Front Shaft | 1275M37P02 | GWN03WSP | N/A | N/A | N/A | 20,000 | 13632 | 6,368 |
| 5 | Stage 1-2 Spool | 1589M66G02 | GWN03TN8 | N/A | N/A | N/A | 20,000 | 13632 | 6,368 |
| 6 | Stage 3 Disk | 1590M59P01 | GWNJU1151 | N/A | N/A | N/A | 20,000 | 17017 | 2,983 |
| 7 | Stage 4-9 Spool | 1590M29G01 | GWN03T6J | N/A | N/A | N/A | 20,000 | 13632 | 6,368 |
| 8 | Compressor Rear (CDP) Air Seal | 1319M25P02 | GFF59L8A | N/A | N/A | N/A | 20,000 | 13632 | 6,368 |
| **HPT Rotor Module S/N:** | | | | | | | | | |
| 9 | Front Shaft | 1385M90P04 | XAE64040 | N/A | N/A | N/A | 20,000 | 13632 | 6,368 |
| 10 | Front Air Seal | 1282M72P05 | GWN03WEP | N/A | N/A | N/A | 20,000 | 13632 | 6,368 |
| 11 | Disk | 1476M29P02 | GWN03TLA | N/A | N/A | N/A | 20,000 | 13632 | 6,368 |
| 12 | Rear Shaft | 9514M71P07 | TMTKA738 | N/A | N/A | N/A | 25,000 | 21837 | 3,163 |
| **LPT Rotor Module S/N:** | | | | | | | | | |
| 13 | Stage 1 Disk | 301-331-126-0 | DA703888 | N/A | N/A | N/A | 25,000 | 21837 | 3,163 |
| 14 | Stage 2 Disk | 301-331-227-0 | BA760630 | N/A | N/A | N/A | 25,000 | 21837 | 3,163 |
| 15 | Stage 3 Disk | 301-331-322-0 | BA970452 | N/A | N/A | N/A | 25,000 | 21837 | 3,163 |
| 16 | Stage 4 Disk | 301-331-429-0 | DA863774 | N/A | N/A | N/A | 25,000 | 21837 | 3,163 |
| 17 | LPT Shaft | 301-330-087-0 | LA042240 | N/A | N/A | N/A | 30,000 | 21837 | 8,163 |
| 18 | LPT Stub Shaft | 301-330-626-0 | DA608472 | N/A | N/A | N/A | 25,000 | 21837 | 3,163 |
| 19 | Conical Support | 305-055-116-0 | BB004457 | N/A | N/A | N/A | 25,000 | 21837 | 3,163 |

SA-M 618
ORIG 11/27/95
REV 05/22/96
RCB 4622

## SOUTHWEST AIRLINES - AIRCRAFT RECORDS
## CFM56-3 ENGINE DISK REFERENCE SHEET

SERIAL NUMBER 857881

PREPARED BY: Nelda Sharp
DATE PREPARED: 10/18/2007

| | INSTALLED | AS OF |
|---|---|---|
| Aircraft | 302 / 2 | Date 10/18/2007 |
| Aircraft Total Time | 61494;23 | Aircraft Total Time 73776;25 |
| Aircraft Total Cycles | 60942 | Aircraft Total Cycles 70876 |

| | | |
|---|---|---|
| Engine Total Hours | 42188;43 | Engine Total Cycles 36113 |
| Time Since LEVEL 3 | 42188;43 | Cycles Since LEVEL 3 36113 |
| Time Since LEVEL 2 | 12282;02 | Cycles Since LEVEL 2 9734 |
| Time Since Installation | 12282;02 | Cycles Since Installation 9734 |

| Item | Part Name | Part No. | Serial No. | Hour Limit | Total Time | Hours Remaining | Cycle Limit | Total Cycles | Cycles Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Fan Disk | 335-014-511-0 | BA637360 | N/A | N/A | N/A | 30,000 | 23971 | 6,029 |
| 2 | Booster Spool | 335-009-306-0 | DA432727 | N/A | N/A | N/A | 30,000 | 23971 | 6,029 |
| 3 | Fan Shaft | 335-006-414-0 | DA480592 | N/A | N/A | N/A | 30,000 | 23971 | 6,029 |
| | **Compressor Rotor Module S/N:** | | | | | | | | |
| 4 | HPC Front Shaft | 1275M37P02 | GWN01WH9 | N/A | N/A | N/A | 20,000 | 17064 | 2,936 |
| 5 | Stage 1-2 Spool | 1589M86G02 | GWN016FJ | N/A | N/A | N/A | 20,000 | 17064 | 2,936 |
| 6 | Stage 3 Disk | 1590M59P01 | XAE54188 | N/A | N/A | N/A | 20,000 | 17064 | 2,936 |
| 7 | Stage 4-9 Spool | 1590M29G01 | GWN022AL | N/A | N/A | N/A | 20,000 | 17064 | 2,936 |
| 8 | Compressor Rear (CDP) Air Seal | 1319M25P02 | GFF59H13 | N/A | N/A | N/A | 20,000 | 14482 | 5,518 |
| | **HPT Rotor Module S/N:** | | | | | | | | |
| 9 | Front Shaft | 1385M50P04 | XAE55312 | N/A | N/A | N/A | 20,000 | 17064 | 2,936 |
| 10 | Front Air Seal | 1282M72P05 | GWN01E0J | N/A | N/A | N/A | 20,000 | 17064 | 2,936 |
| 11 | Disk | 1475M29P02 | GWN013Y7 | N/A | N/A | N/A | 20,000 | 17064 | 2,936 |
| 12 | Rear Shaft | 9514M71P07 | TMTMS540 | N/A | N/A | N/A | 25,000 | 17064 | 7,936 |
| | **LPT Rotor Module S/N:** | | | | | | | | |
| 13 | Stage 1 Disk | 301-331-126-0 | BB371011 | N/A | N/A | N/A | 25,000 | 17064 | 7,936 |
| 14 | Stage 2 Disk | 301-331-227-0 | BB370984 | N/A | N/A | N/A | 25,000 | 17064 | 7,936 |
| 15 | Stage 3 Disk | 301-331-322-0 | BB370954 | N/A | N/A | N/A | 25,000 | 17064 | 7,936 |
| 16 | Stage 4 Disk | 301-331-429-0 | DB468358 | N/A | N/A | N/A | 25,000 | 17064 | 7,936 |
| 17 | LPT Shaft | 301-330-067-0 | LA041804 | N/A | N/A | N/A | 30,000 | 23971 | 6,029 |
| 18 | LPT Stub Shaft | 301-330-626-0 | DA727949 | N/A | N/A | N/A | 25,000 | 17064 | 7,936 |
| 19 | Conical Support | 305-056-116-0 | DB142995 | N/A | N/A | N/A | 25,000 | 17064 | 7,936 |

Page 1 of 1

SA-M 618
ORIG 11/27/95
REV 05/22/96
RCB 4622

# SOUTHWEST AIRLINES - AIRCRAFT RECORDS
## CFM56-3 ENGINE DISK REFERENCE SHEET

SERIAL NUMBER 858278

PREPARED BY: Nelda Sharp
DATE PREPARED: 10/18/2007

| | INSTALLED | AS OF | |
|---|---|---|---|
| Aircraft | 509 / 1 | Date | 10/18/2007 |
| Aircraft Total Time | 45777-49 | Aircraft Total Time | 53930;14 |
| Aircraft Total Cycles | 45508 | Aircraft Total Cycles | 53955 |

| | | | |
|---|---|---|---|
| Engine Total Hours | 38121:18 | Engine Total Cycles | 34059 |
| Time Since LEVEL 3 | 38121:18 | Cycles Since LEVEL 3 | 34059 |
| Time Since LEVEL 2 | 8152:25 | Cycles Since LEVEL 2 | 8447 |
| Time Since Installation | 8152:25 | Cycles Since Installation | 8447 |

| Item | Part Name | Part No. | Serial No. | Hour Limit | Total Time | Hours Remaining | Cycle Limit | Total Cycles | Cycles Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Fan Disk | 335-014-511-0 | BA608884 | N/A | N/A | N/A | 30,000 | 27590 | 2,410 |
| 2 | Booster Spool | 335-009-306-0 | DA432166 | N/A | N/A | N/A | 30,000 | 27590 | 2,410 |
| 3 | Fan Shaft | 335-008-414-0 | DA460670 | N/A | N/A | N/A | 30,000 | 27590 | 2,410 |
| | Compressor Rotor Module S/N: | | | | | | | | |
| 4 | HPC Front Shaft | 1275M37P02 | GWN022ND | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| 5 | Stage 1-2 Spool | 1589M66G02 | GWN031PD | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| 6 | Stage 3 Disk | 1590M59P01 | GWN031L2 | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| 7 | Stage 4-9 Spool | 1590M29G01 | GWN02CAE | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| 8 | Compressor Rear (CDP) Air Seal | 1319M25P02 | GFF59G64 | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| | HPT Rotor Module S/N: | | | | | | | | |
| 9 | Front Shaft | 1385M90P04 | XAE35731 | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| 10 | Front Air Seal | 1282M72P05 | GWN0343G | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| 11 | Disk | 1475M29P02 | GWN0323E | N/A | N/A | N/A | 20,000 | 17284 | 2,716 |
| 12 | Rear Shaft | 9514M71P07 | TMTMS788 | N/A | N/A | N/A | 25,000 | 17284 | 7,716 |
| | LPT Rotor Module S/N: | | | | | | | | |
| 13 | Stage 1 Disk | 301-331-126-0 | DA703478 | N/A | N/A | N/A | 25,000 | 21988 | 3,012 |
| 14 | Stage 2 Disk | 301-331-227-0 | BA941612 | N/A | N/A | N/A | 25,000 | 21988 | 3,012 |
| 15 | Stage 3 Disk | 301-331-322-0 | BB121052 | N/A | N/A | N/A | 25,000 | 21917 | 3,083 |
| 16 | Stage 4 Disk | 301-331-429-0 | DA663709 | N/A | N/A | N/A | 25,000 | 21917 | 3,083 |
| 17 | LPT Shaft | 301-330-067-0 | LA041007 | N/A | N/A | N/A | 30,000 | 27590 | 2,410 |
| 18 | LPT Stub Shaft | 301-330-626-0 | DA727783 | N/A | N/A | N/A | 25,000 | 21917 | 3,083 |
| 19 | Conical Support | 305-056-116-0 | DA864417 | N/A | N/A | N/A | 25,000 | 21917 | 3,083 |