UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

U.S. BANK NATIONAL ASSOCIATION (Successor :
To The Connecticut National Bank), Not in its      :   **ECF CASE**
Individual Capacity but Solely As Owner Trustee   :
Under Certain Trust Agreements,                  :   Case No. 07 CIV 11131 (DLC)

                       Plaintiff,            :

                       :

           - against -             :

                       :

SOUTHWEST AIRLINES CO.,            :

                       :

             Defendant.          :

-------------------------------------------------------------- X

## DEFENDANT SOUTHWEST AIRLINES CO.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Mark S. Cohen (MC 9055)
Michael Tremonte (MT 5996)
Marc E. Isserles (MI 6446)
COHEN & GRESSER LLP
100 Park Avenue, 23rd Floor
New York, New York 10017
Telephone: (212) 957-7600
Facsimile: (212) 957-4514
mcohen@cohengresser.com
mtremonte@cohengresser.com
misserles@cohengresser.com

*Attorneys for Defendant*
*Southwest Airlines Co.*

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................. 1

Factual Background ...................................................................................................... 3

    A.    The Lease Agreements ................................................................................ 3

            1.    Southwest's Right To Install Substitute Engines ...................................... 4

            2.    The Return Condition Provisions ............................................................ 5

            3.    The Cooperation Clause ......................................................................... 6

    B.    The Allegations of the Complaint ........................................................... 7

    C.    Plaintiff's Sole Complaint Is That the Substitute Engines Have Fewer
          "Cycles" Remaining Than the Original Engines .................................. 8

Legal Standard Governing Motion .............................................................................. 9

Argument .................................................................................................................... 10

I.    Plaintiff's Claims Are Foreclosed By the Plain Terms of the Leases. ........................... 10

    A.    Plaintiff's Interpretation Is Flatly Inconsistent With the Specific Cycle
          Requirements Of the Leases, And Would Render Those Provisions
          Meaningless. ......................................................................................... 12

    B.    Plaintiff's Interpretation Would Render Performance Impossible. ...................... 16

    C.    Plaintiff's Interpretation Would Lead To Absurd Results.................................... 17

II.    Plaintiff's Request for Declaratory Judgment Should Be Dismissed Because A
    Judicial Declaration of Rights Under the Leases Would Serve No Useful Purpose. ..... 19

III.    Plaintiff's Claim That Southwest Failed To "Cooperate" With Plaintiff's Effort
    To Resell the Aircraft By Allegedly Returning "Inferior" Engines Is Meritless. .......... 21

Conclusion .................................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

*Achtman v. Kirby, McInerney & Squire, LLP,*
    464 F.3d 328 (2d Cir. 2006) ...................................................................................9

*Advanced Marine Techs., Inc. v. Burnham Sec., Inc.,*
    16 F. Supp. 2d 375 (S.D.N.Y. 1998) .......................................................................9

*Aguirre v. City of New York,*
    214 A.D.2d 692, 625 N.Y.S.2d 597, 598 (1995)....................................................14

*AIM Int'l Trading, L.L.C. v. Valcucine, S.P.A., IBI, L.L.C.,*
    No. 02 Civ. 1363 (PKL), 2003 WL 21203503 (S.D.N.Y. May 22, 2003) ..................9

*Aramony v. United Way of Am.,*
    254 F.3d 403 (2d Cir. 2001) ...................................................................................14

*Beal Sav. Bank v. Sommer,*
    8 N.Y.3d 318, 834 N.Y.S.2d 44 (2007)..............................................................15, 16

*Betancourt v. City of New York HRA/DSS,* No. 07 Civ. 2165 (DLC),
    2007 WL 2948345 (S.D.N.Y. Oct. 9, 2007)........................................................9, 10

*Bluebird Partners, L.P. v. First Fid. Bank, N.A.,*
    248 A.D.2d 219, 671 N.Y.S.2d 7, 12 (1st Dep't 1998) ...........................................15

*Broder v. Cablevision Sys. Corp.,*
    418 F.3d 187 (2d Cir. 2005) ...................................................................................10

*Camofi Master LDC v. College P'ship, Inc.,*
    452 F. Supp. 2d 462 (S.D.N.Y. 2006) .....................................................................20

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147, 154 n.4 (2d Cir. 2002) .......................................................................3

*Continental Cas. Co. v. Coastal Sav. Bank,*
    977 F.2d 734 (2d Cir. 1992) ...................................................................................19

*Corporacion de Mercadeo Agricola v. Mellon Bank Int'l,*
    608 F.2d 43 (2d Cir. 1979) .....................................................................................17

*DeSousza v. Plusfunds Group, Inc.,*
    No. 05 Civ. 5990 (JCF), 2007 WL 4287745 (S.D.N.Y. Dec. 7, 2007) ....................17

*Elsky v. Hearst Corp.,*
    648 N.Y.S.2d 592, 232 A.D.2d 310, 311 (1st Dep't 1996) ......................................17

*Harsco Corp. v. Segui,*
    91 F.3d 337, 341 n.1 (2d Cir. 1996) ......................................................................8,9

*Hauser v. Western Group Nurseries, Inc.,*
    767 F. Supp. 475 (S.D.N.Y. 1991) ..........................................................................15

*International Audiotext Network, Inc. v. AT&T Co.*,
　62 F.3d 69 (2d Cir. 1995) ..................................................................................3

*Iqbal v. Hasty*,
　490 F.3d 143 (2d Cir. 2007) ...............................................................................10

*Josephson v. Empire Blue Cross & Blue Shield*,
　No. 04-CV-3647 (JS)(ETB), 2005 WL 2413638 (S.D.N.Y. Sept. 28, 2005) ...........................16

*In re Lipper Holdings, LLC*,
　1 A.D.3d 170, 766 N.Y.S.2d 561, 562 (1st Dep't 2003)........................................................17

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
　244 F.R.D. 204 (S.D.N.Y. 2007)......................................................................10

*Manley v. Ambase Corp.*
　337 F.3d 237 (2d Cir. 2003) ...............................................................................15

*McCarthy v. Dun & Bradstreet Corp.*,
　482 F.3d 184 (2d Cir. 2007) ...............................................................................9

*Miramax Film Corp. v. Abraham*,
　No. 01 CV 5202 (GBD), 2003 WL 22832384 (S.D.N.Y. Nov. 25, 2003)................................20

*Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*,
　170 F.R.D. 361, 386 (S.D.N.Y. 1997)..................................................................20

*Oldcastle Precast, Inc. v. United States Fid. & Guar. Co.*,
　458 F. Supp. 2d 131 (S.D.N.Y. 2006) ..............................................................14

*Patane v. Clark*,
　508 F.3d 106, n.2 (2d Cir. 2007) .......................................................................10

*Revson v. Cinque & Cinque, P.C.*,
　221 F.3d 59 (2d Cir. 2000) ...............................................................................10

*Schlaifer Nance & Co. v. Estate of Andy Warhol*,
　119 F.3d 91 (2d Cir. 1997) ...............................................................................11

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004)...............................................................10

*Solid State Logic, Inc. v. Terminal Mktg.*,
　No. 02 Civ. 1378 (DLC), 2002 WL 1586977 (S.D.N.Y. July 18, 2002) .................................14

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
　No. 03 Civ. 9608SCR, 2004 WL 3220120 (S.D.N.Y. June 1, 2004).....................................16

*Thayer v. Dial Indus. Sales, Inc.*,
　85 F. Supp. 2d 263 (S.D.N.Y. 2000) ..............................................................10,11

*Travelers Indem. Co. of Ill. v. F & S London Pub, Inc.*,
　270 F. Supp. 2d 330 (E.D.N.Y. 2003)..............................................................14, 15

*United States v. Hamdi*,
　432 F.3d 115 (2d Cir. 2005) ...............................................................................11

iii

*Visual Word Sys., Inc. v. CPT Corp.*,
  No. 83 Civ. 2130 (CES), 1985 WL 567 (S.D.N.Y. Apr. 19, 1985) ...........................................15

*Wilton v. Seven Falls Co.*,
  515 U.S. 277, 287 (1995) ............................................................................................................19

*Zahler v. Twin City Fire Ins. Co.*,
  No. 04 Civ. 10299 (LAP), 2006 WL 846352 (S.D.N.Y. Mar. 31, 2006)..................................16

**Other Authorities**

Rev Proc. 75-21, 1975-1 C.B. 715, § 4(1)(c) (1975).....................................................................13

Rev. Proc. 2001-28, 2001-1 C.B. 1156, § 4.01(3) (2001) .............................................................13

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................................................................1

Defendant Southwest Airlines Co. ("Southwest") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

### Preliminary Statement

In this action, Plaintiff claims that Southwest improperly seeks to return three leased Boeing 737-3H4 aircraft to Plaintiff with allegedly "inferior" substitute engines. Plaintiff does not, because it cannot, allege that Southwest is prohibited from returning the leased aircraft with substitute engines (that is, different engines from the ones originally delivered with the aircraft). Indeed, the lease agreements expressly give Southwest that right. Nor does Plaintiff contend – because there is no basis for such a contention – that the engines Southwest seeks to return are "inferior" in the sense that they fail to meet any FAA regulation or other legal requirement that would impair the airworthiness or safety of the leased aircraft.

On the contrary, Plaintiff's entire case is premised on the contention that the substitute engines are "inferior" because they have fewer "cycles"[1] remaining on them before the next scheduled engine maintenance than the engines originally delivered with the aircraft at the inception of the leases, more than twenty years ago. In advancing this argument, Plaintiff seizes upon language in the lease agreements that requires Southwest to return substitute engines that have a "value and utility at least equal to" the original engines. On Plaintiff's view, substitute engines with fewer "cycles" remaining on them than the original engines necessarily have less "value and utility" than the original engines.

But Plaintiff's interpretation is flatly foreclosed by the plain terms of the lease agreements. Relying exclusively on the "value and utility" language, Plaintiff ignores additional provisions – contained in the very same section of the leases as the "value and utility" language –

---

[1] A "cycle" in the aviation industry is defined as one take-off and landing.

that *specifically* identify the minimum number of cycles that must be remaining on substitute engines returned with the aircraft at the termination of the leases. Those provisions set forth objective "cycle" requirements for substitute engines that can be satisfied without regard to the cycles remaining on the original engines. And the Complaint implicitly concedes that the substitute engines Southwest offered to return satisfy these specific "cycle" requirements.

Plaintiff's untenable interpretation would simply rewrite those specific "cycle" requirements and impose on Southwest the additional – utterly inconsistent – obligation to ensure, at the time of the return of the aircraft, that the substitute engines have at least as many cycles remaining on them as the original engines. Under well-settled principles of contract interpretation, the specific "cycle" requirements for substitute engines necessarily trump the more general "value and utility" language, and foreclose Plaintiff's claims as a matter of law. For similar reasons, Plaintiff's construction of the "value and utility" language should be rejected because it would render these specific "cycle" requirements for substitute engines entirely superfluous. If the "value and utility" clause required that the substitute engines have at least as many cycles remaining as the original engines, it would have been pointless for the parties to specify – in detailed, carefully negotiated provisions – exactly how many cycles must be remaining on the substitute engines.

Plaintiff's interpretation also should be rejected because it would produce absurd, commercially unreasonable results that the parties could not possibly have intended. Southwest has the unfettered right under the leases to remove the original engines and to use them on other aircraft in its fleet. Thus, the number of cycles remaining on the original engines at any given time is a function of largely unpredictable factors, such as how frequently Southwest happens to be using those original engines on its other aircraft, and how recently those engines have been

2

maintained under Southwest's regular engine maintenance program. Plaintiff's entire argument boils down to the plainly untenable claim that the parties affixed a random value to the return condition of the substitute engines – namely, however many cycles just happen to be remaining on the original engines, given Southwest's use and maintenance of those original engines on other aircraft, at the time of the return of the leased aircraft. Such a reading transforms a sophisticated lease agreement into a game of chance. In the end, Plaintiff's interpretation has no rational business justification. It is instead a transparent effort to concoct a legal entitlement to substitute engines with a value far in excess of what the lease agreements expressly require.

Because Plaintiff's claims for breach of contract and for declaratory relief are premised on an interpretation that is foreclosed by the plain terms of the leases, those claims fail as a matter of law, and the entire Complaint should be dismissed.

## Factual Background

### A.    The Lease Agreements.

On or about June 1, 1987, Southwest entered into three substantively identical aircraft lease agreements ("Leases"), in which Southwest agreed to lease three Boeing 737-3H4 aircraft, bearing FAA numbers N319SW (the "319 Aircraft"), N320SW (the "320 Aircraft") and N321SW (the "321 Aircraft") (collectively "the Aircraft") from The Connecticut National Bank, the predecessor-in-interest to Plaintiff U.S. Bank National Association. (Cplt. ¶ 6).[2]  Plaintiff

---

[2] One of the Leases – The "Trust B" Lease governing the 320 Aircraft – is attached as Exhibit A to the Declaration of Marc E. Isserles, Esq. in Support of Motion to Dismiss the Complaint ("Isserles Decl."). (As Plaintiff alleges, all three leases are "substantively identical" (Cplt. ¶ 6), and thus the substantive terms of the Trust B lease are the same as the substantive terms of the remaining two leases). Although Plaintiff did not attach the Leases to its complaint, Plaintiff's numerous references to (and quotation of) the terms of the Leases, and its assertion of legal claims predicated on the alleged terms of those Leases, renders those documents "integral" to the Complaint, and part of the pleading for purposes of Southwest's motion to dismiss. *See International Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (court could consider agreement on motion to dismiss where complaint "relie[d] heavily upon its terms and effect," agreement was "integral" to complaint, and court could "consider its terms in deciding whether [plaintiff] can prove any set of facts that would entitle it to relief"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 n.4 (2d Cir. 2002) (contract is "integral" to complaint where complaint is "replete with references" to the contract and "request[s] judicial interpretation of [its] terms").

leased the Aircraft to Southwest in its capacity as trustee ("Owner Trustee") on behalf of

Chrysler Capital Corporation (predecessor in interest to DaimlerChrysler Capital Services (debis)

LLC) ("Daimler" or the "Owner Participant"), from whom Plaintiff took title to the Aircraft

under separate agreements.

### 1.  Southwest's Right To Install Substitute Engines.

Each Aircraft was equipped at the commencement of the term of the Leases – twenty

years ago – with two General Electric model CFM56-3B1 Engines.  (Cplt. ¶ 7).  The Leases

contain numerous provisions giving Southwest the right during the term of the Leases to

substitute other "engines" for the Engines originally installed on the Aircraft, and to use the

original Engines on other aircraft in its fleet.  (Consistent with the convention used in the Leases,

Southwest uses the term "Engines" (with an upper-case "E") here to denote the engines

originally installed on the Aircraft, and the term "engines" (with a lower-case "e") to denote

engines substituted by Southwest during the term of the Leases and installed on the leased

Aircraft.)

Thus, the Leases define "Engine" to mean "(i) each of the two CFM International Model

CFM 56-3-B1 engines listed by manufacturer's serial number in the initial Lease Supplement in

connection with the Airframe, *whether or not from time to time installed on such Airframe or

installed on any other airframe or on any other aircraft*; and (ii) any engine which may *from

time to time be substituted*, pursuant to the terms hereof, for any of such engines . . . ."  Leases §

1 (emphasis added); *see also* § 7(b)(iii)-(v) (permitting Southwest to install an engine on

additional airframes that it owns or leases under certain specified conditions).  Finally, the

Leases expressly permit Southwest to return substituted engines at the time of the return of the

Aircraft to Lessor.  *See* Leases § 5(a) ("At the time of such return, the Airframe will be fully

equipped with two Engines (or other engines of the same make and model or two other engines

4

of the same or another manufacturer of equivalent utility and value, and suitable for installation and use on the Airframe without impairing the value or utility of the Aircraft) duly installed thereon.").

### 2. The Return Condition Provisions.

In Section 5(a), titled "Condition Upon Return," the Leases contain numerous provisions specifying in detail the return conditions for the Aircraft and the Engines or engines. The Leases require that, at the time Southwest returns the Aircraft, the "Airframe and Engines or engines . . . (i) shall be certificated as an airworthy aircraft by the Federal Aviation Administration," and must be "(ii) free and clear of all Liens (other than Lessor Liens) and rights of third parties . . . ." Leases §§ 5(a)(i),(ii). Furthermore, at the time of the return, the "Airframe and Engines or engines . . . (iii) shall be in passenger configuration and in as good operating condition as when delivered to Lessee hereunder, ordinary wear and tear excepted, or, in the case of any such engines owned by Lessee, shall have a value and utility at least equal to, and shall be in as good operating condition as required by the terms hereof with respect to Engines constituting part of the Aircraft but not then installed on the Airframes." § 5(a)(iii).

In the very same subsection (§5(a)), the Leases identify with specificity the "hours" or "cycles" that must be remaining on the Engines or engines at the time of the return of the Aircraft. These "hours" or "cycles" requirements vary depending on the Lessee's particular maintenance program. Thus, if the Lessee:

> during the period of operation of such Aircraft immediately prior to such return shall not have been using an on-condition maintenance program with respect to the Engines or engines installed thereon upon return, Lessee agrees that the average number of hours or cycles of operation (whichever shall be applicable under the maintenance program then in use with respect to such Engines or engines) on such Engines or engines remaining until the next scheduled engine refurbishment shall be at least 25% of the hours or cycles (whichever shall be applicable) between engine refurbishment allowed under the maintenance program then in use with respect to such Engines or engines.

Leases § 5(a)(v).  By contrast, if the Lessee:

> shall then be using an on-condition maintenance program with respect to the Engines or engines installed on the Airframe upon return, Lessee agrees that each such Engine or engine will have at least 1,750 hours or cycles remaining before the next scheduled engine removal.

*Id.*, § 5(a) (final sentence, first paragraph).  In addition, the Leases set forth detailed compensatory remedies available to the Lessor if, at the time of the return, the Engines or engines that the Lessee returns with the Aircraft do not meet the identified "cycle" or "hour" requirements.[3]

Thus, the Leases set forth objective "cycles" or "hours" requirements on the Engines or engines that the Lessee actually returns with the Aircraft.   The Leases *do not* require the Lessee to compare the number of hours or cycles remaining on the substitute engines to the number of hour or cycles remaining on the original Engines.

### 3.  The Cooperation Clause.

Section 5(e) of the Leases provides that, during the last six months of the term of the Leases, Southwest "agrees . . . that it will cooperate . . . in all reasonable respects with any efforts of Lessor

---

[3] *See* Leases §5(a) (providing that, where Lessee is not using an on-condition maintenance program and fails to meet the required "cycle" or "hour" requirements, Lessee "shall perform (or cause to be performed) all maintenance work necessary to meet such conditions or, if Lessor shall so elect, Lessee shall pay or cause to be paid to Lessor a Dollar amount computed by multiplying (i) the current market cost of performing for an engine of the same model as such Engine or engine the scheduled engine refurbishment under the maintenance program then used by Lessee or any Sublessee for engines of the same model as such Engine or engine by (ii) a fraction of which (x) the numerator shall be the excess of 25% of the hours or cycles of operation (whichever is applicable) allowable between scheduled engine refurbishments over the actual average number of hours or cycles of operation on such Engine or engine remaining until the next such scheduled engine refurbishment, and (y) the denominator shall be the number of hours or cycles allowable between such scheduled engine refurbishments."); *id.* (providing that, where Lessee is using an on-condition maintenance program and fails to meet the 1,750 "hours" or "cycle" requirements, "Lessor may elect either for Lessee to perform (or cause to be performed) any maintenance check required (in which event Lessor shall reimburse Lessee pro rata for the cost of such maintenance check to the extent such check places such Engine or engine in a condition, based on hours remaining to the next scheduled engine removal, better than the condition in which such Engine or engine is required to be returned pursuant to this Section 5) or for Lessee to make a financial adjustment at the rate then charged by Lessee to third parties for performing such work, or if Lessee does not perform such work, at the rate then charged by a reputable independent FAA approved maintenance facility mutually agreed upon by Lessee and the Owner Participant.")

to lease or sell the Aircraft, including without limitation . . . permitting potential lessees or purchasers to inspect the Aircraft and the records relating thereto."  Leases § 5(e).

**B.    The Allegations of the Complaint.**

Under the Leases, Southwest was obligated to return the 319 Aircraft on December 19, 2007, and to return the 320 Aircraft on January 15, 2008.  The return of the 321 Aircraft is scheduled for January 31, 2008.  (Cplt. ¶ 17).

The Complaint alleges that, in anticipation of Southwest's return of the Aircraft, Plaintiff, through Daimler, "began to market the Aircraft during the months prior to the expiration of the Leases." (Cplt. ¶ 18).  "On or about September 28, 2007, AeroTurbine, Inc. ("AeroTurbine") submitted an Offer Letter, pursuant to which AeroTurbine offered to purchase the Aircraft, including the Engines (based on the information that Lessor then had regarding the condition of the Aircraft, including the Engines), for a total purchase price of $19,800,000." (*Id.* ¶ 19).

The Complaint further alleges that "[o]n October 19, 2007, Southwest notified Lessor . . . that it did not intend to return the Engines specified in the Leases upon return, but rather that it would substitute inferior engines that do not have 'a value and utility at least equal to' the original Engines." (*Id.* ¶ 20).  According to the Complaint, "the engines that Southwest stated it would return with the Aircraft have a value of approximately $10,000,000 less than the value of the Engines." (*Id.* ¶ 21).  However, the Complaint is devoid of any factual allegations explaining how the engines that Southwest substituted for the original Engines are allegedly "inferior," or in what respect they allegedly have "a value and utility" that is $10,000,000 less than the Engines.

Plaintiff claims that, "[a]s a result of Southwest's improper substitution of inferior engines for the leased Engines, AeroTurbine has withdrawn its offer to purchase the Aircraft, and Lessor . . . has been unable to find another purchaser for the Aircraft that would be prepared to pay a purchase price in any amount except millions of dollars less than the $19,800,000 price

7

previously offered by AeroTurbine." (*Id.* ¶ 22). Plaintiff further alleges that it has "demanded that Southwest perform its obligations under the Leases and commit to return either the Engines or engines with 'a value and utility at least equal to' the Engines," and that Southwest has refused and "taken the position that it is not required" to do so. (*Id.* ¶ 23).

The Complaint asserts two causes of action against Southwest. In Count I, Plaintiff seeks a "judicial declaration clarifying and declaring the rights of the parties and establishing that Southwest's substitution of inferior engines is a breach of the Leases." (*Id.* ¶ 28). In Count II, Plaintiff alleges that "Southwest breached its obligations under . . . Section 5(e) of the Leases by failing to cooperate 'in all reasonable respects with any efforts of Lessor to lease or sell the Aircraft,' including, *inter alia*, by stating its refusal to return either the Engines or engines with 'a value and utility at least equal to' the Engines." (Cplt. ¶ 30 (quoting Leases 5(e)).

### C.    Plaintiff's Sole Complaint Is That the Substitute Engines Have Fewer "Cycles" Remaining Than the Original Engines.

As noted, the Complaint neglects to explain the basis for Plaintiff's contention that the substitute engines have less "value and utility" than the original Engines. However, the documents on which Plaintiff expressly relies in the Complaint unmistakably do so.

The October 19, 2007 notification from Southwest to Plaintiff contains "Specification Sheets" ("Spec Sheets") that specifically identify the number of "cycles" remaining on the substitute engines. (*See* E-mail from Michael Kortschak, Southwest's Manager of Fleet Planning & Transactions, to Daimler, dated October 19, 2007, attaching "Spec Sheets" for the six substitute engines) (Isserles Decl. Ex. B).[4] The information on the Spec Sheets documenting the

---

[4] Plaintiff's contract claims are expressly predicated on Southwest's notification to Lessor "[o]n October 19, 2007" that Southwest allegedly "did not intend to return the Engines specified in the Leases upon return, but rather that it would substitute inferior engines that do not have 'a value and utility at least as equal to' the Original Engines." (Cplt. ¶ 20). Because Plaintiff expressly relies upon Southwest's October 19 communication in asserting its claims, and because that communication is "integral" to those claims, this Court may consider it in resolving Southwest's motion to dismiss. *See Harsco Corp. v. Segui*, 91 F.3d 337, 341 n.1 (2d Cir. 1996) (court may consider letter that

remaining cycles on the engines is the only information on the Spec Sheets that Plaintiff could have used to compare the value of the substitute engines and the original Engines, or to reach the conclusion that the substitute engines are allegedly "inferior" to those Engines.

Thus, when the Complaint alleges that, "[o]n October 19, 2007, Southwest notified Lessor . . . that it would substitute inferior engines that do not have 'a value and utility at least equal to' the original Engines" (Cplt. ¶ 20), Plaintiff is necessarily taking the position that the substitute engines have less "value and utility" than the original Engines under § 5(a)(iii) *because* the substituted engines have fewer "cycles" remaining on them than the original Engines. No other rational inference or explanation is possible based upon the notification that Plaintiff alleges Southwest provided on October 19, 2007, and on which Plaintiff expressly and exclusively premises its legal claims.

### Legal Standard Governing Motion

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). A court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim

---

was "cited to and described" in the complaint); *Betancourt v. City of New York HRA/DSS*, No. 07 Civ. 2165 (DLC), 2007 WL 2948345, at *2 (S.D.N.Y. Oct. 9, 2007) (same); *AIM Int'l Trading, L.L.C. v. Valcucine, S.P.A., IBI, L.L.C.*, No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at *4 (S.D.N.Y. May 22, 2003) (same); *Advanced Marine Techs., Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 378 (S.D.N.Y. 1998) (same).

9

plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (construing *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S.Ct. 1955, 1968-69 (2007)); *Betancourt*, 2007 WL 2948345, at *2.

In deciding a motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted); *Patane v. Clark*, 508 F.3d 106, 111 n.2 (2d Cir. 2007) (complaint includes "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (quoting *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir. 2000) (citation omitted in original)). Moreover, the court is not required to accept allegations in the complaint that are contradicted by documents incorporated into, or integral to, the complaint. *See Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007) ("At the motion to dismiss stage, where a plaintiff's factual allegations or legal conclusion are flatly contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference. . . .") (citation and internal quotations omitted); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (court need not accept description of terms of agreement in the complaint, but may "look to the agreement itself").

## Argument

### I.    Plaintiff's Claims Are Foreclosed By the Plain Terms of the Leases.

Under New York law, which governs the Leases, *see* Leases § 24, the meaning of a contract that is unambiguous is a question of law for the court to decide." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). Moreover, it is well-settled that "'issues of contract interpretation are generally matters of law and therefore suitable for disposition on a motion to dismiss.'" *Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 269 (S.D.N.Y. 2000)

(quoting *Marketing/Trademark Consultants, Inc. v. Caterpillar, Inc.*, No. 98 Civ. 2570 (AGS), 1999 WL 721954, at *2 (S.D.N.Y. Sept. 16, 1999)).

As demonstrated above, the inescapable premise of the Complaint is that the substitute engines that Southwest seeks to return with the Aircraft have less "value and utility" than the original Engines under § 5(a)(iii) of the Leases *because* those engines have fewer "cycles" remaining on them than the original Engines. In advancing this argument, Plaintiff seizes upon language stating that, at the time the Aircraft is returned, any engines substituted by Southwest for the original Engines "shall have a value and utility at least equal to . . . Engines constituting part of the Aircraft but not then installed on the Airframe." (Cplt. ¶ 11 (quoting §5(a)(iii))). On Plaintiff's view, substitute engines that have fewer "cycles" remaining on them than the original Engines violate this provision because such engines do not have "a value and utility at least equal to" the original Engines.

In relying exclusively on the "value and utility" language of § 5(a)(iii) in support of its claims, Plaintiff disregards the cardinal principle of contract interpretation that "contracts are to be interpreted as a whole." *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (citing Restatement (Second) of Contracts § 202(2) (1981)); *see Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 100 (2d Cir. 1997) (stating that "well-established principles of contract interpretation . . . require that all provisions of a contract be read together as a harmonious whole").

Thus, the Complaint fails utterly even to mention the provisions in §5(a) that *specifically* identify the number of "cycles" or "hours" that must be remaining on the engines or Engines at the time the Aircraft is returned. *See* Leases § 5(a)(v) (requiring that, where Lessee had not been using an "on-condition maintenance program," "the average number of hours or cycles of

11

operation (whichever shall be applicable under the maintenance program then in use with respect to such Engines or engines)[5] on such Engines or engines remaining until the next scheduled engine refurbishment shall be at least 25% of the . . . cycles . . . between engine refurbishment allowed under the maintenance program then in use with respect to such Engines or engines."); *id.* §5(a) (requiring that, where Lessee had been using an "on-condition maintenance program," "each such Engines or engine will have at least 1,750 . . . cycles remaining before the next scheduled engine removal").

As demonstrated below, these specific "cycle" requirement provisions cannot possibly be reconciled with Plaintiff's interpretation of the "value and utility" clause, and end this case as a matter of law.

### A. Plaintiff's Interpretation Is Flatly Inconsistent With the Specific Cycle Requirements Of the Leases, And Would Render Those Provisions Meaningless.

The specific "cycle" requirements for substitute engines upon return of the Aircraft are completely inconsistent with, and necessarily foreclose, Plaintiff's interpretation of the Leases. Those provisions identify a fixed number of minimum "cycles" that must be remaining on the Engines or engines at the time of their return. There is no obligation on the Lessee to compare the "cycles" remaining on the substitute engines with the cycles remaining on the original Engines, nor is there any requirement that the substitute engines have remaining on them a number of cycles that is "at least equal to" the number of cycles remaining on the original Engines. Rather, the Lessee satisfies the return conditions when it returns substitute engines that meet the specified number of minimum cycles remaining before the next scheduled engine

---

[5] As the Spec Sheets attached to Southwest's October 19 notification make clear, Southwest utilizes a "cycles" based maintenance program for its engines rather than an "hours" based program. *See* Isserles Decl. Ex. B. Thus, for purposes of this memorandum, Southwest will only address the language in the Leases relating to remaining "cycles," and will disregard the inapplicable, but functionally identical, "hours" measurement.

12

removal.  Again, Plaintiff makes no claim in this case – because there is no basis for such a claim – that Southwest's substitute engines fail in any way to comply with those specific "cycle" requirements.  Thus, the Complaint implicitly concedes that Southwest's substitute engines fully satisfy these specific "cycle" requirements.

By arguing that the "value and utility" clause obligates Southwest to return substitute engines with cycles remaining that are "at least equal to" the cycles remaining on the original Engines, Plaintiff advances an interpretation that cannot be reconciled with the plain language of these "cycle" provisions.  Thus, Plaintiff's interpretation would obligate a Lessee to ensure that the cycles remaining on a substitute engine are "at least equal to" those remaining on the original Engines *even if,* as in this case, those engines satisfied the specific cycle requirements set forth in § 5(a).  Conversely, on Plaintiff's view, a Lessee could fail to satisfy the specific "cycle" requirements (*e.g.,* by returning an engine under an on-condition maintenance program that had fewer than 1,750 cycles remaining before the next scheduled engine removal), and yet satisfy the "value and utility" clause, so long as the cycles remaining on those substitute engines happened to be "at least equal to" the cycles remaining on the original Engines.  There is simply no way to reconcile the text of § 5(a) – read, as it must be, as a whole – with Plaintiff's theory of the case.

Although the number of remaining cycles on an engine may well be relevant to determining the "value" or "utility" of an engine as a general matter, the Leases' specific "cycle" provisions take precedence over the more general "value and utility" language for purposes of construing § 5(a).[6]  It is a bedrock principle of New York contract law that, "[w]here there is an

---

[6]  The general "value and utility" language was inserted into the agreement for a very different purpose – namely, to ensure for tax purposes that the leased property at the end of the lease term would be worth at least 20% of the *original* cost of the property. *See* Rev. Proc. 2001-28, 2001-1 C.B. 1156, § 4.01(3) (2001); Rev Proc. 75-21, 1975-1 C.B. 715, § 4(1)(c) (1975). However, this Court need not construe the "value and utility" clause definitively in order to grant Southwest's motion to dismiss.  As demonstrated below, whatever the parties meant in fact by inserting the "value and utility" clause into the Leases, they could not possibly have intended the interpretation on which Plaintiff rests it legal claims because that interpretation is foreclosed by the Leases themselves.

13

inconsistency between a specific provision and general provision of a contract, the specific

provision controls." *Aguirre v. City of New York*, 214 A.D.2d 692, 693, 625 N.Y.S.2d 597, 598

(1995); *Oldcastle Precast, Inc. v. United States Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 142

(S.D.N.Y. 2006) (same); *Aramony v. United Way of Am.*, 254 F.3d 403, 413-14 (2d Cir. 2001)

("Even where there is no 'true conflict' between two provisions, 'specific words will limit the

meaning of general words if it appears from the whole agreement that the parties' purpose was

directed solely toward the matter to which the specific words or clause relate.'") (quoting

Richard A. Lord, *Williston on Contracts* §32:10, at 449 (4th ed. 1999)).

Plaintiff's interpretation violates this core interpretive principle because it relies upon a

general phrase – "value and utility" – to graft additional, inconsistent obligations onto provisions

that specifically and comprehensively address the relevant question of how many cycles must

remain on the engines at the time of their return. That is reason enough to reject Plaintiff's

claims as a matter of law. *See, e.g., Aramony*, 254 F.3d at 412-14) (rejecting interpretation of

broad "purpose" provision of pension plan documents that would have provided for replacement

benefits in a manner expressly precluded by more specific provisions computing allowable

replacement benefits; concluding that it would be "unreasonable to treat the imprecision of the

general purpose clause as overriding the specificity of the detailed computation clauses"); *Solid

State Logic, Inc. v. Terminal Mktg.*, No. 02 Civ. 1378 (DLC), 2002 WL 1586977, at *4

(S.D.N.Y. July 18, 2002) (holding, on motion to dismiss for lack of jurisdiction, that provision of

settlement agreement in which party specifically assigned debt to plaintiff, thereby authorizing

plaintiff to release claim for debt in settlement agreement, trumped more general provision

providing that party, and not plaintiff, owned the debt).[7]

---

[7] *See also Travelers Indem. Co. of Ill. v. F & S London Pub, Inc.*, 270 F. Supp. 2d 330, 334 (E.D.N.Y. 2003)
(holding that specific provisions governing fire damage, which imposed liability on lessee only under certain limited

14

Plaintiff's interpretation of the "value and utility" clause also should be rejected because it would violate the equally weighty interpretive cannon that a contract should not be read in such a way as to render any part of it superfluous or meaningless. "It is a cardinal rule of contractual interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual." *Hauser v. Western Group Nurseries, Inc.*, 767 F. Supp. 475, 488 (S.D.N.Y. 1991); *see Manley v. Ambase Corp.* 337 F.3d 237, 250 (2d Cir. 2003) ("New York law . . . disfavors interpretations that render contract provisions meaningless or superfluous.").[8]

If Plaintiff were correct that, in order to satisfy the "value and utility" clause upon return, a Lessee must ensure that the "cycles" remaining on the substituted engines are "at least equal to" the "cycles" remaining on the original Engines, there would have been no need for the parties to agree to specific provisions expressly delineating the number of cycles that must be remaining on the engines at the time of return. The "value and utility" clause alone would have been sufficient. Indeed, on Plaintiff's view, the specific "cycle" requirements for substituted engines become meaningless because, whether or not particular engines satisfy those requirements at the time of return, a Lessee still would have to establish that the remaining cycles on the engines are "at least equal to" the cycles remaining on the original Engines.

In addition, as noted above, *see supra* note 3, the Leases set forth in detail the Lessor's compensatory remedies in the event the engines or Engines that the Lessee returns fail to satisfy

---

circumstances, trumped more general provision arguably requiring lessee to indemnify landlord for all damage to property); *Visual Word Sys., Inc. v. CPT Corp.*, No. 83 Civ. 2130 (CES), 1985 WL 567, at *4 (S.D.N.Y. Apr. 19, 1985) (rejecting argument that general obligation to act in good faith required party to appoint an appraiser where provision dealing specifically with that issue gave party discretion whether or not to appoint appraiser).

[8] *See also Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324, 834 N.Y.S.2d 44, 47-48 (2007) ("A reading of the contract should not render any portion meaningless."); *Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 248 A.D.2d 219, 224, 671 N.Y.S.2d 7, 12 (1st Dep't 1998) ("The task of the court is to enforce the plain meaning of an unambiguous agreement rather than to accept a construction that would render a purposeful provision of the contract meaningless.").

the applicable "cycle" requirements. Again, these specific formulas for compensating a Lessor in the event of a "cycle" requirement deficiency would be rendered utterly meaningless if a Lessee, even *after* making the payments or taking the remedial measures specifically outlined in such instances, nonetheless could be found in breach of the return conditions simply because the cycles remaining on the substitute engines are not "at least equal to" the cycles remaining on the original Engines.

Because Plaintiff's construction of the "value and utility" clause renders meaningless the specific provisions specifying the number of cycles that must be remaining at the time of return, that construction should be rejected as a matter of law. *See, e.g., Beal,* 8 N.Y.3d at 328, 834 N.Y.S.2d at 50 (affirming grant of motion to dismiss breach of contract claims where plaintiff's interpretation of loan documents would have rendered express provision of those documents meaningless); *Zahler v. Twin City Fire Ins. Co.,* No. 04 Civ. 10299 (LAP), 2006 WL 846352, at *7 (S.D.N.Y. Mar. 31, 2006) (granting motion on the pleadings where plaintiff's construction of contract would render express provision meaningless, and plaintiff would as a consequence have "gotten more than it bargained for in its contract"); *Josephson v. Empire Blue Cross & Blue Shield,* No. 04-CV-3647 (JS)(ETB), 2005 WL 2413638, at *3 (S.D.N.Y. Sept. 28, 2005) (same); *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* No. 03 Civ. 9608SCR, 2004 WL 3220120, at *6 (S.D.N.Y. June 1, 2004) (same), *aff'd* 425 F.3d 119 (2d Cir. 2005).

## B.    Plaintiff's Interpretation Would Render Performance Impossible.

Plaintiff's interpretation of the Leases also should be rejected because it would impose a return condition obligation with which it would be practically impossible to comply. Given that each Aircraft originally was equipped with *two* original Engines, and that Southwest may use those original Engines on numerous additional aircraft in its fleet (that is, it may separate the

16

original Engines and use each of them on a *different* aircraft in its fleet), the two original Engines likely will not have the same number of "cycles" remaining on them at any given time.

Assuming that one of the original Engines has more "cycles" remaining on it than the other at the time of the return of the leased Aircraft, Plaintiff does not, and indeed cannot, explain *which* Engine should be used to determine whether the substitute engine has "at least" as many cycles remaining as the original Engines. What if a particular substitute engine has fewer cycles remaining than one of the original Engines, but more cycles remaining on it than the other original Engine? In that event, it would be impossible for Southwest to comply with Plaintiff's reading of the Leases – the substitute engine would, at one and the same time, pass *and* fail Plaintiff's supposed return condition requirement. The incoherence of Plaintiff's interpretation, and the practical impossibility of complying with it, is a further compelling reason why this Court should reject it as a matter of law. *See Corporacion de Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 53 (2d Cir. 1979) ("construction rendering the contract possible of performance will be preferred to one which renders its performance impossible").

### C.  Plaintiff's Interpretation Would Lead To Absurd Results.

Plaintiff's interpretation also should be rejected because it would lead to plainly absurd results that the parties could not possibly have intended. *See DeSousza v. Plusfunds Group, Inc.*, No. 05 Civ. 5990 (JCF), 2007 WL 4287745, at *3 (S.D.N.Y. Dec. 7, 2007) ("Contracts must be interpreted to avoid . . . absurd results."); *In re Lipper Holdings, LLC,* 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.") (citations omitted); *Elsky v. Hearst Corp.,* 648 N.Y.S.2d 592, 593, 232 A.D.2d 310, 311 (1st Dep't 1996) (rejecting contract interpretation that would lead to a commercially unreasonable result).

17

Because Southwest has the express right under the Leases to install the original Engines on other aircraft in its fleet, the number of "cycles" remaining on those original Engines at any given time depends on how frequently Southwest has been using those Engines on other aircraft, and thus on how recently those Engines have been maintained under Southwest's engine maintenance program. The condition of the original Engines on the return date for the leased Aircraft is therefore wholly coincidental. If the original Engines happen to have been maintained recently (because of the manner of their use on *other* aircraft), those Engines will have many cycles remaining on them before the next scheduled maintenance on the date the leased Aircraft are returned. If the original Engines happen to have been maintained earlier on (again, because of the manner of their use on *other* aircraft), those Engines might have comparatively fewer cycles remaining before the next scheduled maintenance on the date the leased Aircraft are returned.

On Plaintiff's interpretation of the Leases, these two otherwise unrelated events – the return date for the Aircraft, and the last maintenance event on the original Engines – become inextricably linked. But what Plaintiff does not, and cannot, explain is *why* the parties rationally would have decided to link these two otherwise unrelated events. Plainly, there is no such reason. On Plaintiff's view, the parties purportedly agreed to ascribe a value to the substitute engines upon return of the Aircraft that is essentially indeterminate and random – namely, however many cycles just happen to be remaining on the original Engines, based on their use and maintenance on *other aircraft* over a twenty year lease period, at the time of the return of the leased Aircraft. That is the very definition of a commercially unreasonable result. Moreover, Plaintiff's interpretation would give the Lessee the perverse incentive to postpone maintenance on the original Engines for as long as possible as the term of the lease draws to a close – not for

18

any legitimate business reason, but simply to ensure that the cycles remaining on the substitute engines would be "at least equal to" the cycles remaining on the original Engines on the date the Aircraft is returned.

Far from reflecting a rational business decision between the parties, Plaintiff's interpretation of the Leases attempts to capitalize on an unanticipated fluke – namely, that Southwest happened to service the original Engines, based on its use of those Engines on *other* aircraft, at the very end of the lease term for the leased Aircraft. This Court should not sanction that effort, or reward Plaintiff with a legal entitlement to substitute engines with a value far in excess of what the leases expressly require.

## II.    Plaintiff's Request for Declaratory Judgment Should Be Dismissed Because A Judicial Declaration of Rights Under the Leases Would Serve No Useful Purpose.

In the event this Court denies Defendant's motion to dismiss the Complaint in its entirety, it should at the very least dismiss Plaintiff's request for declaratory relief in Count I because it is subsumed within, and thus duplicative of, Plaintiff's breach of contract claim in Count II.

It is well-settled that a district court's exercise of jurisdiction under the Declaratory Judgment Act is discretionary. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (courts have "unique and substantial discretion in deciding whether to declare the rights of litigants"). In exercising this broad discretion, district courts should consider whether the requested declaratory relief "will serve a useful purpose in clarifying and settling the legal relations in issue" and whether such relief "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (citations and internal quotations omitted).

This Court should dismiss Count I for failure to state a claim because a judicial declaration of the parties' rights under the Leases will not serve any "useful purpose" and will

19

not further the purposes of the Declaratory Judgment Act. In Count I of the Complaint, Plaintiff seeks a "judicial declaration clarifying and declaring the rights of the parties and establishing that Southwest's substitution of inferior engines is a breach of the Leases." (Cplt. ¶ 28; *id.* at ¶ 27). But the declaration that Plaintiff seeks in Count I is currently at issue in this lawsuit by virtue of Plaintiff's separate cause of action for breach of contract in Count II. Indeed, Plaintiff's breach contract claim is based on the very same alleged conduct that forms the basis for its request for declaratory relief. (*See* Cplt. ¶ 30 (asserting claim for breach of contract predicated on Southwest's alleged "refusal to return either the Engines or engines with 'a value and utility at least equal to' the Engines")).

Because Plaintiff's request for declaratory relief in Count I is necessarily subsumed within its breach of contract claim in Count II, a judicial declaration of the parties' rights under the Leases would fail to serve the objectives of the Declaratory Judgment Act, and a separate cause of action seeking such declaratory relief should be dismissed. *See Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (request for declaratory relief under contract fails to serve the objectives of the Declaratory Judgment Act where it is duplicative of breach of contract claim; declaration of breach serves no "useful purpose" in clarifying the parties' legal relations where that determination must be made in resolving breach of contract claim).[9]

---

[9] *See also Miramax Film Corp. v. Abraham*, No. 01 CV 5202 (GBD), 2003 WL 22832384, at *15 (S.D.N.Y. Nov. 25, 2003) ("Where the declaratory relief sought is already encompassed within the substantive claims, plaintiff can obtain the requested relief without aid of a separate declaratory judgment claim."); *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 386 (S.D.N.Y. 1997) (stating that "[i]t is well settled . . . that a declaratory judgment may be refused where it would serve no useful purpose . . . or where it is being sought merely to determine issues which are involved in a case already pending and can properly be disposed of therein," and holding that request for declaratory relief was improper where it sought a declaration "concerning the claims raised in the remainder of the Complaint") (citations and internal quotations omitted).

20

**III.    Plaintiff's Claim That Southwest Failed To "Cooperate" With Plaintiff's Effort To Resell the Aircraft By Allegedly Returning "Inferior" Engines Is Meritless.**

In the event this Court denies Southwest's motion to dismiss the Complaint in its entirety, it should dismiss Count II (breach of contract) on the alternative ground that Plaintiff fails to identify any action on the part of Southwest that even arguably could be said to constitute a failure to "cooperate" in Plaintiff's efforts to resell the Aircraft. Plaintiff claims that Southwest breached §5(e) of the Leases, which provides that Southwest will "cooperate . . . in all reasonable respects with any efforts of Lessor to lease or sell the Aircraft, including without limitation . . . permitting potential lessees or purchasers to inspect the Aircraft and the records relating thereto." Leases § 5(e). According to Plaintiff, Southwest breached this provision by "stating its refusal to return either the Engines or engines with 'a value and utility at least equal to' the Engines." (Cplt. ¶ 30).

Plaintiff's claim makes no sense. A failure to return engines with a "value and utility" equal to the Engines is, at the very most, an alleged failure to meet the return conditions specified in §5(a). It is not an independent failure to "cooperate" with the Lessor's efforts to resell the Aircraft. If it were, then *every* alleged breach by the Lessee of *any* covenant in the Leases also would constitute a violation of §5(e)'s cooperation clause – because any such breach equally could be said to interfere with the Lessor's potential ability to resell the Aircraft. But any such interpretation of §5(e) would render that clause essentially superfluous because the Lessor would have a cause of action – irrespective of §5(e)'s "cooperation" clause – under the provision of the Leases that it claims the Lessee *actually* breached.

Thus, § 5(e)'s "cooperation" clause has independent meaning only insofar as it obligates the Lessee to take steps to assist the Lessor's efforts to resell the Aircraft that are not otherwise

21

explicitly required under the Leases. The one example given in §5(e) – the Lessee's obligation to permit inspection of the Aircraft by the potential purchaser or lessee – is precisely that kind of obligation. But Plaintiff does not allege that Southwest failed to discharge any "cooperation" obligation of that kind. It claims only that Southwest failed to return engines that comply with §5(a) – a claim that may be actionable (or not) under § 5(a) itself, and that simply does not implicate the separate duty to "cooperate" with Plaintiff's resale efforts. Because Plaintiff failed to bring a claim under §5(a), and relies exclusively on the plainly inapplicable "cooperation" obligation of §5(e), Count II should be dismissed for failure to state a claim.

## Conclusion

For the foregoing reasons, Defendant respectfully requests that this Court dismiss the Complaint in its entirety.

Dated:  New York, New York
        January 25, 2008

Respectfully Submitted,

COHEN & GRESSER LLP

By: _____
        Mark S. Cohen (MC 9055)
        Michael Tremonte (MT 5996)
        Marc E. Isserles (MI 6446)
100 Park Avenue, 23rd Floor
New York, New York 10017
Telephone:  (212) 957-7600
Facsimile:  (212) 957-4514
mcohen@cohengresser.com
mtremonte@cohengresser.com
misserles@cohengresser.com

*Attorneys for Defendant Southwest Airlines Co.*

22