UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
U.S. BANK NATIONAL ASSOCIATION          :
(Successor to the Connecticut National  :
Bank), Not in its Individual Capacity   :
but Solely As Owner Trustee Under       :    07 Civ. 11131 (DLC)
Certain Trust Agreements,               :
                        Plaintiff,      :    <u>OPINION & ORDER</u>
                                        :
              -v-                       :
                                        :
SOUTHWEST AIRLINES COMPANY,             :
                        Defendant.      :
----------------------------------------X

Appearances:

For plaintiff:

Jeff H. Galloway
Eric Bond
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004

For defendant:

Mark S. Cohen
Brett D. Jaffe
Oliver S. Haker
Cohen & Gressler LLP
100 Park Avenue, 23rd Floor
New York, NY 10017

DENISE COTE, District Judge:

     This breach of contract dispute concerns the condition of

leased aircraft upon their return to the lessor at the

conclusion of the lease.  Just prior to the end of the lease,

the lessee replaced valuable engines and parts with inferior

engines and parts, and returned planes that were worth millions

of dollars less when compared to their prior condition or to the other planes in the lessor's fleet.  Plaintiff U.S. Bank National Association and lessee/defendant Southwest Airlines Company ("Southwest") have both moved for summary judgment.  For the following reasons, each party's motion is granted in part and denied in part.

BACKGROUND

The following facts are undisputed, unless they are identified as being advanced by either the plaintiff or Southwest.  On or about June 1, 1987, the Connecticut National Bank ("Lessor"), predecessor in interest to the plaintiff, agreed to act as a trustee on behalf of Chrysler Capital Corporation ("Chrysler" or "Owner Participant"), predecessor in interest to Daimler Chrysler Capital Services (debis) LLC ("Daimler"), to take title to certain aircraft and engines, and to lease the aircraft and engines to Southwest.[1]  It thereby leased three Boeing 737-3H4 aircraft (the "Aircraft") to Southwest ("Lessee") for twenty years in three substantively identical lease agreements (collectively, the "Lease").[2]  Each

---

[1] The parties refer to Daimler as "the real plaintiff party in interest in this lawsuit."  The term "plaintiff" shall be used in this Opinion to refer collectively to Daimler, U.S. Bank National Association, and their predecessors-in-interest.

[2] The parties do not explicitly state that Boeing 737-3H4 aircraft are a type of Boeing 737-300 aircraft.  When comparing

Aircraft had two General Electric model CFM 56-3-B1 engines, bringing the total number of engines leased to six (the "Leased Engines").  The Lease was later amended to extend its terms by several months for each Aircraft.  The three Aircraft were ultimately returned by Southwest in January and February, 2008.

1. Lease Provisions

Plaintiff's breach-of-contract allegations principally concern Southwest's obligations to return engines and parts of a certain "value" and "utility", as described in Sections 5 and 8 of the Lease.  To put these and remaining claims in context, the relevant contractual provisions are quoted here.

Section 1 of the Lease defines "Aircraft" and acknowledges that it may include engines substituted under the terms of the Lease.  It defines the Aircraft as

> the Airframe delivered and leased hereunder
> (or any airframe substituted for such
> Airframe pursuant to Section 10(b) hereof)
> together with the Engines originally
> installed thereon and leased hereunder (or
> any engine substituted for any of such
> Engines pursuant to the terms hereof),
> whether or not any such initial or
> substituted Engines may from time to time be
> installed on such initial or substituted
> Airframe or may be installed on any other
> airframe or on any other Aircraft.

---

the Aircraft to other Aircraft in Southwest's fleet, both parties, and their experts, refer to Southwest's 737-300 fleet. There being no sign of dispute regarding this fact, it will therefore be assumed that 737-3H4 aircraft are a type of 737-300 aircraft.

(Emphasis supplied.)  The definition of "Engine" also includes

properly substituted engines.  The Lease defines an Engine as

> (i) <u>each of the two</u> CFM International Model
> CFM 56-3-B1 engines <u>listed</u> . . . in the
> initial Lease Supplement in connection with
> the Airframe, whether or not from time to
> time installed on such Airframe or installed
> on any other airframe or on any other
> aircraft; <u>and</u> (ii) <u>any engine</u> which may from
> time to time be <u>substituted, pursuant to the</u>
> <u>terms hereof</u>, for any of such engines.

(Emphasis supplied.)

Section 5(a) of the Lease, at the center of the instant

controversy, describes the condition in which the Aircraft were

required to be delivered upon their return, including any

engines substituted for the Leased Engines (the "Replacement

Engines"):

> [U]pon termination of this Lease . . .
> Lessee . . . will return the Aircraft to
> Lessor . . . .  At the time of such return,
> the Airframe will be fully equipped with two
> Engines (or other engines of the same make
> and model or two other <u>engines</u> of the same
> or another manufacturer <u>of equivalent</u>
> <u>utility and value</u>, and suitable for
> installation and use on the Airframe <u>without</u>
> <u>impairing the value or utility of the</u>
> <u>Aircraft</u>) duly installed thereon.  Also, at
> the time of such return, such Airframe and
> Engines . . . shall be in . . . as good
> operating condition as when delivered to
> Lessee hereunder, ordinary wear and tear
> excepted, or, in the case of any such
> engines owned by Lessee, <u>shall have a value</u>
> <u>and utility at least equal to, and shall be</u>
> <u>in as good operating condition</u> as required
> by the terms hereof <u>with respect to Engines</u>

> constituting part of the Aircraft but not
> then installed on the Airframe . . . .  In
> the event that Lessee . . . shall then be
> using an on-condition maintenance program
> . . . Lessee agrees that each such
> Engine . . . will have at least 1,750 hours
> or cycles remaining before the next
> scheduled engine removal.

(Emphasis supplied and removed.)  A "cycle" is one take-off and landing.  Neither "value" nor "utility" are defined terms in the Lease.

Section 8, meanwhile, governs Southwest's replacement of "Parts," which were defined as all parts installed on an Airframe or Leased Engine except for items that Southwest had leased from a third party.  This provision also uses the terms "value" and "utility".  Section 8(a) provides that

> Lessee may . . . remove in the ordinary
> course of maintenance, service, repair,
> overhaul or testing, any
> Parts . . . provided that Lessee, except as
> otherwise provided in [Section 8(c)] will,
> at its own cost and expense, replace such
> Parts as promptly as practicable.  All
> replacement Parts . . . shall be in as good
> operating condition as, and shall have a
> value and utility at least equal to, the
> Parts replaced.

(Emphasis supplied.)  Under Section 8(c), Southwest was permitted to make "alterations and modifications" to the Aircraft provided that

> [n]o such alteration, modification or
> addition shall materially diminish the value
> or utility of such Airframe or such Engine,
> or materially impair the condition or impair

> airworthiness thereof below the value,
> utility, condition or airworthiness
> immediately prior to such alteration,
> modification or addition assuming such
> Airframe or such Engine was then of the
> value and utility and in the condition
> and airworthiness required to be maintained by
> the terms of this Lease Agreement.

(Emphasis supplied.)

Plaintiff's breach of contract claims are also premised on

Section 7(a) of the Lease, which forbids discrimination in

maintenance.  This "non-discrimination" clause required

Southwest to

> maintain, service, repair and overhaul . . .
> the Aircraft (x) so as to keep the Aircraft
> in good operating condition, ordinary wear
> and tear excepted, (y) so as to keep the
> Aircraft maintained in the same manner and
> with the same care as used by Lessee with
> similar aircraft owned by Lessee, and (z) so
> as to keep such Aircraft in such
> condition . . . to enable the applicable
> airworthiness certification for such
> Aircraft to be maintained in good standing
> at all times under the Federal Aviation Act.

(Emphasis supplied.)

The Lease also includes provisions governing legal disputes

arising between the parties.  Section 15, entitled "Remedies,"

provides that, under certain circumstances whose application the

parties dispute, Southwest must reimburse attorneys' fees and

costs incurred by the Lessor:

> In addition, Lessee shall be liable, except
> as otherwise provided above without
> duplication of amounts payable hereunder,

> for any and all unpaid Rent due hereunder
> before, after or during the exercise of any
> of the foregoing remedies <u>and for all</u>
> <u>reasonable and actual legal fees and other</u>
> <u>costs and expenses</u> . . . <u>incurred by</u>
> <u>Lessor</u> . . . <u>and the Owner Participant in</u>
> <u>connection with the return of the Airframe</u>
> <u>or Engine</u> in accordance with the terms of
> Section 5 or in placing such Airframe or
> Engine in the condition and airworthiness
> required by such Section.

(Emphasis supplied.)  Finally, Section 23 of the Lease contains

a choice-of-jurisdiction clause selecting the Southern District

of New York, and Section 24 contains a choice-of-law clause

designating New York law.

2. The Participation Agreement

Connecticut National Bank, Chrysler, and Southwest also

signed a Participation Agreement for the Lease on June 1, 1987.

Section 7(c) of the Participation Agreement provides that

Southwest will indemnify the bank and Chrysler from

> any and all liabilities, obligations,
> losses, damages, penalties, claims, actions,
> suits, out-of-pocket costs, expenses and
> disbursements (<u>including reasonable legal</u>
> <u>fees and expenses</u> and Transaction Expenses
> to the extent not required to be paid by the
> [Connecticut National Bank] pursuant to
> Section 16 but excluding internal costs and
> expenses such as salaries and overhead), of
> whatsoever kind and nature (collectively
> called "Expenses") <u>imposed on, incurred by</u>
> <u>or asserted against any Indemnitee or any</u>
> <u>successors</u> . . . <u>arising out of (A) the</u>
> <u>Operative Documents [containing the Lease]</u>
> <u>(including, without limitation, because of</u>
> <u>Lessee's failure to perform any covenant,</u>

> condition or agreement contained
> therein . . . ) or the enforcement of any of
> the terms thereof . . . (C) the
> ownership . . . use, operation, condition,
> maintenance, overhaul . . sale, return or
> other disposition of the Aircraft.

(Emphasis supplied.)[3]

## 3. Other Documents

Before executing the Lease, the parties negotiated a term sheet, dated May 20, 1987 (the "Term Sheet").  The Term Sheet explained that, upon their return to Lessor, the Aircraft must be

> FAA certified, in compliance with Lessee's
> FAA approved maintenance program . . . shall
> be in as good operating condition as when
> originally delivered to Lessee, ordinary
> wear and tear excepted . . . and shall have
> no less than 1,750 hours remaining on each
> engine and airframe until the next scheduled
> engines removal . . . .  Lessee shall have
> treated the Aircraft similarly to other
> Boeing 737-300 Aircraft in its fleet.

(Emphasis supplied.)  The Term Sheet did not describe Southwest's rights to return Replacement Engines or Parts, or the requirement that any substituted items be of equal "value" and "utility" to items they were replacing.

---

[3] The "Transaction Expenses," not at issue in this lawsuit, are defined in Section 16 of the Participation Agreement.  They include legal fees incurred by counsel to the parties to the Participation Agreement, among other fees associated with the consummation of the Lease.

In December 1987, a Daimler employee prepared an internal memorandum entitled "Lease Summary" (the "Daimler Memorandum"). The Daimler Memorandum included the following description of the condition in which the Lease required that the engines be returned:

> The Aircraft will be FAA certified, in compliance with [Southwest's] FAA approved maintenance program and in compliance with all applicable airworthiness directives and manufacturer's mandatory service bulletins, shall be in as good operating condition as when originally delivered to [Southwest], ordinary wear and tear excepted, shall be in a passenger configuration and shall have no less than 1,750 hours remaining on each engine and on the airframe until the next scheduled engine removal . . . .

(Emphasis supplied.)  The Daimler Memorandum does not mention a "value" and "utility" requirement.

4. Measuring "Value and Utility": Expert Opinions

Much of this lawsuit concerns the meaning of the phrase "value and utility" as used in Sections 5 and 8 of the Lease. The parties have submitted expert testimony addressing this subject.

Plaintiff's technical experts, Walter Andrushenko and Clive Medland, both testified that "value and utility" is a common term in aircraft leases and is included in leases to prevent the replacement of valuable items with less valuable items.

9

Andrushenko testified that the phrase "value" refers to an engine's "maintenance value," which is the

> the value of the shop visit to refurbish the engine and the value of the life of the parts that are within that engine, primarily, and certain modifications that are time-scheduled with engine refurbishments . . . . [It is] the value of the engine, value of the parts that comprise that engine, plus the cost to repair or refurbish those parts.

In the context of Section 5 of the Lease, Andrushenko did not believe that "value" meant "fair market value."  Medland, however, testified that "value" in Section 5 means "fair market value."

The plaintiff also points to a 1987 practice guide (contemporary to the Lease) explaining that equipment leases customarily permit the lessee to remove severable additions to the equipment, as long as the removal of the additions does not reduce the equipment's "value" and "utility".  Robert P. Davis, Leveraged Leasing of Capital Equipment: A Practical Guide to Negotiating Certain Non-Tax Issues from the Lessee's Perspective, in <u>Leveraged Leasing 1987</u>, at 77-78 (PLI Commercial Law & Practice, Course Handbook Series No. A4-4191, 1987).

Southwest's expert Patrick J. Harris reported that the term "value" could relate to eighteen different types of value, including replacement cost, reproduction cost, fair market value, insurance replacement cost, and liquidation value.

Harris concluded that, as a result, the "value and utility" clauses in the Lease imposed no specific return requirements on Southwest.  Barbara Beyer, another Southwest technical expert, testified about the components that affect the valuation of the difference between two engines, which is derived from the "base value" of the engine, which accounts for the engine's age, its previous utilization (in terms of hours and cycles), the year the engine was built, and the engine's maintenance condition, including engine overhaul costs and the operating life remaining on Life Limited Parts ("LLPs").[4]  She explained that other factors, such as engine damage, may also be included in the calculation.  Both sides' experts considered engine maintenance in their value calculations.

5. Southwest's Engine Maintenance Program

As of 2008, Southwest's 737-300 fleet engines had, on average, 11,180 cycles between heavy maintenance.  Each heavy maintenance shop visit costs approximately $1.2 to $1.5 million. In addition, the cost of a new set of LLPs is approximately $1.75 million for a 737-300 engine.

Beginning in 2004, Southwest began the process of upgrading its 737-300 fleet engines by outfitting them with the "3D Aero"

---

[4] LLPs are parts with a finite operating life defined by hours, cycles, or calendar years.  The parties disagree about whether an LLP may be repaired once it reaches its life limit.

modification.  The list price of a 3D Aero upgrade is $1.4 million per engine, although Southwest received a discount.  The 3D Aero modification is designed to improve fuel efficiency and an engine's durability on a wing.

Engines in Southwest's fleet that were not outfitted with 3D Aero are built to last a minimum of 9,500 cycles before requiring heavy maintenance.  An engine outfitted with a 3D Aero had a "minimum build" of 20,000 cycles before heavy maintenance was required.[5]  Out of 430 engines in Southwest's "Classic" 737-300 fleet, the airline has outfitted 410 with the 3D Aero modification.  By January 28, 2008, the only such Southwest aircraft that had not received the 3D Aero modification were aircraft that Southwest had leased, but did not own.

6. The Return of the Aircraft

As the end of the Lease term approached, Daimler began marketing the Aircraft to potential buyers.  At this point, Daimler believed that it would be receiving the Leased Engines or engines with an equal or greater number of cycles remaining. On October 3, 2007, Aeroturbine, Inc. ("Aeroturbine") and Daimler entered into an offer letter in which Aeroturbine agreed

---

[5] Receiving the Aero 3D modification does not increase the number of engine cycles remaining before an engine requires heavy maintenance.  Rather, GE, with which Southwest had a contract for the Aero 3Ds, required Southwest to "build out" all engines receiving the 3D Aero modification to 20,000 cycles in order to maximize its return on investment.

to purchase the Aircraft for $19.8 million.[6]  The offer letter also allowed Aeroturbine to terminate its agreement if it was dissatisfied with the condition of the Aircraft or the Engines.

On October 19, 2007, Southwest informed Daimler that it would be returning Replacement Engines, rather than the Leased Engines.  At least four of the six Leased Engines had recently undergone heavy maintenance and had their entire set of LLPs replaced.  Five of the six Leased Engines had received the 3D Aero modification.[7]  By January 2008, all six Leased Engines had been so modified.  Engines receiving the 3D Aero modification have an average number of cycles remaining that ranges from 8,000 (for engines modified in 2004) to 18,250 (for engines modified in 2008).

In contrast with the Leased Engines, the Replacement Engines were close to the end of their maintenance cycles; they had on average about 2,600 cycles remaining before the required

---

[6] The plaintiff represents that the $19.8 million bid assumed that only four of the six Leased Engines had been freshly overhauled, and did not assume that any had received the 3D Aero modification.

[7] On October 25, 2007, Southwest communicated to Daimler that the fifth Leased Engine -- which was not being returned -- was receiving the 3D Aero modification.

heavy maintenance.  The Replacement Engines would also need a new set of LLPs soon and none had the 3D Aero modification.[8]

As for the Aircrafts' other parts, such as landing gear and auxiliary power units, Southwest also installed replacements that had less value.  Michael Kortschak, a Southwest employee in charge of deciding which components to swap, circulated an email recommending that parts "close to their life limit" and "dogs" should be selected for the Aircraft to be returned to Daimler.

As a result of the substitution with the Replacement Engines, the parties agree that the Aircraft were worth millions of dollars less than if the Leased Engines had been returned instead.  The plaintiff contends the value was reduced by $20.5 million; Southwest asserts the reduction was $5.9 million.

Aeroturbine sought to renegotiate its deal with Daimler when it learned in October 2007 that Southwest would be substituting engines, having determined that the Replacement Engines were worth $7.6 million less.  The deal collapsed when Daimler refused to lower the sale price.

Plaintiff objected to Southwest's substitution on October 23, 2007, asserting that Southwest was substituting engines of lower "value and utility" than the Leased Engines, in breach of Section 5(a) of the Lease.  On December 10, 2007, plaintiff

---

[8] As another standard of comparison, the average CFM-56 engine that Southwest owns has about 12,500 cycles remaining and is outfitted with 3D Aero technology.

commenced this lawsuit for breach of the Lease and sought a declaration that the return of the Aircraft with the Replacement Engines would breach the Lease.  Plaintiff also began remarketing the Aircraft, which were ultimately sold to AAR Parts Trading, Inc. ("AAR") for $15.775 million,[9] that is, roughly $4 million less than the sale price in the Aeroturbine agreement of October 2007.  While the Replacement Engines were "serviceable," upon their return to Daimler, two of the six engines failed AAR's boroscope examination, conducted three days following their return, and were declared unairworthy.[10]

On April 1, 2009, following the close of fact discovery, the plaintiff moved for partial summary judgment and the defendant moved for summary judgment on all claims.  The plaintiff seeks summary judgment on its allegations that Southwest has breached Sections 5, 7, and 8 of the Lease by stripping the Aircraft of engines and parts that plaintiff owned and substituting in their place items worth far less.  It seeks a jury trial on the amount of damages it has sustained from this

---

[9] The price had been reduced by $225,000 from AAR's original $16 million bid, in part because Southwest decided to change two of the six Replacement Engines.  The price was also lowered because Southwest returned the Aircraft with components and auxiliary power units that were close to their life limit.

[10] A boroscope is a small camera mounted at the end of a long tube that is used to inspect the inside of aircraft engines.  An engine is "serviceable" unless it manifests an external form of unserviceability, such as smoke or high oil consumption.

breach.  Plaintiff also seeks summary judgment on its claim that Southwest must reimburse plaintiff's attorneys' fees pursuant to Section 15(e) of the Lease and Section 7(c) of the Participation Agreement.

Southwest, meanwhile, asserts that it has fulfilled the applicable return conditions as set forth in the Lease by returning the Aircraft with Replacement Engines with at least 1,750 cycles remaining before overhaul.  It argues that, while the Lease is ambiguous, the parties' intent was definitive: that the only return condition was that each Replacement Engine have 1,750 cycles remaining.  Southwest also seeks summary judgment dismissing plaintiff's claim for attorneys' fees.  The cross-motions were fully briefed on May 11, 2009.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d

Cir. 2006).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at 169.  That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Under New York law, a party alleging breach of contract must demonstrate (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).  Each of the plaintiff's claims requires construction of contract terms.

In interpreting contracts in general, the rules under New York law are well established:

> the fundamental, neutral precept of contract
> interpretation is that agreements are
> construed in accord with the parties'

intent.  Typically, the best evidence of
intent is the contract itself; if an
agreement is complete, clear and unambiguous
on its face, it must be enforced according
to the plain meaning of its terms.  If the
contract is ambiguous, extrinsic evidence
may be considered to ascertain the correct
and intended meaning of a term or terms.
Ambiguity exists where a contract term could
suggest more than one meaning when viewed
objectively by a reasonably intelligent
person who has examined the context of the
entire integrated agreement and who is
cognizant of the customs, practices, usages
and terminology as generally understood in
the particular trade or business.

Id. at 177-78 (citation omitted); see also Chapman v. New York

State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008).[11]  In

interpreting contracts, "words should be given the meanings

ordinarily ascribed to them and absurd results should be

avoided."  Mastrovincenzo v. City of New York, 435 F.3d 78,

104 (2d Cir. 2006) (citation omitted).  Additionally, "an

interpretation of a contract that has the effect of rendering at

least one clause superfluous or meaningless is not preferred and

will be avoided if possible."  LaSalle Bank Nat. Ass'n v. Nomura

Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation

omitted).

     "Whether or not a writing is ambiguous is a question of law

to be resolved by the courts."  Eternity Global, 375 F.3d at 178

---

[11] The parties do not dispute that New York law applies here.
See Postlewaite v. McGraw Hill, Inc., 411 F.3d 63, 67 (2d Cir.
2005).

(citation omitted). "The language of a contract is not made ambiguous simply because the parties urge different interpretations.  Nor does ambiguity exist where one party's view strains the contract language beyond its reasonable and ordinary meaning." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citation omitted).  "Ambiguity in a contract is the inadequacy of the wording to classify or characterize something that has potential significance.  A contract may be ambiguous when applied to one set of facts but not another." Eternity Global, 375 F.3d at 178 (citation omitted).

Ambiguity "is determined by looking within the four corners of the document, without reference to extrinsic evidence." Chapman, 546 F.3d at 236 (citation omitted). See also Consedine v. Portville Cent. School Dist., 12 N.Y.3d 286, 293 (2009) ("[w]hether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous") (citation omitted).  When examining the document, however, the court must act as a "reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Id. (citation omitted).

If a contract is unambiguous, its meaning is "a question of law for the court to decide." JA Apparel Corp. v. Abboud, 568

19

F.3d 390, 397 (2d Cir. 2009).  Where a contract is susceptible to multiple interpretations, extrinsic evidence of the parties' intent shall determine its meaning.  Golden Pac. Bancorp. v. FDIC, 273 F.3d 509, 517 (2d Cir. 2001).  If "the intent of the parties cannot be determined from the contractual language itself, the ambiguity presents a question of fact to be resolved by a jury."  Hoyt v. Andreucci, 433 F.3d 320, 331 (2d Cir. 2006).  A court may resolve the ambiguity as a matter of law only where "there is no extrinsic evidence to support one party's interpretation of the ambiguous language or it the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation."  Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002) (citation omitted).  Summary judgment may also be granted, "[n]otwithstanding the existence of contractual ambiguities," where "under any of the reasonable interpretations the moving party would prevail.  In such a case, the non-movant will have failed to show that there is any issue of material fact for trial."  Chock Full O'Nuts Corp. v. Tetley, Inc., 152 F.3d 202, 204 (2d Cir. 1998).

Plaintiff alleges breaches of Sections 5, 7 and 8 of the Lease and it seeks attorneys' fees.  These claims will be addressed in turn.

1. Section 5: Substitution of Engines

   Plaintiff argues that the words "value" and "utility," as used in Section 5 of the Lease, unambiguously required Southwest to return engines with a "monetary worth and usefulness" equivalent to that of the Leased Engines.  Section 5 requires in pertinent part that at the time the Aircraft are returned their engines "shall have a value and utility at least equal to" that of the Leased Engines.  Southwest contends that its only duty was to return engines with at least 1,750 cycles remaining and that the Lease's use of the words "value" and "utility" imposed no additional duty on it.[12]

   The unambiguous language of the Lease requires that the Replacement Engines have both a "value" and "utility" equal to the Leased Engines, and at least 1,750 cycles remaining. Southwest has failed to submit any evidence that it returned Engines of equivalent value and utility to the Leased Engines under any plausible definition of the words "value" and "utility," including the definitions that it proffers.  For example, the uncontroverted evidence is that Southwest returned engines worth millions of dollars less than the Leased Engines. The plaintiff is therefore entitled to summary judgment on the issue of Southwest's liability for its breach of Section 5.  The

---

[12] As discussed below, plaintiff's claim for relief under Section 8 of the Lease presents similar issues of interpretation, but with respect to the substitution of Parts, rather than Engines.

proper measurement of value and utility -- which the parties dispute -- shall be determined at trial, as well as the amount of damages for the breach of Section 5(a).

Each of Southwest's proffered contract constructions fails to suggest an ambiguity that would forestall this finding of breach.  Southwest's favored interpretation -- that the terms value and utility imposed no requirements on Southwest -- would render the "value and utility" clauses in Section 5(a) of the Lease meaningless, and must be avoided.  In contrast, plaintiff's proposed construction -- that the Replacement Engines must have 1,750 cycles remaining <u>and</u> be of equal "value and utility" as the Leased Engines -- gives effect to all the terms of the contract.  <u>LaSalle Bank Nat. Ass'n</u>, 424 F.3d at 206.[13]

The remaining interpretations Southwest offers are unreasonable because they are without support in the Lease. These three proffered interpretations are that Southwest was obligated to return engines with 1) the greater of the number of cycles remaining on the Leased Engines and 1,750 cycles; 2) the greatest of the number of cycles remaining on the Leased Engines, on the average engine in Southwest's fleet, and 1,750

---

[13] The parties dispute the degree to which <u>First Security Bank of Utah v. Northwest Airlines, Inc.</u>, 43 F. Supp. 2d 136 (D. Mass. 1999), provides useful guidance with respect to the construction of the phrase "value and utility" in an airplane lease.

cycles; and 3) at least 1,750 cycles remaining, and a "value and utility" equivalent to the Leased Engines when measured "in a way that has nothing to do with engine cycles or maintenance status".[14]  The first two interpretations are unreasonable because they restrict the measurement of "value and utility" to engine cycles without any support in the Lease for that restriction.  The third is unreasonable because it excludes consideration of maintenance needs, a commonly accepted element of any determination of an engine's value, without support from the Lease.

Southwest argues that the plaintiff may not obtain summary judgment on Southwest's liability under Section 5(a) since the term "value and utility" is ambiguous and is not a defined term in the Lease.  As the Second Circuit Court of Appeals recognized in Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger, 423 F.3d 145, 150 (2d Cir. 2005), a term may be undefined because the parties "believed it was so easily understood that they did not see the need to define it."  Id.  The plaintiff may be able to show that the lack of a definition in the Lease reflects the existence of an established meaning for the phrase

---

[14] It should be noted that at least two and possibly all three of these alternative readings of the Lease would lead to a finding that Southwest breached the Lease.  The plaintiff would prevail under the first two interpretations because it is undisputed that the Replacement Engines, when measured collectively or individually, had fewer cycles remaining than the Leased Engines.

in the leasing industry.  In any event, for reasons already explained, the dispute over the meaning of this contractual duty does not prevent a finding of liability where the plaintiff has established a breach under any of the plausible meanings for the phrase that the parties have identified.

Southwest next relies on extrinsic evidence in an effort to undermine the requirements set out in Section 5(a) of the Lease. Given that the duty under Section 5(a) to provide Replacement Engines with a value and utility equivalent to that of the Leased Engines is unambiguous, Southwest may not resort to extrinsic evidence in an effort to eliminate that duty.[15]  JA Apparel Corp., 568 F.3d at 397.  Nonetheless, the extrinsic evidence to which it points does not suggest that the duty imposed by the Lease to provide Replacement Engines with a value and utility equivalent to the Leased Engines may be ignored.

Southwest points out that neither the Daimler Memorandum nor the Term Sheet mentions the "value and utility" requirement. This argument has little force, however, as neither document even addresses substitution rights, and the "value and utility" requirement arises only in the context of the substitution of an Engine or Parts.  Silence on the issue of value and utility is therefore unremarkable.

---

[15] The existence of a duty may be unambiguous even where the contours of the duty are subject to debate.

The failure of these two documents to mention certain contractual terms is also insufficient as a matter of law to set aside the clear language of the Lease.  A contract's plain terms are not rendered ambiguous by the absence of those terms in an employee's internal summary of the contract or in the parties' term sheet.  See, e.g., John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 669 (2d Cir. 1983) (declining to vary the plain meaning of a contract based on a term sheet).

Southwest's remaining piece of extrinsic evidence is the affidavit of its lead negotiator John Owen, who attests that "[a]t no point during the negotiation of the Leases did Mr. Sloan and I agree to, discuss, or propose material economic conditions related [to] the engine return conditions in addition to or in any way different than those set out on page 7 of the term sheet."[16]  In his deposition, Owen testified that he did not recall any discussion of Section 5 at all.

Like the omission in the Term Sheet and Daimler Memorandum, Owen's testimony is not affirmative evidence that the parties intended the plain language of the contract not to apply. Rather, it suggests that they may have focused their attention during the negotiations on other provisions of the contract.

---

[16] Richard Sloan, the Vice President of Chrysler, led the Lease negotiations on Chrysler's behalf.

This choice does not undermine their decision to use form contract language or to include other contractual provisions in the final document.  Because the lead negotiators did not discuss (or do not remember discussing) a particular provision does not mean that that provision should be given no weight.  A contract may not be rewritten under the guise of interpretation.  Terwillinger v. Terwillinger, 206 F.3d 240, 245 (2d Cir. 2000).

2. Section 8: Substitution of Parts

     Plaintiff also seeks summary judgment in its favor regarding Southwest's breach of Section 8, which requires that "all replacement Parts . . . shall be in as good operating condition as, and shall have a value and utility at least equal to, the Parts replaced," and which permits alterations to the Airframe "provided that no such alteration, modification or addition shall materially diminish the value or utility of such Airframe."  As under Section 5(a), it is undisputed that Southwest returned Parts of lower value and utility.

     Southwest does not point to any definition of value and utility under which the Parts it returned fulfill the terms of the Lease.  The evidence shows that Southwest swapped out Parts of the Leased Aircraft and replaced them with "dogs."  Summary judgment in the plaintiff's favor is thus appropriate, with a reservation of the determination of the appropriate amount of

damages identical to that described for the claim arising from the breach of Section 5(a).

Southwest attempts to read the return requirement out of the Lease by warning that plaintiff's interpretation of Section 8 will lead to an absurd result.  Were the Lease read to require Southwest to return Parts of equal value and utility to those replaced, Southwest submits that it could have fulfilled this requirement only by analyzing the value of every single replacement Part, such as a bolt or a doorknob, and compared it to the value of all removed Parts at each point that it installed such a Part on each Aircraft during the twenty-year duration of the Lease.

It is unclear, though, why Southwest would need to have compared the value and utility of the original and replacement Parts throughout the term of the Lease, rather than only at Lease-end as the Aircraft were returned.  Moreover, if the parts were simply replaced in the ordinary course during the life of the Aircraft, as Southwest customarily does with the rest of its fleet, there would seem to be no need to do any comparison even at Lease-end.  Finally, as plaintiff explains, Southwest's ability systematically to strip the Aircraft of their Parts, search out less valuable Parts, and return the Aircraft outfitted with those less valuable Parts indicates that a lessee is capable of comparing the value of two sets of Parts.  In sum,

Southwest's systematic effort to outfit the Aircraft with inferior Parts breached the "value and utility" requirement of Section 8.  The difficulty in evaluating replacement Parts may affect the calculation of damages at trial, but it does not prevent a finding of a breach.

3.   Section 7: Non-Discrimination

Plaintiff also seeks summary judgment on its claim that Southwest discriminated against plaintiff's Aircraft in violation of Section 7(a) of the Lease by outfitting the Aircraft, just prior to return, with Engines that had fewer cycles remaining than the average Southwest engine and that lacked the 3D Aero modification, and with less valuable Parts. As quoted above, Section 7(a) required Southwest to "maintain, service, repair, and overhaul . . . the Aircraft . . . so as to keep the Aircraft maintained in the same manner and with the same care as used by lessee with similar Aircraft owned by lessee."

The parties agree that the non-discrimination clause is a standard lease term.  In unambiguous terms it required Southwest to treat the Aircraft with the "same care" it used in overhauling and maintaining similar planes that it owned.  The plaintiff has shown that it is entitled to a finding of liability on Section 7.

It is undisputed that in replacing the Engines and Parts on the Aircraft just prior to returning them to Daimler, Southwest stripped the Aircraft of their valuable Engines and Parts, and replaced them with comparatively inferior Engines and Parts, thereby constructing three substantially degraded airplanes. Southwest has offered no evidence to raise a question of fact that it ever serviced or maintained any single similar airplane that it owned in this manner, much less that it generally treated its fleet in this manner.  While the quantification of damages must await trial, the plaintiff has shown it is entitled to summary judgment on the issue of liability.

Southwest opposes summary judgment on the Section 7 claim by arguing that the standard for measuring its breach is unclear.  It takes issue with using its "average" engine or part as a standard of comparison.  As with the content of the terms "value" and "utility" which are at issue in the Section 5 and 8 claims, the level of care required in order for Southwest to provide the "same care" to the Aircraft as it did to the similar airplanes that it owned remains to be determined.  What can be easily settled at this time is that Southwest failed to provide the same level of care under any reasonable measurement.

4. Attorneys' Fees

The final issue is whether Southwest is liable for attorneys' fees under either Section 15 of the Lease or the indemnity clause contained in Section 7(c) of the Participation Agreement.  Both parties have moved for summary judgment, relying on competing interpretations of the contractual provisions, and without resort to extrinsic evidence.  The plaintiff is not entitled to attorneys' fees under the unambiguous language of either provision.

"Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."  NetJets Aviation, Inc. v. LHC Communications, LLC, 537 F.3d 168, 175 (2d Cir. 2008).  To be "sufficiently clear," the intent to provide attorneys' fees in a breach of contract action must be "unmistakably clear from the language of the contract," because promises in a contract to indemnify the counterparty's attorneys' fees "run against the grain of the accepted policy that parties are responsible for their own attorneys' fees."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005) (citation omitted) ("Mid-Hudson").

a. Section 15 of the Lease

The parties dispute plaintiff's entitlement to attorneys'
fees under Section 15 of the Lease, entitled "Remedies."
Specifically, they dispute whether Section 15 requires the
plaintiff either to seek certain remedies or to declare an
"Event of Default" before it may collect attorneys' fees from
Southwest in the event of a dispute regarding the return of the
Aircraft.

The entitlement to attorneys' fees arises from Section
15(e), which, as quoted above, provides that "Lessee shall be
liable . . . for any and all unpaid Rent due hereunder before,
after or during the exercise of any of the foregoing remedies
and for all reasonable and actual legal fees . . . incurred by
Lessor . . . in connection with the return of the Airframe or
Engine."  The opening paragraph of Section 15, which precedes
subsections (a) through (e), provides that

> upon the occurrence of any Event of Default
> and at any time thereafter . . . Lessor
> may . . . declare by written notice to
> Lessee this Lease Agreement to be in
> default; and at any time thereafter, so long
> as any such outstanding Events of Default
> shall not have been waived or remedied,
> Lessor may do one or more of the
> following . . . .

Subsections (a)-(e) follow this paragraph.

The introductory paragraph to Section 15 plainly requires
the occurrence of an Event of Default and the delivery to

Southwest of notice of default before the plaintiff may pursue "one or more of the following."[17] "[T]he following" refers to the remedies that follow the opening paragraph in Sections 15(a)-(e).  Claiming legal fees under Section 15(e) is one such remedy.  See U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co., 369 F.3d 34, 57 (2d Cir. 2004) (citing U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co., 219 F. Supp. 2d 403, 477 (S.D.N.Y. 2002)) (delivery of notice of default a condition precedent to finding surety liable under bond where bond provided that surety's obligation "shall arise after," inter alia, notice of default was delivered).[18] Plaintiff has not shown that any Event of Default occurred or that it ever delivered a Notice of Default to Southwest.

Plaintiff argues that the attorneys' fees provision creates a "freestanding" obligation, but this assertion ignores the unambiguous structure of Section 15, which includes the introductory paragraph quoted above.  The plaintiff is not entitled to recoup its attorneys' fees under Section 15(e).

---

[17] Events of Default are defined in Section 14 of the Lease.

[18] Plaintiff does not contest Southwest's claim that "Daimler does not even purport to have declared a default."

b. Section 7(c) of the Participation Agreement

The plaintiff also claims that an indemnification provision in Section 7(c) of the Participation Agreement obligates Southwest to pay plaintiff's legal fees.  Applying "the accepted policy that parties are responsible for their own attorneys' fees" to indemnification agreements, courts applying New York law have declined to apply an attorneys' fee provision to claims between the parties to the contract, as opposed to claims between a third party and a contracting party, where the attorneys' fee provision did not "exclusively or unequivocally refer to such claims or otherwise support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract."  Mid-Hudson, 418 F.3d at 177 (citation omitted).  The presence of language elsewhere in the contract referring to indemnification for third-party claims has supported courts' narrower interpretation of attorneys' fee provisions as applying to third-party claims only.  Id. at 178.  An example of such language cited by the New York Court of Appeals is a provision requiring a plaintiff to "'promptly to notify' defendant of 'any claim or litigation to which the indemnity clause shall apply,'" as well as a provision allowing defendant to "assume the defense of any such claim or litigation with counsel satisfactory to plaintiff."  Id. at n.4 (quoting

Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 492 (1989)).

The Participation Agreement contains nearly identical language to that cited by the Court of Appeals in Hooper Associates and by the Second Circuit in Mid-Hudson to support limiting an indemnification provision to indemnification from third-party claims. The General Indemnity Section of the Participation Agreement in which the reference to attorneys' fees is found also provides in part that the plaintiff must "promptly . . . give notice . . . to [Southwest]" of claims. This same section contains other language suggesting indemnification of third-party claims, including provisions that the plaintiff ("Indemnitee") must also "supply [Southwest] with such information reasonably requested by [Southwest] as is necessary or advisable for [Southwest] to control or participate in any proceeding," and Southwest "shall be entitled . . . to be consulted by Indemnitee with respect to judicial proceedings subject to the control of such Indemnitee." Applying this language to a suit between the parties would "render [these] provisions meaningless" because they have "no logical application to a suit between the parties." Mid-Hudson, 418 F.3d at 178 n.4 (citation omitted).

The attorneys' fees provision of the Participation Agreement does not constitute an "unmistakeably clear"

34

obligation assumed by Southwest to fund Daimler's attorneys' fees in a suit between the two parties.  Id. at 177.[19] Attorneys' fees shall therefore not be imposed based on the indemnification clause of the Participation Agreement, and Southwest's motion for summary judgment on the issue of attorneys' fees is granted.

### CONCLUSION

Plaintiff's April 1, 2009 motion for partial summary judgment is granted with respect to Southwest's failure to comply with Sections 5, 7, and 8 of the Lease by substituting engines and parts of lesser "value and utility" and by discriminating against plaintiff's Aircraft.  Southwest's April 1, 2009 motion for summary judgment with respect to its liability for attorneys' fees is granted.   The parties' motions are otherwise denied.

SO ORDERED:

Dated:    New York, New York
          July 20, 2009

_____
                    DENISE COTE
United States District Judge

_____

[19] Plaintiff's authorities, none of which are controlling, describe situations where third-party actions were unlikely and where the provisions clearly contemplated reimbursement for attorneys' fees in inter-party suits.

35